# ORIGINAL

FILED IN OPEN COURT
U.S.D.C. ...

FEB 1 0 2016

James N. ~~~~~ Clerk
By: Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

    *v.*

TYSON RHAME
TERRENCE KELLER, AKA TERRYK,
JAMES SHAW
FRANK BELL

Criminal Indictment

No. **1:16 CR 67**

**UNDER SEAL**

### THE GRAND JURY CHARGES THAT:

### Count One
*Conspiracy to Commit Mail Fraud and Wire Fraud*
(18 U.S.C. § 1349)

1. Beginning in or about 2010, and continuing to on or about June 3, 2015, in the Northern District of Georgia and elsewhere, the defendants, TYSON RHAME, TERRENCE KELLER, also known as TerryK, JAMES SHAW, and FRANK BELL, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with others, both known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omissions of material facts, well knowing and having reason to know that said pretenses were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material, and, in so

doing, caused the United States Postal Service and other interstate carriers to be used, and interstate wire communications to be made, in furtherance of the scheme and artifice to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

### Background

It is relevant to this Indictment that during the time period of the conspiracy:

2. Sterling Currency Group, LLC, which also did business as Sterling Online Processing Services, LLC, and Dinar Banker (collectively, "Sterling"), was a Georgia corporation with its principal place of business in Atlanta, Georgia. Sterling sold and exchanged so-called "exotic currencies", including most predominantly the currency for the country of Iraq, the Iraqi dinar.

3. TYSON RHAME and JAMES SHAW were co-owners of Sterling, which began operations in 2004. FRANK BELL began working for Sterling in 2010 and became Sterling's Chief Operating Officer in 2011.

4. During the course of the conspiracy, Sterling grossed over $600 million in revenue from the sale of Iraqi dinar and other currencies. During this time period, RHAME and SHAW received over $180 million in distributions from Sterling. Sterling's sales were primarily derived from three sources: (1) dinar and other currency sales to individual customers, (2) non-refundable and refundable "layaway orders" whereby customers could put a percentage of money down for the full purchase price of the dinar and other currency, and (3) orders from entities that purchased the dinar and other currencies in bulk (who

2

were, at various times of the conspiracy, referred to as "high-value customers", "high-risk customers", "resellers", and "agents").

5. "The GET Team" was the trade name for a group of individuals, led by TERRENCE KELLER, also known as TerryK, who ran a website, an internet chat forum and weekly conference calls in which, among other things, information was disseminated to participants concerning the potential investment value of the Iraqi dinar. KELLER maintained operational control over The GET Team, including its finances and revenue, through a Kentucky corporation named "TCB Group."

## Manner and Means

6. During the time period of the conspiracy, the Iraqi dinar was touted by some as a potential investment opportunity. For example, in 2010, Sterling's website, which contained videos featuring RHAME and articles written by RHAME, described the potential for the Iraqi dinar to increase in value. Additionally, information publicly available on certain internet websites, blogs, chat rooms, and conference calls fueled the speculation by predicting that a "revaluation" of the Iraqi dinar would occur imminently.  A "revaluation" or "RV", in this context, meant a sudden, exponential rise in value of the Iraqi dinar as compared to the U.S. dollar and other relatively stable global currencies. Individuals who owned Iraqi dinar would realize potentially enormous gains if an "RV" ever occurred in this manner.

7. TERRENCE KELLER, through The GET Team, was one of the leading internet-based proponents of the "RV" theory. On The GET Team's website, internet chat forum, and on weekly conference calls, KELLER falsely claimed to have information from, and verified by, high-level confidential sources in the United States government, the Iraqi government, international organizations, and major financial institutions, regarding an imminent "RV."

8. Sterling was one of the largest sellers and currency exchangers of the Iraqi dinar in the United States. Beginning at least as early as 2010, Sterling's business revenue was driven in part by the investment advice touted by TERRENCE KELLER and others, both on the internet and on participating conference calls. In fact, TYSON RHAME, JAMES SHAW, and FRANK BELL, through Sterling, began advertising with The GET Team through a web banner placed on The GET Team's website. A Sterling representative also participated in The GET Team's internet forum and on conference calls with followers. At various times, RHAME and BELL personally participated in The GET Team's conference calls. Followers of The GET Team were on occasion offered a discount coupon and sale price to purchase Iraqi dinar from Sterling.

9. TERRENCE KELLER induced followers of The GET Team into believing his claims about the imminent "RV" of the Iraqi dinar, and about his access to high-level confidential sources, by making material misrepresentations and by omissions of material facts. For instance, KELLER did not have information from, or contact with, high-level confidential sources. Additionally, KELLER

4

claimed directly and indirectly to followers of The GET Team that he had no financial or other ulterior motive to promote the Iraqi dinar as an investment, but rather, that he was simply disseminating his knowledge and information so that others could benefit from it as well. Religious and patriotic themes were often interwoven into The GET Team's conference calls and internet forums, further solidifying the perception that KELLER was honest, credible and could be trusted.

10. In truth, TERRENCE KELLER had a secret arrangement with TYSON RHAME, JAMES SHAW and FRANK BELL to promote and "pump" the Iraqi dinar in exchange for payments made by Sterling to benefit KELLER. KELLER, RHAME, SHAW, and BELL knew and believed that representations concerning an imminent "RV" of the Iraqi dinar, particularly claims that the information came from one or more supposed high-level confidential sources, would boost sales for Sterling.

11. TERRENCE KELLER affirmatively told his followers that he did not make substantial profits from his dealings with Sterling and other dinar dealers. In actuality, since at least as early as August 2011, Sterling paid KELLER over $160,000. Additionally, since Sterling's partnership with KELLER began in late 2010, KELLER received dinar specials, extensions on layaway sales, and other material benefits from Sterling. Separate from this, KELLER received over $100,000 from at least one other dinar dealer. KELLER consistently downplayed all of these financial benefits to his followers and listeners.

5

12. The correlation between Sterling's increased sales and TERRENCE KELLER's promotion and "pump" of the Iraqi dinar was further cemented by the presence of a Sterling representative and other dinar dealer representatives, including, at times, TYSON RHAME and FRANK BELL, on The GET Team's conference calls and internet forums. At various times, RHAME, BELL and other Sterling representatives participated in conference calls and internet forums in which KELLER made representations to followers concerning the imminent Iraqi dinar "RV", his access to high-level confidential sources, and claims that he was just trying to be helpful and received no financial benefit for providing this information to others.

13. The presence and participation of TYSON RHAME, FRANK BELL, and other Sterling representatives on The GET Team's conference calls and internet forums provided further validation to followers that KELLER's claims about an imminent "RV" of the Iraqi dinar should be believed. While making no direct representations about the likelihood of an "RV" themselves or offering investment advice to potential investors, RHAME, BELL, and other Sterling representatives assured listeners on The GET Team's conference calls that Sterling was prepared to handle the high volume of Iraqi dinar exchanges that many investors expected would occur immediately after the "RV."

14. Since at least as early as 2011, RHAME, SHAW, AND BELL established financial relationships with additional promoters, both known and unknown to the Grand Jury, who promoted the notion of an Iraqi dinar revaluation.

15. TYSON RHAME, JAMES SHAW, and FRANK BELL knew and believed that many of Sterling's customers relied upon information from TERRENCE KELLER and these other promoters when making investment decisions regarding the Iraqi dinar, and that much of the information being disseminated by KELLER and the other promoters was materially false.  For one, RHAME, SHAW, and BELL never believed that KELLER or the other dinar promoters had the types of high-level sources they repeatedly claimed to have. Furthermore, at the same time that RHAME, SHAW, and BELL told their employees not to speculate or offer investment advice to customers, they knew that KELLER and the other promoters would continue to spread false information about the dinar.

16. TYSON RHAME, JAMES SHAW, and FRANK BELL knew and believed that the pumping activities of TERRENCE KELLER and other dinar promoters (who were oftentimes called "bloggers") were essential to Sterling's financial success.  In November 2010, SHAW told an individual that Sterling was the "second largest in US but have been making ground up as we now have the bloggers singing our praises.  Almost a little cult like."  In December 2010, RHAME told colleagues that KELLER and the GET Team "push 80% of our business these days."  By December 2011, the relationship with KELLER had

7

grown so strong that, in an internal Sterling email, BELL referred to The GET

Team as Sterling's "largest referrer."  RHAME, SHAW, and BELL knew and

believed that the relationships with KELLER and the other dinar promoters

continued to generate Sterling millions of dollars in dinar and other currency

sales throughout the course of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

### Counts Two Through Seven
*Mail Fraud*
(18 U.S.C. §§ 1341 and 2)

17. The Grand Jury re-alleges and incorporates herein by reference the factual

allegations set forth in paragraphs 2-16.

18. On or about the dates listed below, within the Northern District of

Georgia, the defendants, TYSON RHAME, TERRENCE KELLER, also known as

TerryK, JAMES SHAW, and FRANK BELL, aided and abetted by each other and

others known and unknown to the Grand Jury, for the purpose of executing and

attempting to execute the above-described scheme and artifice to defraud,

knowingly and willfully caused to be delivered the following mailings to the

Sterling customers identified by initials below, by the Postal Service and by

private and commercial interstate carrier:

| Count | Date (On or about) | Mailing |
|-------|--------------------|---------|
| 2 | 4/29/2011 | Money Order for $489.00 mailed from J.H. to Sterling |
| 3 | 8/22/2011 | Money Order for $303.00 mailed from R.G. to Sterling |
| 4 | 9/29/2011 | Money Order for $2,380.00 mailed from K.C. to Sterling |
| 5 | 5/8/2012 | Cashier's check for $2,845.00 mailed from R.W. to Sterling |
| 6 | 9/4/2012 | Cashier's check for $120.00 mailed from L.B. to Sterling |
| 7 | 10/8/2014 | Cashier's check for $1,165.00 mailed from M.G. to Sterling |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## Counts Eight Through Eleven
*Wire Fraud*
(18 U.S.C. §§ 1343, 1349, and 2)

19. The Grand Jury re-alleges and incorporates herein by reference the factual allegations set forth in paragraphs 2-16.

20. On or about the dates listed below, within the Northern District of Georgia, the defendants, TYSON RHAME, TERRENCE KELLER, also known as TerryK, JAMES SHAW, and FRANK BELL, aided and abetted by each other and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud,

knowingly and willfully caused the following wire communications to be
transmitted in interstate commerce:

| Count | Date | Wire Communication |
|---|---|---|
| 8 | 7/11/2011 | Wire transfer of $1,089.00 from A.L. to Sterling |
| 9 | 08/11/2011 | Wire transfer of $2,402.00 from L.P. to Sterling |
| 10 | 1/10/2012 | Wire transfer of $11,370 from D.G. to Sterling |
| 11 | 5/14/2015 | Wire transfer of $480 from K.H. to Sterling |

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2.

## Count Twelve
*Money Laundering Conspiracy*
(18 U.S.C. § 1956(h))

21. The Grand Jury re-alleges and incorporates herein by reference the factual
allegations set forth in paragraphs 2-16.

22. Beginning in or about 2010, and continuing to on or about June 3, 2015, in
the Northern District of Georgia and elsewhere, the defendants, TYSON
RHAME and JAMES SHAW, did knowingly combine, conspire, and agree with
each other and with others, both known and unknown to the Grand Jury, to
commit offenses against the United States in violation of Title 18, United States
Code, Section 1957, to wit:  to knowingly engage and attempt to engage in
monetary transactions by, through or to a financial institution, affecting
interstate and foreign commerce, in criminally derived property of a value

greater than $10,000, such property having been derived from a specified unlawful activity, to wit: mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343; in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

### Counts Thirteen Through Twenty-Four
*Money Laundering*
(18 U.S.C. §§ 1957 and 2)

23. The Grand Jury re-alleges and incorporates herein by reference the factual allegations set forth in paragraphs 2-16.

24. On or about the dates listed below, within the Northern District of Georgia and elsewhere, the defendants, TYSON RHAME and JAMES SHAW, aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate commerce, as described below, each such transaction knowingly involving criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, each transaction constituting a separate count as set forth below:

11

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 13 | 01/24/2011 | Transfer in the amount of $150,000 from a PrivateBank account controlled by SHAW, ending in account number 6748, to another Private Bank account controlled by SHAW, ending in account number 4531 |
| 14 | 02/18/2011 | Transfer in the amount of $75,000 from a USAA account controlled by RHAME, ending in account number 4327-2, to a financial account in the name of a third party with initials "T.A.G." |
| 15 | 03/22/2011 | Check in the amount of $1,000,000 from a USAA account controlled by RHAME, ending in account number 4327-2, issued to "TYSON RHAME", which was then deposited in a Navy Federal Credit Union Account controlled by RHAME, ending in account number 6340. |
| 16 | 03/23/2011 | Check in the amount of $800,000 from a PrivateBank account controlled by SHAW, ending in account number 4531, issued to a third party with initials "F.F.C." |
| 17 | 10/25/2012 | Transfer in the amount of $700,000 from a Wells Fargo Bank account controlled by RHAME, ending in account number 8032, to a Wells Fargo Advisors account controlled by RHAME, ending in account number 7939. |
| 18 | 12/31/2012 | Transfer in the amount of $5,000,000 from a Merrill Lynch account controlled by SHAW, ending in account number 2089, to another Merrill Lynch account controlled by SHAW, ending in account number 0471. |
| 19 | 04/04/2013 | Transfer in the amount of $500,000 from a Wells Fargo account controlled by RHAME, ending in account number ending in 8032, to a third party with initials "Y.N." |
| 20 | 06/21/2013 | Transfer in the amount of $2,929,000 from a Merrill Lynch account controlled by SHAW, ending in account number 2089, to another Merrill Lynch account controlled by SHAW, ending in account number 2066. |

| 21 | 07/30/2014 | Transfer in the amount of $3,000,000 from a Merrill Lynch account controlled by RHAME, ending in account number 2062, to a Wells Fargo account controlled by Rhame, ending in account number 5439. |
| 22 | 10/27/2014 | Transfer in the amount of $2,500,000 from a Merrill Lynch account controlled by SHAW, ending in account number 2089, to a Merrill Lynch account controlled by SHAW, ending in account number 2050. |
| 23 | 01/07/2015 | Transfer in the amount of $750,000 from a Merrill Lynch account controlled by SHAW, ending in account number 2089, to a Merrill Lynch account controlled by SHAW, ending in account number 2050. |
| 24 | 01/26/2015 | Transfer in the amount of $2,500,000 from a Merrill Lynch account controlled by RHAME, ending in account number 2062, to a Wells Fargo account controlled by RHAME, ending in account number 5493. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Forfeiture Provision

25. Upon conviction of one or more of the offenses alleged in Counts One Through Eleven of the Indictment, the Defendants, TYSON RHAME, TERRENCE KELLER, JAMES SHAW, and FRANK BELL, shall forfeit to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the wire and mail fraud offenses or a conspiracy to commit such offenses including, but not limited to, the following:

- MONEY JUDGMENT: A sum of money in United States currency representing the amount of proceeds obtained as a result of the

13

offenses.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable; and

- REAL AND PERSONAL PROPERTY identified in paragraph 27 below.

26. Upon conviction of one or more of the offenses alleged in Counts Twelve through Twenty-Four of the Indictment, the Defendants, TYSON RHAME and JAMES SHAW, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the money laundering offenses and all property traceable to such property including, but not limited to, the following:

- MONEY JUDGMENT:  A sum of money in United States currency representing the total amount of money involved in each offense for which the defendant is convicted.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable;

- REAL PROPERTY located at 225 Valley Road, N.W., Atlanta, Fulton County, Georgia 30305, Tax Parcel ID No.: 17-0116LL0675; and

- REAL AND PERSONAL PROPERTY identified in paragraph 27 below.

27. **Real and Personal Property Subject to Forfeiture:**

A. BANK ACCOUNTS:
  1) $1,826,973.89 seized from Actors Federal Credit Union account number XXXX01-75;

2) $200,000.00 seized from Actors Federal Credit Union account number XXXX01-76;

3) $45,183.75 seized from Actors Federal Credit Union account number XXXX01-99;

4) $6,321.47 seized from Actors Federal Credit Union account number XXXX02-75;

5) $105,193.25 seized from Actors Federal Credit Union account number XXXX02-76;

6) $42,848.25 seized from Actors Federal Credit Union account number XXXX02-99;

7) any and all funds maintained in Goldman Sachs and Co. account number XXX-XX113-9;

8) any and all funds maintained in J.P. Morgan Chase account number XXX-X9613;

9) $760,456.50 seized from Mahopac National Bank account number XXXXXX8418;

10) any and all funds maintained in Merrill Lynch account number XXX-X0471;

11) any and all funds maintained in Merrill Lynch account number XXX-X0478;

12) any and all funds maintained in Merrill Lynch account number XXX-X0479;

13) any and all funds maintained in Merrill Lynch account number XXX-X0480;

14) any and all funds maintained in Merrill Lynch account number XXX-X0488;

15) $100,002.56 seized from Merrill Lynch account number XXX-X1015;

16) any and all funds maintained in Merrill Lynch account number XXX-X2048;

17) any and all funds maintained in Merrill Lynch account number XXX-X2049;

18) any and all funds maintained in Merrill Lynch account number XXX-X2050;

19) any and all funds maintained in Merrill Lynch account number XXX-X2062;

20) any and all funds maintained in Merrill Lynch account number XXX-X2065;

21) any and all funds maintained in Merrill Lynch account number XXX-X2066;

22) any and all funds maintained in Merrill Lynch account number XXX-X2072;

23) any and all funds maintained in Merrill Lynch account number XXX-X2087;

24) any and all funds maintained in Merrill Lynch account number XXX-X2089;

25) any and all funds maintained in Merrill Lynch account number XXX-X2386;

26) $5,177,314.90 seized from Merrill Lynch account number XXX-X2391;

27) any and all funds maintained in Merrill Lynch account number XXX-X2421;

28) any and all funds maintained in Merrill Lynch account number XXX-X2426;

29) $14,231.03 seized from Regions Bank account number XXXXXX0235;

30) $25,260.98 seized from Regions Bank account number XXXXXX8724;

31) $246.85 seized from SunTrust Bank account number XXXXXXXXX0477;

32) $66,312.33 seized from SunTrust Bank account number XXXXXXXXX7073;

33) $115,774.55 seized from SunTrust Bank account number XXXXXXXXX7380;

34) $2,780,017.79 seized from TD Ameritrade account number XXX-XX3551;

35) any and all funds maintained in TD Ameritrade account number XXX-XX5715;

36) any and all funds maintained in TD Ameritrade account number XXX-XX5720;

37) any and all funds maintained in TD Ameritrade account number XXX-XX7569;

38) $72.61 seized from USAA Federal Savings Bank XXXXX-184-2;

39) $104,336.14 seized from USAA Federal Savings Bank account number XXX-X327-2;

40) any and all funds maintained in Wedbush Morgan Securities Inc. account number XXXX4008;

41) any and all funds maintained in Wedbush Morgan Securities Inc. account number XXXX8860;

42) $3,000.00 seized from Wells Fargo account number XXXXXX0124;

43) $36,200.72 seized from Wells Fargo account number XXXXXX0132;

44) $30,843.89 seized from Wells Fargo account number XXXXXX0165;

45) $126.02 seized from Wells Fargo account number XXXXXX0199;

46) $94,635.98 seized from Wells Fargo account number XXXXXX0223;

47) $9,787.45 seized from Wells Fargo account number XXXXXX0231;

48) $1,297.77 seized from Wells Fargo account number XXXXXX0280;

49) $13,961.39 seized from Wells Fargo account number XXXXXX0298;

50) $293,814.26 seized from Wells Fargo account number XXXXXX0371;

51) $9,940.00 seized from Wells Fargo account number XXXXXX0397;

52) $37,878.22 seized from Wells Fargo account number XXXXXX0496;

53) $22,797.65 seized from Wells Fargo account number
XXXXXX0579;

54) $37,015.37 seized from Wells Fargo account number
XXXXXX2673;

55) $99,970.00 seized from Wells Fargo account number
XXXXXX2681;

56) $201,572.39 seized from Wells Fargo account number
XXXXXX2821;

57) $178,791.99 seized from Wells Fargo account number
XXXXXX2839;

58) $85,038.93 seized from Wells Fargo account number
XXXXXX2850;

59) $122,487.52 seized from Wells Fargo account number
XXXXXXXXX3245;

60) $38,036.83 seized from Wells Fargo account number
XXXXXX3808;

61) $1,597,831.09 seized from Wells Fargo account number
XXXXXX4675;

62) $77,676.58 seized from Wells Fargo account number
XXXXXX4767;

63) $50,048.42 seized from Wells Fargo account number
XXXXXX5133;

64) $1,201,546.95 seized from Wells Fargo account number
XXXXXX5439;

65) $40,516.12 seized from Wells Fargo account number
XXXXXX5536;

66) $114,187.52 seized from Wells Fargo account number XXXXXX5551;

67) $43,132.68 seized from Wells Fargo account number XXXXXX6320;

68) $1,611.81 seized from Wells Fargo Advisors account number XXXX-6797;

69) $158,010.36 seized from Wells Fargo account number XXXXXX7400;

70) $8,796.58 seized from Wells Fargo Advisors account number XXXX-7939;

71) $139,577.61 seized from Wells Fargo account number XXXXXX8032;

72) $79,896.51 seized from Wells Fargo account number XXXXXX8575;

73) $16,882.82 seized from Wells Fargo account number XXXXXX8594;

74) $61,854.65 seized from Wells Fargo account number XXXXXX8658;

75) $39,597.41 seized from Wells Fargo account number XXXXXX8674; and

76) $44,405.30 seized from Wells Fargo account number XXXXXX9969;

B. CORPORATE AND TRUST ENTITIES:

1) Sterling Currency Group, LLC;

2) Sterling Online Processing Services, LLC;

3) GID Partners, LLC;

4) Alex Capital Holdings, LLC;

5) Lullwater Holdings;

6) Lullwater Trust;

7) Curtis Creek;

8) Valley Trust;

9) Springlake Trading, LLC;

10) JS Real Estate Investments, LLC;

11) SR Equipment Leasing, LLC;

12) Primestone Properties, LLC;

13) Wingover Capital, LLC;

14) Northwest Capital, LLC;

15) The TAR Revocable Trust;

16) Broadway Trader 4Z, LLC;

17) Yards at Noda, LLC;

18) Sherrills Ford Holdings, LLC;

19) Scotch Cove, LLC;

20) RG Classics, LLC;

21) Isolveit.com, LLC;

22) Sterlingfunder, LLC;

23) Trinvest, LLC;

24) Sky Combat Blue, LLC;

25) TR East Point Real Estate, LLC;

26) TR Interactive Technologies, LLC;

27) Polaris Aviation, LLC;

28) Sky Combat Red, LLC;

29) Cascades at Rea, LLC;

30) Arrowood Station Holdings, LLC;

31) Arrowhead Station Holdings, LLC;

32) Miracle Charters, LLC;

33) TR Real Estate, LLC;

34) Whistlejacket, Inc.;

35) J-Brem, LLC;

36) Therrell Farms Estates, LLC;

37) Zonolite Holdings, LLC;

38) Sustainability Solutions, LLC;

39) 200 West Land DST;

40) 200 West Building, LLC;

41) Primestone FifeCo Realty Fund, LLC;

42) Preferred Capital, LLC;

43) Wingover Ranch, LLC;

44) Shaw Capital & Guaranty, LLC;

45) Shaw Irrevocable Trust;

46) Shaw Alys Beach, LLC;

47) GID Associates, LLC; and

48) LeVan Capital, LLC, f/k/a Trinvest Partners, LLC;

C.  REAL PROPERTIES:

1) the real property located at 4536 East Brookhaven Drive, N.E., a/k/a 3060 Mabry Road, Atlanta, Fulton and DeKalb Counties, Georgia, Fulton Tax Parcel ID No.: 17-001300020262 and DeKalb Tax Parcel ID No.: 18-275-02-001;

2) the real property located at 1418 Dresden Drive, N.E., Unit A310, Atlanta, DeKalb County, Georgia, Tax Parcel ID No.: 18-238-18-072;

3) the real property located at 3464 Paces Place, N.W., Atlanta, Fulton County, Georgia, Tax Parcel ID No.: 17-019800030227;

4) the real property located at 48 Shinbone Court, Panama City Beach, Walton County, Florida, Tax Parcel ID No.: 27-3S-18-16420-0JJ-0150;

5) the real property located at 7 La Garza Court, Panama City Beach, Walton County, Florida, Tax Parcel ID No.: 27-3S-18-16420-0NN-0060;

6) the real property located at 715 Rollerton Road, Charlotte, Mecklenburg County, North Carolina, Tax Parcel ID No.: 08303142, more particularly described as:

Being a portion of that certain parcel of land located in Charlotte, Mecklenburg County, North Carolina formerly having a Parcel ID# of 08303101, recorded in Deed Book 22268, Page 908 of the Mecklenburg County Registry, and being more particularly described as follows:

BEGINNING at an existing iron pipe, said pipe being the northwest corner of RM 36th Street Investors, LLC (now or formerly) Deed Book 20682, Page 575; thence with the western line of RM 36th Street Investors, LLC, S 26°49'36" E a total distance of 403.52 feet to a point in the center of the Norfolk Southern Railroad right-of-way, passing a new iron pipe at 13.85 feet; thence with the center of the Norfolk Southern Railroad right-of-way, said right-of-way being forty feet (40') in width, the following (3) calls:

1)  S 69°25'24"W, a distance of 498.00 feet to a point; thence

2)  around a curve to the left having a radius of 1,392.37 feet for an arc distance of 336.98 feet (chord bearing and distance of S 62°29'24" W 336.16 feet) to a point; thence

3)  S 55°33'24" W, a distance of 20.06 feet to a point in the center of the right-of-way for a railroad spur line;

thence continuing with the center of the railroad spur line right-of-way for six (6) calls and also severing the land of CAR-CHI, LLC, a North Carolina Limited Liability Company (now or formerly) and then continuing for three (3) more calls for a total of nine (9) calls as follows:

1)  around a curve to the right having a radius of 1,479.38 feet for an arc distance of 95.75 feet (chord bearing and distance of S 60°03'20" W 95.73 feet) to a point; thence

2)  around a curve to the right having a radius of 878.08 feet for an arc distance of 99.84 feet (chord bearing and distance of S 65°10'01" W 99.78 feet) to a point; thence

3)  around a curve to the right having a radius of 461.80 feet for an arc distance of 99.76 feet (chord bearing and distance of S 74°36' 47" W 99.57 feet) to a point; thence

4)  around a curve to the right having a radius of 465.99 feet for an arc distance of 100.70 feet (chord bearing and distance of S 86°59'32" W 100.50 feet) to a point; thence

5)  around a curve to the right having a radius of 604.51 feet for an arc distance of 100.88 feet (chord bearing and distance of N 82°02' 11" W 102.55 feet) to a point; thence

6)  around a curve to the right having a radius of 1079.86 feet for an arc distance of 43.72 feet (chord bearing and distance of N 76°05'45" W 43.72 feet) to a point; thence

7)  N 26°48'25" E, a distance of 215.17 feet to a point; thence leaving the center of the railroad spur line right-of-way and continuing to sever the land of CAR-CHI, LLC

8)  around a curve to the right having a radius of 709.79 feet for an arc distance of 503.29 feet (chord bearing and distance of N 47°07' 13" E 492.82 feet) to a point; thence

9)  N 67°26'02" E, a distance of 706.87 feet to the POINT OF BEGINNING, containing 10.86 acres, more or less, and shown as "Tract 1" on a Final Subdivision Plat by The John R. McAdams Company, Inc. entitled "THE YARDS AT NODA FINAL SUBDIVISION PLAT- MAP 1," dated June 12, 2008.

LESS AND EXCEPT that portion of the above described property consisting of 17,950 square feet, more or less, as described in that Final Judgment recorded in Book 26953, at Page 586, of the Mecklenburg County Public Registry.


Note:
In the deed filed of record in Book 23948, at Page 734, of the Mecklenburg County Public Registry, the chord distance in call #5 above is stated to be 100.76 feet. However, the Survey referred to above lists the chord distance for that same call as 102.55. See

the Survey filed of record in Map Book 50, at Page 476, of the Mecklenburg County Public Registry.

Being the same property shown and depicted on the survey entitled "ALTA/ACSM Land Title Survey Prepared for YARDS AT NODA, LLC" prepared by C. Clark Neilson, NC PLS No. L-3212, dated March 8, 2012, last revised February 13, 2013, designated Map File W-1732B, and being more particularly described as:

That certain parcel of land, situated, lying and being in the City of Charlotte, Mecklenburg County, North Carolina, and being more particularly described as follows:

COMMENCING at NGS Monument "M 045", having NC GRID NAD83 coordinates of N:549,759.58 ft;  E: 1,459,955.84 ft; thence N28°52'00" E a horizontal ground distance of 590.55 feet to an existing iron pipe, said point being located at the northwest corner of the RM36th Street Investors, LLC Property as described in Deed Book 20682, Page 575 of the Mecklburg County Registry; Which is POINT OF BEGINNING; thence with the aforesaid RM 36th Street Investors, LLC Property S 26°49'36" E crossing and existing iron pipe at a distance of 13.52 feet for a total distance of 403.52 feet for a total distance of 403.52 feet to a new iron rod, said point being located in the centerline of the Norfolk Southern Railroad R/W (now or formerly); thence with the centerline of the aforesaid Railroad R/W the following 9 courses and distances:  1) S 69°25'24 W a distance of 498.00 feet to a new iron rod; 2) with the arc of a circular curve turning to the left with a radius of 1,392.37 feet, and an arc length of 336.98 (chord: S 62°29'24" W a distance of 336.16 feet), to an existing nail; 3) S 55°33'24 W a distance of 20.06 feet to an existing nail; 4) with the arc of a circular curve turning to the right a radius of 1,479.38 feet, and an arc length of 95.75, (chord: S 60°03'20"W a distance of 95.73 feet ), to and existing iron pipe; 5) with the arc of a circular curve turning to the right with a radius of 878.08 feet, and an arc length of 99.83, (chord: S 65°10'01" W  a distance of 99.78 feet), to a new iron rod; 6) with the arc of a circular curve turning to the

right with a radius of 461.80 feet, and an arc length of 99.76, (chord: S 74°36'47" W a distance of 99.57 feet), to an existing nail; 7) with the arc of a circular curve turning to the right with a radius of 465.99 fee, and an arc length of 100.70, ( S 86°59'32 W a distance of 100.50 feet), to an existing nail; 8) with the arc of a circular curve turning to the right with a radius of 604.51 feet, and an arc length of 100.88, (chord: N 82°02'11" W a distance of 10.76 feet), to a new iron rod; 9) with the arc of a circular curve turning to the right with a radius of 1,079.86 feet, and an arc length of 3.81,(chord: N 77°09'17" W a distance of 3.81 feet), to a new iron rod, said iron rod being located at the southeast corner of the City of Charlotte Property as described in Deed Book 26112, Page 394 and Deed Book 26953, Page 586 of the Mecklenburg County Registry; thence with the aforesaid City of Charlotte Property the following 3 courses and distances: 1) N 26°46'52" E a distance of 200.93 feet to an existing iron rod capped "City Survey"; 2) with the arc of a circular curve turning to the right with a radius of 709.79 feet, and an arc length of 377.86, (chord: N 39°34'13" E a distance of 373.42 feet), to an existing iron rod capped "City Survey", 3) with the arc of a circular curve turning to the left with a radius of the left with a radius of 5629.65 feet, and an arc length of 143.91, (chord: S 60°30'37" W a distance of 143.91 feet), to a new iron rod, said point being located on a common line with Tract 2 of The Yards at Noda Subdivision, Map 1 as described in Map Book 50, Page 476 of the Mecklenburg County Registry; thence with the aforesaid Tract 2 the following 2 courses and distances: 1) with the arc of a circular curve turning to the right with a radius of 709.79 feet, and an arc length of 259.46, (chord: N 56°57'43" E a distance of 258.02 feet), to an existing iron pipe: 2) N 67°26'02" E a distance of 706.87 feet to the POINT OF BEGINNING, Containing 455,016 square feet or 10.4457 acres as shown on a survey by R.B. Pharr and Associates P.A. dated March 8 2012, Last revised February 13, 2013 (Map File W-1732B).

7) 699.115 acres, more or less, in Mountain Creek Township, Catawba County, North Carolina, Tax Parcel ID No.: 461904616962, more particularly described as:

A TOTAL OF 699.115 ACRES LOCATED IN MOUNTAIN CREEK TOWNSHIP, CATAWBA COUNTY, NORTH CAROLINA, CONSISTING OF THE FOLLOWING THREE (3) TRACTS OF LAND: (A) THAT TRACT OF LAND DESIGNATED AS "SURPLUS TRACT 3424-01, AREA=585.933 ACRES" ON PLAT RECORDED IN PLAT BOOK 63, PAGES 37-44 IN THE CATAWBA COUNTY REGISTER OF DEEDS ("PLAT"), (B) THAT TRACT OF LAND DESIGNATED AS "AREA=89.447 ACRES" ON THE PLAT, AND (C) THAT TRACT OF LAND DESIGNATED AS "AREA=23.735 ACRES" ON THE PLAT.

TOGETHER WITH SUCH ADDITIONAL PROPERTY AS WAS CONVEYED TO GRANTOR BY DENNIS WINKS AND PAMELA WINKS PURSUANT TO THAT CERTAIN LINE AGREEMENT DATED MAY 7, 2013 AND RECORDED JULY 18, 2013 IN BOOK 3200, PAGE 176 IN THE CATAWBA COUNTY REGISTER OF DEEDS.

LESS AND EXCEPT SUCH PROPERTY AS WAS CONVEYED TO DENNIS WINKS AND PAMELA WINKS BY GRANTOR PURSUANT TO THAT CERTAIN LINE AGREEMENT DATED MAY 7, 2013 AND RECORDED JULY 18, 2013, IN BOOK 3200, PAGE 176 IN THE CATAWBA COUNTY REGISTER OF DEEDS.

TOGETHER WITH THE NON-EXCLUSIVE RIGHTS OF ACCESS UNDER THE RIGHT-OF-WAY AGREEMENT FOR RACCOON TRACT DRIVE RECORDED IN BOOK 1718 AT PAGE 403, CATAWBA COUNTY REGISTER OF DEEDS OFFICE, AS SHOWN ON PLAT RECORDED IN PLAT BOOK 53, PAGE 48, AFORESAID COUNTY REGISTRY;

8)  the real property located at 200 West Second Street, Winston-Salem, Forsyth County, North Carolina, Tax Parcel ID No.: 6835-26-1005.00, more particularly described as:

ALL OF THAT PROPERTY BEING KNOWN AND
DESIGNATED AS LOT 1 AS SHOWN ON THE MAP OF TRIAD
PARK AS RECORDED IN PLAT BOOK 30, PAGE 40, IN THE
OFFICE OF THE REGISTER OF DEEDS OF FORSYTH COUNTY,
NORTH CAROLINA, REFERENCE TO WHICH IS HEREBY
MADE FOR A MORE PARTICULAR DESCRIPTION. ALSO
BEING A PORTION OF PARCEL 16, AS SHOWN ON MAP OF
CENTRAL DOWNTOWN PROJ. NO. N.C. R-55, AS RECORDED
IN PLAT BOOK 28, PAGE 121, FORSYTH COUNTY REGISTRY.

TOGETHER WITH PERMANENT AND EXCLUSIVE
EASEMENT ENTITLED "OFFICE BUILDING LOBBY
EXTENSION" AND IDENTIFIED AS EASEMENT "C" ON THE
MAP OF TRIAD PARK RECORDED IN PLAT BOOK 30, AT
PAGE 40, FORSYTH COUNTY REGISTRY.

TOGETHER WITH THE EASEMENTS AND PARKING RIGHTS
GRANTED BY THE CITY OF WINSTON-SALEM TO DUDLEY
WEBB & COMPANIES, A NORTH CAROLINA CORPORATION
(THE "DEVELOPER") IN THE DEVELOPMENT AGREEMENT
DATED FEBRUARY 12, 1985, AS AMENDED, WHICH IS
RECORDED IN BOOK 1624, AT PAGES 2191 AND 2295, IN THE
OFFICE OF THE REGISTER OF DEEDS OF FORSYTH COUNTY,
NORTH CAROLINA, WHICH EASEMENTS AND PARKING
RIGHTS WERE ASSIGNED BY THE DEVELOPER TO
WEBB/WINSTON-SALEM VENTURES, 100 LIMITED
PARTNERSHIP, A NORTH CAROLINA LIMITED
PARTNERSHIP, BY INSTRUMENT DATED SEPTEMBER 30,
1987, AND RECORDED IN BOOK 1624, AT PAGE 4003, IN THE
OFFICE OF THF REGISTER OF DEEDS OF FORSYTH COUNTY,
NORTH CAROLINA;

9)  approximately 46.866 acres on England Street, Mecklenburg
County, North Carolina, Tax Parcel ID Nos.: 205-173-19, 205-173-
18, 205-173-17, 205-173-16, 205-173-15, 205-173-14, 205-173-13,
205-173-12, 205-173-11, 205-173-02, 205-173-22, 205-173-20, and
205-173-21,  more particularly described as:

29

All that certain lot or parcel of land situated in the City of Charlotte, Mecklenburg County, North Carolina, and more particularly described as follows:

Tract I - Mecklenburg County Tax Parcel No. 205-173-02:

Beginning at a found iron in the most Southwestern corner of property owned by the City of Charlotte as recorded in Deed Book 17540, Page 337 of the Mecklenburg County Registry, said iron being located S 5°26'38" E 635.53' from a found iron in the line of City of Charlotte as described above; from the POINT OF BEGINNING thence with a bearing of S 70°57'43" E and a total distance of 519.76' (passing an iron at 425.68' and 469.53'), to a point near the centerline of the (Now or Formerly) Norfolk Southern Railway as shown in Map Book 40, Page 693; thence leaving the margin of the centerline with a bearing of S 12°55'13" E and a distance of 224.62', to a point; thence with a bearing of S 2°58'17" Wand a distance of 250.00', to a point; thence with a bearing of S 68°30'46" W and a distance of 8.16', to a point near the centerline of the (Now or Formerly) Norfolk Southern Railway as referenced above; thence with the margin of centerline of said track an Arc to the Right having a Radius of 1671.44' and a Length of 462.30' and being Chorded by a bearing of S 12°51'29" W with a distance of 460.83' to a point near the centerline of said track; thence with an Arc to the Right having a Radius of 3278.14' and a Length of 239.85' and being Chorded by a bearing of S 22°52'40" W with a distance of 239.80' to a point near the centerline of said track; thence with a bearing of S 24°58'23" Wand a distance of 262.08', to a point also near the centerline of said track; thence leaving the said Railway with the common line of the (Now or Formerly) City of Charlotte, as recorded in Deed Book 4147, Page 370 of said registry a -bearing of N 70°42'34" Wand a total distance of 294.39', to a found iron rod (passing irons at 65.32' and at 1 04.54'); thence with the common line of the (Now or Formerly) City of Charlotte, as recorded in Deed Book 4147, Page 370 of said registry with a bearing of N 12°46'34" Wand a distance of 553.51', to a found concrete monument; thence with the common line of The City of

Charlotte, as recorded in deed book 4147, page 370 of said registry a bearing of S 69°04'50" W and a distance of 657.69', to a found iron pipe; thence with the common line of (Now or Formerly) Crown Atlantic Company as recorded in Deed Book 10478, Page 356 of said registry a bearing of N 33°07'05" W and a distance of 175.49', to a found iron pipe; thence with the common line of the (Now or Formerly) CW Holdings of Charlotte, LLC as recorded in Deed Book 17644, Page 302 of said registry a bearing of N 32°29'~4" W and a distance of 320.60', to a found iron; thence with the common line of the (Now or Formerly) Reagents, Inc., as recorded in Deed Book 3982, Page 796 of said registry a bearing of N 23°09'06" E and a distance of 99.74', to a found iron; thence with the Reagents, Inc. line a bearing of N 79°38'15" W and a distance of 221.70', to a found iron on the Eastern edge of the 60' Right of Way of England Street as shown on Map Book 23, Page 809 of said registry; thence with said Right of Way a bearing of N 25° 11'32" E and a distance of 118.51', to a found iron; thence leaving said Right of Way with the common line of Lemarc Inc. as recorded in Deed Book 8717, Page 986 of said registry with a bearing of S 80°01'01" E and a distance of 280.06', to a set rebar; thence with a Lemarc line a bearing of N 25°11'32" E and a distance of 248.70', to a found iron; thence with the Lemarc line a bearing of N 80°00'30" W and a distance of 280.05', to a found iron in the Eastern edge of the 60' Right of Way of England Street as described above; thence with said right of way a bearing of N 25°11'32" E and a distance of 714.79', to a set rebar; thence leaving said Right of Way with the common line of the (Now or Formerly) City of Charlotte as recorded in Deed Book 20204, Page 51 of said registry a bearing of N 71°24'05" E and a distance of 39.53', to a set rebar; thence with City of Charlotte line for (4) courses: (1) a bearing of S 64°54'04" E and a distance of 76.46', to a set rebar; (2) thence with an Arc to the Left having a Radius of 315.49' and a Length of 206.12' and being Chorded by a bearing of S 83°37'04" E and a distance of 202.47', to a set rebar; (3) thence with a bearing of N 77°39'59" E and a distance of 379.7 4', to a set rebar; (4) thence with a bearing of S 56°07'20" E and a distance of 86.86', to a set rebar, said rebar being located S 47"45'52" W 2365.07' (ground distance) from NGS monument "M-082"; thence

with the common line of the (Now or Formerly) City of Charlotte as recorded in Deed Book 17540, Page 337 of the Mecklenburg County Registry a bearing of S 5°26'38" E and a distance of 373.44' to the POINT OF BEGINNING, and containing 46.866 Acres as shown on survey by Carolina Surveyors, Inc., last revised July 24, 2007.

LESS AND EXCEPT that certain property described as follows:

Being all of Parcel 1A, Parcel 1 B, Parcel 2A, Parcel 3A, Parcel 3B, Parcel 11 A, Parcel 11 B, Parcel 11 C, Alley 1, Alley 2, Alley 3, Alley 11 and all streets dedicated as Public Right of Way, all as shown on that certain survey entitled "A Plat Showing Hadley Subdivision Map 1" dated February 4, 2009, prepared by Thomas E. White, North Carolina Professional Land Surveyor L-4689 of Carolina Surveyors, Inc. and recorded in Map Book 51, Page 367, Mecklenburg County Public Registry.

Tract II- Mecklenburg County Tax Parcel Nos. 205-173-11, 205-173-12, 205-173-13, 205-173-14, 205-173-15, 205-173-16, 205-173-17, 205-173-18, 205-173-19, 205-173-20, 205-173-21 and 205-173-22:

Being all of Parcel 1A, Parcel 1B, Parcel 2A, Parcel 3A, Parcel 3B, Parcel 11A, Parcel 11B, Parcel 11C, Alley 1, Alley 2, Alley 3 and Alley 11 as shown on that certain survey entitled "A Plat Showing Hadley Subdivision Map 1" dated February 4, 2009, prepared by Thomas E. White, North Carolina Professional Land Surveyor L-4689 of Carolina Surveyors, Inc. and recorded in Map Book 51, Page 367, Mecklenburg County Public Registry.

Tracts I and II being portions of that certain property conveyed from Brian B. Helms and wife Debra C. Helms and Jerry N. Helms and wife, Sue Lemmond Helms to Arrowood Station, LLC by deed recorded August 29, 2007 in Book 22742, Page 593, Mecklenburg County Public Registry.

10) the real property located at 2294 Fernwood Drive, East Point, Fulton County, Georgia, Tax Parcel ID No.: 14-016600021379;

32

11) the real property located at 1891 Connally Drive, East Point, Fulton County, Georgia, Tax Parcel ID No.: 14-016600021361;

12) the real property located at 1901 Connally Drive, East Point, Fulton County, Georgia, Tax Parcel ID No.: 14-016600021353;

13) the real property located at 2095 Newnan Avenue, East Point, Fulton County, Georgia, Tax Parcel ID No.: 14-013400020644;

14) the real property located at 2225 Dodson Drive, East Point, Fulton County, Georgia, Tax Parcel ID No.: 14-019800070014;

15) the real property located at 1202/1216 Zonolite Road, N.E., Atlanta, DeKalb County, Georgia, Tax Parcel ID No.: 18-107-14-036;

16) the real property located at 1750 Briarwood Road, Atlanta, DeKalb County, Georgia, Tax Parcel ID No.: 18-197-02-006;

17) the real property located at 1808 Therrell Farms Road, Sandy Ridge, Union County, North Carolina, Tax Parcel ID Nos.: 06183026, 06183029, 06183030, and 06183058, more particularly described as:

Tract 1:
Being all of Lots 1 and 33 of Therrell Farms, Map 1 as same is shown on map thereof recorded in Plat Cabinet H, at File 757, in the Union County Public Registry, North Carolina; reference to which is hereby made for a more particular description thereof.

Tract 2:
Being all of Lots 4 and 5 of Therrell Farms, Map 2, as same is shown on map thereof recorded in Plat Cabinet H, at File 759, in the Union County Public Registry, North Carolina; reference to which is hereby made for a more particular description thereof;

18) the real property specifically identified as: 4237 Rea Road, 7903 Rea View Court, 7907 Rea View Court, 7911 Rea View Court, 7915 Rea View Court, 7919 Rea View Court, 7920 Rea View Court, 7916 Rea View Court, 7912 Rea View Court, 7908 Rea View Court, 7904 Rea View Court, 0.14 acres on Rea View Court, 0.141 acres on Rea View Court, 0.052 acres on Rea View Court, and 0.107 acres on Rea View Court, Charlotte, Mecklenburg County, North Carolina, Tax Parcel ID Nos.: 21159314, 21159318, 21159319, 21159320, 21159321, 21159322, 21159323, 21159324, 21159325, 21159326, 21159327, 21159328, 21159329, 21159330, and 21159331, more particularly described as:

SITUATED in the City of Charlotte, Mecklenburg County, North Carolina, and being more particularly described as follows:

BEGINNING at the iron survey stake, having North Carolina (NAD 83) grid coordinates of N = 498,776.23 feet and E = 1,460,301.57 feet located at the northwest corner of the property of 2728 Holding Corporation, as described in Deed Book 8736, Page 810 in the Mecklenburg County Public Registry (hereinafter the "Registry"); thence from the point of beginning, with and along the boundary line of said property of 2728 Holding Corporation, S. 14-28-47 E. 12.46 feet to an iron survey stake located at the northwest corner of the property of Madina M. Riley, as described in Deed Book 21469, Page 777, in the Registry; thence with and along the boundary line of said property of Madina M. Riley, S. 14-28-47 E. 326.72 feet to a misc. deciduous tree; thence S. 41-19-05 W. 100.45 feet to an iron pipe lying in the northeast corner of the property of Jane Rea Clute, et al., as described in Deed Book 5562, Page 243, of the Registry; thence with and along the boundary line of said property of Jane Rea Clute, et al., N. 49-17-05 W. 293.77 feet to an iron pipe having North Carolina (NAD 83) grid coordinates of N = 498,776.23 feet and E = 1,460,301.57 feet, lying southeast of the right-of-way of Rea Road; thence the following three (3) courses and distances: (1) with the arc of a circular curve to the left, having a radius of 2,473.08 feet, a chord bearing and distance of N. 43-55-16 E. 85.28 feet and an arc length of 85.29 feet to a point; (2) N. 43-45-15 E.

34

60.35 feet to a point; (3) N. 43-56-00 E. 148.87 feet to an iron survey stake, the place of beginning, all as shown on that certain Topographic Survey for Insite Residential, LLC, dated December 31, 2007, and prepared by A.G. Zoutewelle, P.A.

ADDITIONAL DESCRIBED AS FOLLOWS:
SITUATED in the City of Charlotte, Mecklenburg County, North Carolina, and being more particularly described as follows:

BEGINNING at the iron survey stake, having North Carolina (NAD 83) grid coordinates of N = 498,776.23 feet and E = 1,460,301.57 feet located at the northwest corner of the property of 2728 Holding Corporation, as described in Deed Book 8736, Page 810, in the Mecklenburg County Public Registry (hereinafter the "Registry"); thence from the point of beginning, with and along the boundary line of said property of 2728 Holding Corporation, S. 14-28-47 E. 12.46 feet to an iron survey stake located at the northwest corner of the property of Madina M. Riley, as described in Deed Book 21469, Page 777, in the Registry; thence with and along the boundary line of said property of Madina M. Riley, S. 14-28-47 E. 326.72 feet to a misc. deciduous tree; thence S. 41-19-05 W. 100.45 feet to an iron pipe lying in the northeast corner of the property of Jane Rea Clute et al, as described in Deed Book 5562, Page 243 of the Registry; thence with and along the boundary line of said property of Jane Rea Clute et al, N. 49-17-05 W. 293.77 feet to an iron pipe having North Carolina (NAD 83) grid coordinates of N = 498,573.69 feet and E = 1,460,087.84 feet, lying southeast of the right-of-way of Rea Road; thence the following three (3) courses and distances: (1) with the arc of a circular curve to the left, having a radius of 2,473.08 feet, a chord bearing and distance of N. 43-55-16 E. 85.28 feet and an arc length of 85.29 feet to a point; (2) N. 43-45-15 E. 60.35 feet to a point; (3) N. 43-56-00 E. 148.87 feet to an iron survey stake, the place of beginning, all as shown on that certain Topographic Survey for Insite Residential, LLC, dated December 31,2007, and prepared by A.G. Zoutewelle, P.A.; and

19) the real property located at 2553 340th Street, Keokuk, and adjoining 377 acres in Montrose Township, Lee County, Iowa, Tax Parcel ID Nos.: 042318341000070; 042318342000020; 042318343000050; 042318344000010; 042318344000020; 042318344000040; 042318342000040; 042318344000030; 042318342000010; and 042318342000030, more particularly described as:

Three Hundred and Seventy Seven (377) acres off the East side of Section Thirty Four (34), in Township Sixty Six (66) North, Range Five (5) West of the Fifth Principal Meridian, in Lee County, Iowa.

Subject, however, to conveyances to Lee County, Iowa, for the purposes and for use as public highways of parcels recorded at Microfiche 98S-44 E2, Microfiche 99S-10 C7, and Book 05S, Page 494, at the Office of the Recorder of Lee County, Iowa, and subject to other easements and licenses of record;

D.   PERSONAL PROPERTY:

1) 2006 Cessna Citation XLS aircraft, Manufacturer's Serial Number 560-5623, bearing registration number N562VP;

2) Gipps Aero Party Limited Model GA8TC-320 aircraft bearing tail number N68GA and serial number GA8-TC-320-12-187;

3) Extra Flugzeugproduktions Und Model EA300/LT aircraft bearing tail number N330TY and serial number LT020;

4) 2012 Mercedes Benz GL550 bearing vehicle identification number 4JGBF8GE5CA785200;

5) 2012 Mercedes Benz SLS AMG bearing vehicle identification number WDDRJ7HA1CA008056; and

6) 2013 Audi SS Quatro bearing vehicle identification number WAUD2AFD2DN020235;

E.   CURRENCY AND MONETARY INSTRUMENTS:

1) a total of approximately 8,671,456,050 in Iraqi dinar seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

2) a total of approximately 13,317,698,200 in Vietnamese Dong seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

3) a total of approximately 2,100 in Afghanis seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

4) a total of approximately 100 in Chinese Yuan seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

5) a total of approximately 1,600,000 in Indonesian Rupiahs seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

6) approximately 29 silver coins seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

7) a total of approximately 14,396,403 in Iraqi dinar seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

8) a total of approximately 20,000 in Vietnamese Dong seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

9) a total of approximately 150,000 in Bank of Mozambique notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

10) a total of approximately 23,200 in Bank of Egypt notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

11) a total of approximately 1,000 in Union of Burma bank notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

12) a total of approximately 1,000,000 in Republic of Iran bank notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

13) a total of approximately 9,799 in Chinese Yuan seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

14) a total of approximately 1,502,600 in Afghanis seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

15) a total of approximately 2,450 in Bank of Suriname notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

16) a total of approximately 9,300 in Bank of Yugoslavia notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

17) a total of approximately 155,000 in Cambodian Bank notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

18) a total of approximately 500 in Brazilian currency seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

19) a total of approximately 1,000 in Bank of Sudan notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

20) approximately 182 gold coins seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

21) approximately 49 silver coins seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015; and

22) approximately $48,718.00 in United States currency seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015.

28. If, as a result of any act or omission of TYSON RHAME, JAMES SHAW, FRANK BELL, OR TERRENCE KELLER, any property subject to forfeiture:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third person;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1); or Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of said defendants up to the value of the forfeitable property.


A _____TRUE_____ BILL

_____
FOREPERSON

JOHN A. HORN
  *United States Attorney*

THOMAS J. KREPP
  *Assistant United States Attorney*
Georgia Bar No. 346781

STEVEN D. GRIMBERG
  *Assistant United States Attorney*
Georgia Bar No. 312144

JAMIE L. MICKELSON
  *Assistant United States Attorney*
Georgia Bar No. 591094

600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

1:16CR67

## CRIMINAL CHARGES FILED

**Today's Date:** February 9, 2016
**USAO #:** 2014R00956
**Caption:** Tyson Rhame, et al.
**Court Number:**

**Date Charges Filed:** February 10, 2016

**Under Seal?** Yes
**PSN Case:** No

FILED IN OPEN COURT
U.S.D.C. Atlanta

FEB 1 0 2016

James ~~N. Hatten, Clerk~~
By: Deputy Clerk

**Charge Type:**  Indictment
**District/Magistrate Judge:**

Felony

### Defendant Information:

**Tyson Rhame** — Praecipe

| Charge: | Count: |
| --- | --- |
| 18§1349 | 1 |
| Charge: | Count: |
| 18§1341 and 2 | 2-7 |
| Charge: | Count: |
| 18§1343, 1349, and 2 | 8-11 |
| Charge: | Count: |
| 18§1956(h) | 12 |
| Charge: | Count: |
| 18§1957 and 2 | 13-24 |

**Terrence Keller** — Praecipe

| Charge: | Count: |
| --- | --- |
| 18§1349 | 1 |
| Charge: | Count: |
| 18§1341 and 2 | 2-7 |
| Charge: | Count: |
| 18§1343, 1349, and 2 | 8-11 |

**James Shaw** — Praecipe

| Charge: | Count: |
| --- | --- |
| 18§1349 | 1 |
| Charge: | Count: |
| 18§1341 and 2 | 2-7 |
| Charge: | Count: |
| 18§1343, 1349, and 2 | 8-11 |
| Charge: | Count: |
| 18§1956(h) | 12 |
| Charge: | Count: |
| 18§1957 and 2 | 13-24 |

**Frank  Bell** — Praecipe

| Charge: | Count: |
| --- | --- |
| 18§1349 | 1 |

**[IF OCDETF  Case= Yes Then**
**REMINDER:** *Forward copy of indictment and this form to OCDETF Assistant*