**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION NO.** |
| **v.** | **1:16-CR-00067-SCJ-CMS** |
| **TYSON RHAME, TERRENCE KELLER a/k/a Terry K, JAMES SHAW, and FRANK BELL,** | |
| **Defendants.** | |

## REPORT AND RECOMMENDATION

This case is before the Court on the following motions: (1) the Joint Motion to Suppress Evidence (Doc. 84) and request for oral argument (Doc. 140) filed by defendants Tyson Rhame, James Shaw, and Frank Bell (hereinafter, the "Sterling Defendants"); (2) the original and perfected Motion to Suppress Evidence regarding the search of two email accounts filed by defendant Terrence Keller (Docs. 77, 93); (3) the original and perfected Motion to Suppress Evidence regarding the search of defendant Keller's residence (Docs. 79, 100); and (4) the Motion to Suppress Evidence filed by defendant Frank Bell (Doc. 85).

The indictment (Doc. 1) charges the three Sterling Defendants and Terrence Keller with wire and mail fraud conspiracy and several substantive wire and mail fraud counts, in violation of 18 U.S.C. §§ 1341-43, 1349. Rhame and Shaw are also charged

AO 72A
(Rev.8/8
2)

with money laundering conspiracy and numerous substantive money laundering counts, in violation of 18 U.S.C. §§ 1956, 1957.

## I.   STERLING DEFENDANTS' JOINT MOTION TO SUPPRESS (DOC. 84)

### A.   BACKGROUND[1]

The Sterling Defendants' Joint Motion to Suppress (the "Joint Motion") (Doc. 84) asks this Court to hold a hearing under Franks v. Delaware to determine whether search warrants issued to search the Sterling Defendants' emails and homes contained material omissions and/or material misrepresentations that require suppression of the evidence found.[2] The following background information is derived from the indictment, the relevant applications and search warrants, and the parties' various submissions.

Starting in or about 2004, defendants Tyson Rhame and James Shaw formed an Atlanta-based currency exchange company known as the Sterling Currency Group, LLC, which also did business as Sterling Online Processing Services, LLC and Dinar

---

[1] To the extent that the facts recited herein are taken from the indictment or amount to law enforcement accusations, the Court recognizes that the statements are allegations only. The Court is mindful that each of the defendants is presumed innocent at this stage in the proceedings.

[2] In separately filed motions that are addressed later in this R&R, defendants Keller and Bell adopt many of the arguments put forth in the Sterling Defendants' Joint Motion and request similar relief.

2

Banker (collectively "Sterling").   (Indictment at 2).   Sterling's business involved dealing in "exotic currencies," including, for purposes of this case, the Iraqi dinar, the official currency for the country of Iraq.  (Id.).  Rhame and Shaw were co-owners and co-founders of Sterling.  Frank Bell began working for Sterling in mid December 2010 and became its Chief Operating Officer ("COO") sometime between July 2011 and March 2012.  (Doc. 84-3, Affidavit of Bell's attorney, Sean T. Sullivan ["Sullivan Aff."], at 21 ¶ 37).  Other Sterling employees included Rhett Rhame, Tyson Rhame's brother, who was at one point a Sterling manager, Dena Marzo (accounting manager), and Youssef Hodaigui (Information Technology ["IT"] contractor).  (Doc. 112-2, Affidavit in support of application for search warrants averred by FBI Special Agent Roderick F. Coffin on January 22, 2015 [the "Coffin Affidavit"] at 7 ¶ 20).[3]  From approximately June 2011 through mid-2012, Tony Pleasant worked for Sterling in the compliance area, as its Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") officer.  (Id. ¶ 21).

---

[3] As the Government notes, there were actually three separate affidavits signed by Agent Coffin on January 22, 2015.  The only difference among the three affidavits was the specific name of the internet service provider to which the warrants were directed (i.e., Earthlink, AOL, and Google).  Accordingly, for purposes of this R&R, I will refer collectively to the three affidavits as the Coffin Affidavit.

AO 72A
(Rev.8/8
2)

During the relevant time period, there apparently was a relatively large market in the United States for the purchase and sale of Iraqi dinars. (Coffin Aff. ¶ 12). Currency exchangers, such as Sterling, were generally required to register with the U.S. Treasury Department, Financial Crimes Enforcement Network, as money service businesses. (Id. ¶ 11). Currency exchangers, including Sterling, typically obtained dinars from overseas and shipped them to customers around the United States. (Id. ¶ 29). Sterling charged a fee for dinar purchases. (Id. ¶ 11). Sterling also offered investors the option of sending a down payment for the option of purchasing dinars in the future at a set rate. Sterling referred to this option as its "layaway" program. (Indictment ¶ 4).

The indictment indicates that between 2010 and June 2015, the Iraqi dinar was being touted on the internet as a potentially lucrative investment opportunity. (Indictment ¶ 6). In December 2010, Sterling's website contained videos featuring Tyson Rhame and articles written by Rhame describing the extremely low valuation of the Iraqi dinar as compared with its historical value, the "minimal risk" that the dinar would continue to decrease in value, and the potential for a "tremendous ... upside return." (Coffin Aff. ¶¶ 36-37). Other publicly available information, including internet websites, blogs, chat rooms, and conference calls, fueled speculation in the

4

currency by predicting an imminent revaluation, or "RV," of the Iraqi dinar by the Iraqi government that could mean a sudden, exponential rise in the value of the dinar as compared to the U.S. dollar. The theory was that individual investors who bought and held Iraqi dinars could potentially realize enormous gains and massive profits if the dinar were revalued, and the investors could then quickly exchange their dinars for U.S. dollars. (Indictment ¶ 6).

According to the indictment, defendant Keller was the leader of a group of individuals known as the GET Team, and he was one of the leading internet-based proponents of the RV theory. Keller ran one of the websites discussed above, an internet chat forum, and weekly conference calls in which information was disseminated concerning the potential investment value of the Iraqi dinar. (Indictment ¶ 5). The indictment states that Keller falsely claimed to have information from high-level confidential sources in the United States and Iraqi governments, international organizations, and major financial institutions regarding an imminent revaluation. (Id. ¶ 7). Sterling began advertising with the GET Team through a web banner placed on the GET Team's website. Sterling representatives also allegedly participated in the GET Team's internet forums and took part in conference calls with the GET Team's followers. (Id. ¶¶ 8, 12). The indictment alleges that the presence of Rhame, Bell, and

5

other Sterling representatives on the GET Team's conference calls and internet forums provided validation to the listeners that Keller's claims about an imminent revaluation of the Iraqi dinar were credible and should be believed.  (Id. ¶ 13).  On occasion, followers of the GET Team were offered a discount coupon and sale price to purchase the Iraqi dinar from Sterling.  The indictment alleges that Rhame, Bell, and other Sterling representatives assured participants on the GET Team's conference calls that Sterling was prepared to handle the high volume of Iraqi dinar exchanges that many investors expected would occur immediately after the revaluation.  (Id.).

The indictment alleges that Sterling's business revenue was driven in significant part by the investment information and advice touted by Keller and others.  (Indictment ¶ 8). The indictment alleges that Keller had a "secret arrangement" with the Sterling Defendants to promote and "pump" the Iraqi dinar in exchange for payments made by Sterling to benefit Keller and/or the GET Team.  (Id. ¶ 10).  Beginning in late 2010 or early 2011, Sterling paid Keller and/or the GET Team approximately $4,000 a month, over $150,000 in total, to promote investing in dinars and the imminent possibility of a dinar revaluation. (Doc. 112-49, Baucom August 13, 2015 Aff., at 11 ¶ 16).  The indictment alleges that the Sterling Defendants knew and believed that many of Sterling's customers relied upon such misleading information from Keller and other

promoters when making investment decisions regarding the Iraqi dinar, and that much of the information being disseminated by Keller and others was materially false. (Indictment ¶ 15).  Despite the fact that Sterling and its principals told their employees not to speculate or offer investment advice to customers, the indictment alleges that they knew and believed that the pumping activities of Keller and other dinar promoters (bloggers) were essential to their financial success.  (Id. ¶¶ 12-16).  According to the indictment, Sterling generated over $600 million in dinar and other currency sales during its relationship with Keller.  (Id. ¶ 4).

The first affidavit at issue in this motion–the affidavit signed on January 22, 2015 by Special Agent Roderick F. Coffin (Doc. 112-2)–indicates that Sterling's website also contained misleading information about the potential for the dinar to skyrocket in value, and that certain regulators and a consumer protection group had warned the public about scams related to the Iraqi dinar, including that "the rapid appreciation of any currency's value is extremely rare (the opposite is much more likely)" (Coffin Aff. ¶ 15); that investing in Iraqi dinar can be "extremely risky and generally unsuitable for all but the most seasoned investors who can afford the high risk" (id. ¶ 16); and that it is "very difficult to sell [foreign currency, including the dinar], and it's extremely unlikely they will ever significantly increase in value" (id. ¶ 18).  The Coffin Affidavit

7

further asserts that Sterling was lying when it assured customers on its website and over the phone that it would open up airport exchanges following a revaluation. (Id. ¶¶ 42-43).  The Coffin Affidavit states that Sterling used blogs to anonymously spread false information about the Iraqi dinar.  (Id. ¶¶ 44-69).  The affidavit asserts that Sterling's BSA/AML officer, Tony Pleasant,[4] was fired after he raised concerns about those blogs and Sterling's apparent inability to exchange customers' dinars for U.S. currency at U.S. airports if a revaluation were to take place.  Pleasant's concerns also pertained to claims that Sterling made on its website and over the telephone to customers that it would install and open "secure remote satellite offices" and/or currency exchange kiosks at numerous major U.S. airports, including JFK International Airport, following any revaluation.  (Id. ¶¶ 40, 42-43, 47).

On January 22, 2015, United States Magistrate Judge Russell G. Vineyard authorized three search warrants based upon the January 22, 2015 Coffin Affidavit, for a total of eight email addresses.  (Docs. 112-2 through 112-5).  Soon thereafter, a series of search warrants for additional email addresses were issued by U.S. magistrate judges in February, March, and April 2015 that are not being challenged in the Joint Motion.

---

[4] Mr. Pleasant is referred to as "CW1" or "Cooperating Witness 1" in certain of the affidavits.  (Doc. 84-1 at 2; Doc. 112-34 at 5 ¶ 14).

(See Docs. 112-6 through 112-10 [five search warrants for thirteen email addresses authorized on February 13, 2015 by U.S. Magistrate Judge Gerrilyn G. Brill]; Docs. 112-12 through 112-21 [eight search warrants for twenty-three email addresses authorized on March 31, 2015 by U.S. Magistrate Judge Linda T. Walker]; Docs. 112-22 through 112-33 [ten search warrants for a total of thirty email addresses authorized on April 27, 2015 by Judge Vineyard]).

Agents next turned their attention to physical addresses in the Atlanta area where Sterling was based. On May 29, 2015, Judge Brill authorized four search warrants based upon an affidavit signed by Special Agent W. Scott Baucom dated May 29, 2015 (the "May Baucom Affidavit") for three physical residences in the Atlanta area as well as the physical address believed to be used by Sterling. (Docs. 112-33 through 112-38).

Following the execution of the physical search warrants, agents continued their investigation. Search warrants for a series of websites promoting the Iraqi dinar as an investment were issued on August 3, 2015. (Docs. 112-46 through 112-48). Then, on August 13, 2015, U.S. Magistrate Judge Alan J. Baverman authorized eight search warrants based upon another affidavit signed by Agent Baucom on August 13, 2015 (the "August Baucom Affidavit") for a total of 53 email addresses. (Docs. 112-49 through 112-57). Each of the warrants issued on August 13, 2015 authorized the agents

to look for evidence of wire fraud, money laundering, and conspiracy to commit those offenses.

The Sterling Defendants challenge the following three sets of warrants: (1) the January 22, 2015 warrants authorized by Judge Vineyard for the listed email addresses; (2) the May 29, 2015 warrants authorized by Judge Brill for the Sterling Defendants' residences and Sterling's office suite; and (3) the August 13, 2015 warrants authorized by Judge Baverman for the email addresses listed therein.  (Docs. 84, 84-1).  The affidavits at issue in the Joint Motion are the affidavits  supporting those three sets of warrants–the Coffin Affidavit (Doc. 112-2), the May Baucom Affidavit (Doc. 112-34), and the August Baucom Affidavit (Doc. 112-49).

## B.    **PRELIMINARY ISSUES**

In its response to the Sterling Defendants' Joint Motion to Suppress, the Government first argues that the Sterling Defendants lack standing to challenge the search warrants and have not sufficiently identified exactly what evidence they are seeking to suppress.  (Doc. 106, Gov't Resp. Br., at 11-18).

AO 72A
(Rev.8/8
2)

### 1.   Standing

The Government argues that the Sterling Defendants have failed to allege and establish standing in their initial brief and are barred from doing so at this point in the proceedings.   A defendant bears the burden of proving standing.   See Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S. Ct. 2556, 2561 (1980); United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

In response, the Sterling Defendants assert that they seek to suppress the evidence obtained from the emails the Government alleges they personally used and the evidence obtained from the homes in which the Government contends they resided. Accordingly, the Sterling Defendants argue that their standing is evident and obvious.

Nevertheless, the Sterling Defendants have responded to the Government's lack-of-standing argument by submitting as exhibits A-C to their reply brief sworn declarations from each of them.   (Docs. 128-1, 128-2, 128-3).   Exhibit A, the Declaration of Tyson Rhame, declares, under penalty of perjury, that Rhame had exclusive control of and access to the specific email accounts identified in his declaration, that he used those email accounts for both personal communications and communications related to Sterling business, and that the property described in the May

11

29, 2015 search warrant at 4536 E. Brookhaven Drive, Atlanta, Georgia, 30319 was and is Rhame's primary personal residence.  (Doc. 128-1, "Rhame Decl.").

Attached to the Sterling Defendants' reply brief as Exhibit B is the Declaration of Frank Bell.  (Doc. 128-2, "Bell Decl.").  In his declaration, Bell declares, under penalty of perjury, that he had exclusive control of and access to the email accounts identified in his declaration and in both the January 22, 2015 and August 13, 2015 search warrants, that he used those email accounts for both personal communications and communications related to Sterling business, and that the property described in the May 29, 2015 search warrant as 2385 Heather Drive, Decatur, Georgia, 30033 was and is Bell's primary personal residence.  (Id.).

Attached as Exhibit C is the Declaration of James Shaw.  (Doc. 128-3, "Shaw Decl.").  In his declaration, Shaw declares, under penalty of perjury, that he had exclusive control of and access to the email accounts identified in his declaration and in both the January 22, 2015 and August 13, 2015 search warrants, that he used those email accounts for both personal communications and communications related to Sterling business, and that the property described in the May 29, 2015 search warrant as 225 Valley Road, N.W., Atlanta, Georgia, 30305 was and is Shaw's primary personal residence.  (Id.).

12

I find that the Sterling Defendants have made a sufficient showing that Rhame has standing to challenge the search warrants for the email accounts identified in his declaration and the search of his personal residence; that Bell has standing to challenge the search warrants for the email accounts identified in his declaration and the search of his personal residence; and that Shaw has standing to challenge the search warrants for the email accounts identified in his declaration and the search of his personal residence.

**2.        Evidence the Sterling Defendants are Seeking to Suppress**

As noted above, in response to the Government's argument that the Sterling Defendants have failed to identify which specific email addresses and search warrants they are seeking to suppress, the Sterling Defendants, in their reply brief, have clarified the specific evidence each defendant seeks to suppress. (Doc. 128 at 4-5). Rhame is seeking to suppress evidence from his personal residence (4536 E. Brookhaven Drive) and his three email addresses (tyrhame@earthlink.net; trhameb@earthlink.net; trhame@earthlink.net). (Id.; Doc. 128-1, Rhame Decl.). Bell is seeking to suppress evidence from his personal residence (2385 Heather Drive) and his two email addresses (franksterlingcurrencygroup@gmail.com; uyopilot@gmail.com). (Doc. 128 at 5; Doc. 128-2, Bell Decl.). Shaw is seeking to suppress evidence from his personal residence

13

(225 Valley Road) and his two email addresses (shawmarket@aol.com; jshaw405@gmail.com).  (Doc. 128 at 5; Doc. 128-3, Shaw Decl.).

I find that the Sterling Defendants have sufficiently articulated what evidence each defendant is seeking to suppress, and I will exercise my discretion to address the merits of the Sterling Defendants' Joint Motion.

## C.   DISCUSSION

The Sterling Defendants move to suppress all evidence seized pursuant to the search warrants issued on January 22, 2015, May 29, 2015, and August 13, 2015 on the grounds that the affidavits in connection therewith did not establish probable cause, and/or contained material misrepresentations and omissions that, had accurate and complete information been provided, would have negated any finding of probable cause.  (Doc. 84-1 at 3-4).  The Sterling Defendants request a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978).

To be entitled to an evidentiary hearing on a motion to suppress based on misrepresentations or omissions in a search warrant affidavit, a defendant must make a substantial preliminary showing that: (1) the affiant made false statements; (2) the false statements were made either intentionally or with reckless disregard for the truth; and (3) the false statements were necessary to the finding of probable cause. See

14

Franks, 438 U.S. at 171-72, 98 S. Ct. at 2684.  Material omissions from a supporting affidavit may also give rise to entitlement to a Franks hearing.  United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).  The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). "'[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id.

"[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." United States v. Bushay, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085 (1984)).  Courts are not to "interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense

15

approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. at 1379 (citing United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994)); see also United States v. Robinson, 62 F.3d 1325 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause).

Affidavits supporting search warrants are presumptively valid. Franks, 438 U.S. at 171, 98 S. Ct. at 2684. "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit." United States v. Price, 582 F. App'x 846, 850 (11th Cir. 2014). The allegations of deliberate falsehood or of reckless disregard for the truth must be accompanied by an offer of proof, including a statement of supporting reasons and affidavits of witnesses. Franks, 438 U.S. at 171, 98 S. Ct. at 2684. "Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant." Id. If, after setting aside the material that is the subject of the alleged falsity or reckless disregard, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Id. at

16

171-72.

Despite submitting initial and reply briefs totaling over 92 pages, and a 25-page affidavit from Bell's counsel, Sean Sullivan, the Sterling Defendants have not made a sufficient preliminary showing to warrant a <u>Franks</u> hearing.

### 1.   Agent Coffin's January 22, 2015 Affidavit and Search Warrants

#### a.   Probable Cause

The Sterling Defendants have failed to establish that Judge Vineyard made an improper probable cause determination when he authorized the searches of the Sterling Defendants' email accounts in January 2015.  Under long-established Supreme Court precedent, "the prohibition of mail fraud 'includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" <u>United States v. Svete</u>, 556 F.3d 1157, 1162 (11th Cir. 2009) (citing <u>Durland v. United States</u>, 161 U.S. 306, 313, 16 S.Ct. 508, 511 (1896)).

The affidavit supporting the January 2015 set of search warrants alleged, among other things, that the affiant, Agent Coffin, participated in an investigation, along with the U.S. Attorney's Office for the Northern District of Georgia, the FBI, and the IRS, into Sterling's suspected involvement in making false statements about the Iraqi dinar in order to increase sales through the use of interstate wires, the creation and use of

17

anonymous internet blogs and Sterling's own website, as well as speaking on the telephone with one or more Sterling customers, in furtherance of a scheme to defraud Iraqi dinar investors.  (Coffin Aff. ¶ 5).

Among the facts included in the affidavit (or that can be inferred from the affidavit) are the following:

Despite Sterling's express claims to the public that it did not provide investment advice, Sterling's website contained misleading information about the imminent and likely potential for the dinar to skyrocket in value and the "minimal risk" that the dinar would decrease in value.  (Coffin Aff. ¶¶ 35-41).  Sterling utilized anonymous blogs on the internet to promote the dinar as a good investment and to spread false information about the dinar, despite the fact that predictions on the internet of a revaluation of the Iraqi dinar (and speculators potentially reaping enormous profits) had been repeatedly discredited by several state regulators and a consumer protection agency, all of whom warned potential investors against buying Iraqi dinars as an investment.  (Id. ¶¶ 14-18).  The Utah Department of Commerce, Division of Securities, listed investing in Iraqi dinars as a "top ten" scam for 2011.[5]  (Id. ¶ 15).  The Alabama

_____

[5]  The Utah Department of Commerce alert, issued on January 3, 2011, warned that the likelihood of investors seeing any return on their purchase of dinars was "slim to none," that this get-rich-quick scheme to profit by purchasing Iraqi dinars was a

Securities Commission also issued an investor alert about investing in Iraqi dinars, calling such trading "extremely risky and generally unsuitable for all but the most seasoned investors who can afford the high risk." (Id. ¶ 16). The Washington State Department of Financial Institutions warned consumers in 2011 not to be misled by currency traders claiming that they are registered as a money service business with the U.S. Treasury Department. The warning characterized such registration as "meaningless" and "nothing more than a form [dealers] file ... to lend legitimacy to their scam and avoid more stringent regulation." (Id. ¶ 17). Coffin's affidavit noted that the Better Business Bureau also warned that investing in Iraqi dinars in hopes the currency would revalue was a "scam" and a "hoax," pointing out that foreign currencies are "very difficult to sell, and it's extremely unlikely they will ever significantly increase in value." (Id. ¶ 18).

The Sterling Defendants argue that such statements do not establish probable cause because it is not a crime in the United States to sell the dinar to private individuals who may disagree with regulators' judgments and with public service announcements that the Iraqi dinar is not a good investment. Nor is it a crime to try and

_____

"scam," and that because there was no currency exchange set up for the Iraqi dinar, dealers could charge whatever they wanted to sell and buy back dinars. (Doc. 84-3 at 45, 49-50).

generate consumer interest in one's product, so long as one advertises honestly.  (Doc. 84-1 at 15-16).

The Coffin Affidavit supporting the January 2015 search warrants further alleged that in 2010, Sterling's website falsely claimed that if a currency revaluation occurred, Sterling would set up secure currency exchange locations at major airports across the country, in Canada and in Puerto Rico, where customers could exchange their dinars for U.S. currency.  (Coffin Aff. ¶ 42).  The affidavit alleged that Tony Pleasant, a cooperating witness and former Sterling employee, had confirmed to IRS agents in October 2014 that he overheard Sterling employee Rhett Rhame (defendant Tyson Rhame's brother) tell a customer in a different state over the telephone in 2012 that when the revaluation happened, Sterling would set up kiosks at all major airports.  (Id.). The affidavit indicates that Tony Pleasant told Rhett Rhame that Sterling did not have enough money to pay out all of its customers if and when a revaluation actually happened.  Pleasant told investigators that Sterling had never approached any airports about setting up currency exchange kiosks at the airports.  (Id. ¶ 43).  Agent Coffin avers that investigators independently checked with officials at the Cincinnati/Northern Kentucky International Airport, and the officials corroborated Pleasant's information

and confirmed to investigators that Sterling had never submitted an application to set up a secure remote satellite office for customers to exchange foreign currency.  (Id.).

Agent Coffin next averred that Tony Pleasant informed investigators that he learned in 2012 that Sterling employees were actively using anonymous internet blogs to promote the dinar as a good investment and to increase dinar sales, in furtherance of the Sterling Defendants' fraud scheme.  (Coffin Aff. ¶ 44).  The affidavit stated that after Tony Pleasant learned about the blog sites, Pleasant warned several employees at Sterling, including Bell's nephew and Sterling IT contractor Youssef Hodaigui, that Sterling could not legally provide investment advice because it did not have the proper license.  (Id. ¶ 45).  Hodaigui responded that the blog sites were anonymous.  (Id. ¶ 47). According to the affidavit, Pleasant later confronted Tyson Rhame, James Shaw, Frank Bell, and Tyson Rhame's brother, Rhett Rhame, about the blogs and told them that Sterling could not advertise on the blogs, and that giving investment advice without the proper license was illegal.  (Id.).  Soon thereafter, Pleasant was fired from Sterling for the stated reason that he was taking too long to obtain his anti-money laundering certification.  (Id.).

The Coffin Affidavit describes in great detail how Pleasant identified the various blogs and websites, as well as the investigators' subsequent efforts to determine who

21

registered the anonymous blog domains and created and maintained the sites, as well as the results of their investigation, which appeared to connect the registration, creation, and/or management of the blogs to (1) Frank Bell; (2) Dinar Banker (Sterling's alternate name); (3) Sterling's IT contractor/manager Youssef Hodaigui and his email accounts; (4) Sterling's corporate address and telephone number; and (5) Bell's email and home addresses. (Id. ¶¶ 47-58). The Coffin Affidavit states that Bell's residence address was also found on Sterling's account applications with Actors Federal Credit Union and Fifth Third Bank, as well as on the resume for Frank Bell that was sent to Chelsea Bank. (Id. ¶ 52).

Agent Coffin averred that he attempted to access each of the Iraqi dinar blogs identified through the agents' investigation, and most were either no longer active or appeared to be operated by other individuals. (Coffin Aff. ¶ 61). However, utilizing a publicly available website called the Internet Archive, which creates a snapshot of a webpage as it existed during a certain time, Agent Coffin was able to review information that had been previously posted on several of the Iraqi dinar blogs during the time that Pleasant was employed by Sterling. (Id. ¶¶ 25, 61). The Coffin Affidavit described, on the dates identified, what Coffin asserted were numerous false statements on the blogs about investing in Iraqi dinars, including that there are never any losses of

22

value ("The Iraqi currency will never get low"); that exchanging dinars for dollars was easy ("if you need the invested amount back you can easily exchange it with the same rate that you bought it"); and that investment in the dinar would yield big profits soon ("the Iraqi dinar will be soon giving away tons of dollars and large sums of returns for the people who have invested in it").  (Id. ¶¶ 61-65).  Several of the blogs contained links to Sterling's or Dinar Banker's website.  (Id. ¶ 66).  However, none of the blogs indicated or revealed that they were associated with Sterling or its personnel.  The Coffin Affidavit stated that the evidence obtained as of the date of the affidavit suggested that Sterling hid its ownership of these anonymous blogs and promotion of the dinar from Sterling's banks as well as from the general public.  (Id. ¶ 69).

The Coffin Affidavit explained that the nature of the currency exchange business meant that Sterling needed banks that would permit it to open and maintain accounts to transact business.  (Coffin Aff. ¶ 30).  Coffin averred that in the past, Sterling had maintained accounts at several large financial institutions, including JP Morgan Chase, Fifth Third Bank, and SunTrust, but those banks subsequently closed the accounts. (Id.).  Sterling was then required to find different financial institutions with whom to do business.  Tony Pleasant reported that he received a $10,000 bonus for helping Sterling open accounts with Mercantile Bank, located in Quincy, Illinois, but

23

Mercantile later shut down Sterling's accounts.  (<u>Id.</u>).  The affidavit identified three more recent financial institutions that Sterling appeared to be banking with, including Actors Federal Credit Union in New York, Mahopac National Bank in New York, and Chelsea Bank in Massachusetts.  (<u>Id.</u>).

The Coffin Affidavit described that as part of the investigation, agents were able to obtain and review records from a number of the financial institutions where Sterling had banked, including Actors Federal Credit Union and Mercantile Bank.  (Coffin Aff. ¶¶ 75-79).  Through those records, investigators were able to identify certain email addresses through which Sterling conducted business, including making wire transfer requests and communicating with regulators.  As detailed in the Coffin Affidavit, the investigation revealed that the email addresses listed in the affidavit were used to conduct business on behalf of Sterling and were likely to contain additional relevant evidence, including information pertaining to Sterling's operations, the identities of Sterling's customers, the sale of Iraqi dinars, communications with regulators and financial institutions, the state of mind of Sterling executives, and the disposition of Sterling's proceeds.  (<u>Id.</u> ¶ 9).

For example, Agent Coffin identified one of the email addresses, youssefhodaigui@gmail.com, as being used to administer the anonymous blogs that

made false claims about the dinar.  (Id. ¶¶ 56-60).  The Coffin Affidavit identified

another email address, trhame@earthlink.net, as the email address used to register the

corporate website that later claimed customers would be able to exchange cash for

dinars at airports.  (Id. ¶ 78).  The affidavit described how the subject email accounts

were used to conduct business on behalf of Sterling.  (Id. ¶¶ 72-105).  In their

declarations attached to their reply brief, the Sterling Defendants have confirmed that

they used the majority of the email accounts identified in the Coffin Affidavit for both

personal communications and communications related to Sterling's business.  The

Coffin Affidavit sufficiently described how the email addresses were essential to the

alleged fraud and money laundering scheme, which resulted in individuals sending

Sterling significant sums of money.  (Id. ¶¶ 28-31, 72-105).  The electronic transfer of

those funds in and out of bank accounts can reasonably form the basis of wire fraud and

money laundering charges.

Given the demonstrated links between the email accounts set forth in the Coffin

Affidavit and the financial institutions and accounts used by Sterling to conduct its

business and transfer proceeds, Judge Vineyard had more than ample probable cause

to believe that evidence of wire fraud and money laundering probably would be found

in those email accounts. See Martin, 297 F.3d at 1314.  The Coffin Affidavit stated

25

sufficient facts to justify a conclusion that there was a fair probability that evidence of these crimes would be found in the Sterling Defendants' emails.  Id.

### b.   **Franks** Analysis

As noted earlier, to be entitled to an evidentiary hearing on a motion to suppress based on misrepresentations or omissions in a search warrant affidavit, a defendant must make a "substantial preliminary showing" that the affiant made false statements or omissions, either intentionally or with reckless disregard for the truth, and that the false statements or omissions were necessary to the finding of probable cause.  Franks v. Delaware, 438 U.S. 154, 171-72, 98 S. Ct. 2674, 2684-85 (1978); United States v. Cross, 928 F.2d 1030, 1040 (11th Cir. 1991).

To determine whether the alleged false statements and omissions were material, the Court first will disregard those portions of the affidavit that the Sterling Defendants have shown are arguably false or misleading.  See Franks, 438 U.S. at 171-72, 98 S. Ct. at 2676, 2684 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); Cross, 928 F.2d at 1040. Then, looking only at the remaining portions of the affidavit, the Court will determine whether inclusion of the omitted facts would have prevented a finding of probable

cause. <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1327 (11th Cir. 1997) (noting that "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause").

The Sterling Defendants contend that, with the inclusion of matters wrongfully omitted, and the exclusion of matters wrongfully included, the Coffin Affidavit failed to provide probable cause for the searches identified in the accompanying search warrants.

The Coffin Affidavit, which supported the January 2015 search warrants, was comprised of several parts that included Agent Coffin's credentials, a summary of the investigation leading to the request for the subject search warrants, general background information about the Iraqi dinar and Sterling, internet predictions of a dinar revaluation, investor warnings issued by several states and a consumer protection group, a discussion about information provided by former Sterling employee Tony Pleasant, Sterling's alleged involvement with Iraqi dinar blog sites, Sterling's banking relationships, the use of certain email accounts to conduct Sterling transactions, and other facts relating to the investigation of the Sterling Defendants. (Doc. 112-2).

27

The Sterling Defendants contend that but for the following intentional misrepresentations and intentional omissions in the Coffin Affidavit , there would not have been probable cause to support the January 2015 search warrants:

- The Coffin Affidavit stated in Paragraph 11 that in 2014, Wells Fargo's website indicated that it did not sell the dinar and advised investors against buying the dinar as an investment, but Coffin omitted the fact that Wells Fargo sold the dinar in 2010 and 2011. (Doc. 84-1 at 9).

- By the time Utah issued its advisory in January 2011, Sterling had removed from its website any statement about the prospect that the dinar would go up in value and had included a disclaimer stating that Sterling was not an investment company and that information on Sterling's website should not be construed as investment advice. (Id. at 9).

- By April 2011, three years before Alabama issued its alert, Sterling had posted a statement on its website warning potential customers "to conduct their own research on the Iraqi Dinar before making a purchase." (Id. at 11).

- Sterling had an A+ rating from the Better Business Bureau for much of the time frame covered by the Coffin Affidavit. (Id. at 12).

28

- The Coffin Affidavit failed to identify which statements made by Sterling on its website were false when made and why the statements supposedly were false. (Id. at 14).

- The Coffin Affidavit omitted the fact that between 2007 and 2009, many people believed that Iraq, with its vast resources, was on the verge of blossoming into a mega-economy. (Id. at 18).

- The Coffin Affidavit failed to include opinions contrary to the state advisories, including the fact that a reputable news program, a famous investment advisor, and a competitor of Sterling all recommended the dinar as a good investment. (Id. at 18-19).

- In 2011, then Secretary of State Hillary Clinton spoke publicly about what she believed was Iraq's bright future and potential for economic growth. (Id. at 22).

- The Coffin Affidavit quoted an article posted on Sterling's website discussing the "minimal risk" of the Iraqi dinar decreasing in value and that "indicators point toward something happening in the near future (next 12 months) if not the very near future (next 3 months)," but failed to disclose that Sterling subsequently removed the article from its website

29

after the value of the dinar did not increase within the time period suggested by the article. (Id. at 23).

- The Coffin Affidavit falsely claimed that Sterling's former compliance officer, Tony Pleasant, told investigators that he had informed "Sterling executives" that Sterling did not have the financial resources to "cash out" customers if and when a revaluation occurred; in fact, Pleasant told investigators that he made that statement to Rhett Rhame, Tyson Rhame's younger brother who was not a Sterling executive. (Id. at 25).

- The Coffin Affidavit failed to mention that Sterling had a plan to capitalize its accounts and exchange its customers' dinars. Sterling published the plan on its website, entitled "Complete Guide to Exchanging Iraqi Dinar After Revaluation," which explained that Sterling maintained an inventory of 2 billion Iraqi dinar (worth approximately $2 million U.S. dollars) that it could exchange for U.S. dollars if a "rapid large increase in the value of the Iraqi dinar" occurred, and that Sterling would use those dollars to exchange its customers' dinars. (Id. at 27-28; Doc. 84-3 ¶ 19).

- The Coffin Affidavit failed to disclose that the statements on Sterling's website on October 21, 2010 about setting up "secure remote satellite

offices" at numerous airport locations as soon as possible in the event of a revaluation were removed from the website by April 2011 and that the plan to open offices at airports was scrapped two months before Tony Pleasant joined Sterling in June 2011. (Doc. 84-1 at 28-31).

- The Coffin Affidavit failed to disclose that in response to Pleasant's warnings about the blogs, Sterling removed the information. (Id. at 32).

- The Coffin Affidavit disclosed that investigating agents initially encountered Pleasant during an investigation of potential BSA/AML violations at a financial institution where Pleasant worked as a BSA/AML officer.   Coffin, however, omitted critical credibility information, including that by the time the agents met Pleasant, (1) Sterling had accused Pleasant of stealing protected information from his previous employer; (2) Pleasant had already attempted to secure payments from two whistleblower sites; and (3) Pleasant had an axe to grind with Sterling due to his termination.  (Id. at 34-35).

- The Coffin Affidavit failed to mention any of the disclaimers that Sterling posted on its website. (Id. at 35).

31

- The Coffin Affidavit stated that Bell was Sterling's COO, but omitted the date Bell became COO at Sterling, giving the misimpression that Bell was involved in activities prior to 2011, when he in fact had no involvement. (Id. at 37).

With regard to what the Sterling Defendants contend are the deliberate misrepresentations and omitted facts summarized above, the Court has removed all the alleged tainted misrepresentations, transplanted into the text the material omissions averred by the Sterling Defendants, and then stepped back to see if there remains sufficient content in the Coffin Affidavit to support a finding of probable cause. Kapordelis, 569 F.3d at 1309. My determination is that there remains sufficient content to support a finding of probable cause to believe that evidence of wire fraud and money laundering would be found in the email accounts.

With regard to the alleged lack of credibility information about Pleasant, it is clear from the affidavit that Sterling fired Pleasant. It is also clear that after Pleasant learned that the employer he worked for after Sterling was under federal investigation for Bank Secrecy Act violations by the department where Pleasant served as BSA officer, Pleasant offered information that Sterling employees were engaged in a scam. Omission of an informant's legal troubles and potential motivations to cooperate does

32

not ordinarily implicate <u>Franks</u> concerns.  <u>See</u> <u>United States v. Taylor</u>, Crim. No. 14-0303-CG, 2015 WL 5923580, at *2 (S.D. Ala. Oct. 12, 2015) (stating that "[i]t would have to be a very naïve magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive. The magistrate would naturally have assumed that the informant was not a disinterested citizen."); <u>United States v. Dale</u>, 991 F.2d 819, 844 (D.C. Cir. 1993) ("an affiant's failure to disclose the backgrounds and alleged biases of informants does not establish the affiant's reckless disregard for the truth").

Nor was Agent Coffin's affidavit materially misleading because it failed to disclose that during the time period in question, a few famous commentators had positive opinions about the dinar or that Hillary Clinton was bullish on the Iraqi economy.  None of those individuals' statements suggested that a revaluation was imminent, as Sterling was alleged to be promoting through its website and anonymous blogs.  Even if they had, the Government is generally not required to include exculpatory information in search warrant applications.  <u>See, e.g.</u>, <u>Mays v. City of Dayton</u>, 134 F.3d 809, 816 (6th Cir. 1998) (no duty to disclose potentially exculpatory information in search warrant application); <u>United States v. Colkley</u>, 899 F.2d 297,

33

302-03 (4th Cir. 1990) (no duty to include all potentially exculpatory evidence in affidavit; affirming conviction and ruling that no <u>Franks</u> hearing was required).

Nor does omission of the dates that certain information was removed from Sterling's website or the blogs identified by Pleasant negate probable cause. If anything, removing Rhame's article predicting an imminent revaluation from Sterling's website when a revaluation did not occur tends to show that the Sterling Defendants knew that any continued predictions of an imminent revaluation would be misleading to potential investors.

The affidavit provided ample probable cause that Sterling, through its representatives, made a variety of false statements over the internet and telephone to induce customers to purchase the dinar; that while Sterling claimed on the one hand that it did not offer investment advice, its website expressly told potential customers that all indicators were that the dinar was about to skyrocket in value (overnight, or over the weekend), a representation that regulators warned was false; the Sterling website and at least one employee told customers that Sterling had plans to open airport exchanges after the dinar "revalued," but at least one former employee and one airport confirmed

34

to investigators that the company had no such plan in place[6]; Sterling was connected to a number of anonymous blog sites that falsely claimed that investors would never lose money by purchasing the Iraqi dinar; Sterling had a series of bank accounts and banking relationships through which it received and transferred funds from the sale of dinars and conducted business; and the Sterling Defendants used the email addresses identified in the affidavit, and others, to conduct company operations and business on behalf of Sterling. (Coffin Aff. ¶¶ 38-43, 49-61, 63-69, 72). Inclusion of the omitted facts would not have prevented a finding of probable cause. See Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997) (noting that "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause").

The Sterling Defendants have failed to make a sufficiently strong preliminary showing that the affiant, Agent Coffin, with an intention to mislead, excluded critical

---

[6] Early in their brief, the Sterling Defendants argue that Agent Coffin misled the magistrate judge by intentionally withholding the fact that Sterling had scrapped its plan to exchange customers' dinars at airports in early 2011, before Pleasant joined the company in June 2011, and so Pleasant could not have known about such plans. (Doc. 84-1 at 29-30; Doc. 128 at 10). This argument, however, is seriously undermined by the Sterling Defendants' later argument that Agent Baucom misled the magistrate judge by failing to mention that on a GET Team call on August 10, 2011, Frank Bell continued to tell listeners that "as quickly as possible, Sterling will open offices with major hub airport locations. ... it's a matter of when and not if." (Doc. 84-1 at 64).

information from the affidavit, and that the omissions were critical to the finding of probable cause.  Mays, 134 F.3d at 816.  The Sterling Defendants have also failed to make a substantial showing that Agent Coffin made any material false statement in his affidavit, either deliberately or with reckless disregard for the truth, that would have negated the probable cause determination.  Accordingly, for all the reasons stated, the Sterling Defendants are not entitled to a Franks hearing as to the January 2015 search warrants and Agent Coffin's affidavit.

### 2.    Agent Baucom's May 29, 2015 Affidavit and Search Warrants

The Sterling Defendants next move this Court to suppress evidence obtained through the execution of search warrants on May 29, 2015 authorizing the search of the Sterling Defendants' homes.[7]  (Doc. 84-1 at 42; Doc. 112-35 through 112-38).  In support of the search warrants, Agent Baucom provided the previously discussed May Baucom Affidavit, which the Sterling Defendants argue incorporates and reasserts Agent Coffin's allegations from his affidavit in support of the first set of search

---

[7] Although the Sterling Defendants' brief notes at the outset of the section addressing the May Baucom Affidavit that the warrants also authorized the search of Sterling's office, the Sterling Defendants do not present any argument regarding the office location.  Accordingly, the Court has assumed the Sterling Defendants' motion to suppress evidence obtained pursuant to the May 2015 search warrants is limited to the Sterling Defendants' residences.

AO 72A
(Rev.8/8
2)

warrants in January 2015, along with three additional allegations. (Doc. 84-1 at 42-43). The Sterling Defendants have incorporated by reference the arguments they made with regard to the Coffin Affidavit, and focus on the three new allegations in the May Baucom Affidavit. For ease of discussion, the Court will do the same.[8]

The Sterling Defendants argue that the May Baucom Affidavit merits a <u>Franks</u> hearing for the same reasons as they asserted with regard to the January Coffin Affidavit, and that Agent Baucom's three new allegations failed to provide probable cause by presenting the magistrate judge with distorted and/or plainly false facts. The three new allegations concern (1) one blog post; (2) Sterling's relationship with Keller, the GET Team, and conference calls that Keller hosted; and (3) additional information obtained from the Sterling Defendants' emails. The Sterling Defendants argue that had Judge Brill been presented with an accurate portrayal of the facts, she would not have found probable cause to support the May 2015 search warrants.

_____

[8] The Sterling Defendants argue that for the first fifteen pages of Agent Baucom's May 2015 affidavit, he simply restates the allegations that Agent Coffin included in his affidavit for the email accounts. (Doc. 84-1 at 43). The undersigned has already determined, post <u>Franks</u> analysis, that there remained sufficient content in the Coffin Affidavit to support a finding of probable cause to believe that evidence of wire fraud and money laundering would be found in the email accounts identified in the Coffin Affidavit and the related search warrants.

37

For the same or similar reasons as discussed above, the Sterling Defendants have failed to make a substantial showing that Agent Baucom made any material false statements or material omissions in his affidavit, either deliberately or with reckless disregard for the truth, that would have negated the probable cause determination.

The Sterling Defendants first take issue with paragraph 49 of the May Baucom Affidavit, which described a blog post dated April 20, 2012 on an anonymous blog site linked to Sterling that encouraged viewers to purchase Iraqi dinar from Sterling. The Sterling Defendants argue that unlike the other blog posts identified in the Coffin Affidavit (which allegedly made misrepresentations about an imminent revaluation and likelihood of the dinar increasing in value), this post contained no inaccurate information; the post merely touted Sterling's reputation, credentials, trustworthiness, compliance with applicable federal requirements, ability to meet customers' demands for exchanging dinar, and solid banking connections "to ensure fast and secure exchanges with customers." (Doc. 112-34 at 16 ¶ 49). The Sterling Defendants argue that, if anything, the blog content undermines, rather than supports, Agent Baucom's contention that Sterling used blogs to publish false information.

The Sterling Defendants' argument misses the mark. Agent Baucom's affidavit does not assert that the content of this particular blog post was false. Rather, Agent

AO 72A
(Rev.8/8
2)

Baucom asserts that this blog post, and others associated with Sterling, misled potential viewers by failing to disclose that Sterling and/or Sterling personnel owned and created the blogs, and were using them to boost Sterling's rankings in search engine results. (Id. ¶ 50). The Sterling Defendants have failed to show that Agent Baucom's allegation was false, a material misstatement or omission, or that it in some way negated probable cause.

The Sterling Defendants next take issue with the portion of the May Baucom Affidavit addressing Sterling's alleged payments to websites and blogs that discussed the possibility of a dinar revaluation, including specifically Sterling's alleged involvement with co-defendant Terrance Keller and Keller's website, known as the GET Team. The May Baucom Affidavit described that Keller and the GET Team ran a blog and held conference calls on which false and/or misleading information was disseminated about the Iraqi dinar, including false information suggesting that a revaluation was about to occur. The May Baucom Affidavit described that financial records reviewed during the investigation revealed what appeared to be monthly payments in the amount of $4,000 from Sterling to the GET Team website for advertisements thereon, and that email correspondence between Keller and Sterling's

39

Tyson  Rhame and Frank Bell suggested that Keller sought to promote Sterling and increase Sterling's dinar sales.  (Id. ¶¶ 52-53, 56).

The Sterling Defendants argue that in his May affidavit, Agent Baucom deliberately tried to mislead Judge Brill by failing to advise her that other dinar sellers and businesses also paid Keller and/or the GET Team to advertise on his website and/or participate in his conference calls.  (Doc. 84-1 at 45 n.9).  This argument is unfounded and directly contradicted by paragraph 53 of the affidavit, in which Agent Baucom states that, "At least one other dinar broker also advertises on the GET Team and makes monthly advertising payments." (May Baucom Aff. ¶ 53).  Paragraph 56 identified two other dinar sellers that advertised on the website and/or participated in the website's conference calls.  The Sterling Defendants' argument is without merit.

The affidavit then discusses various emails Keller sent to one or more of the Sterling Defendants describing Keller's website, including one email inviting Tyson Rhame to participate in one of Keller's weekly conference calls for the first ten to fifteen minutes (May Baucom Aff. ¶ 54), and another email dated November 7, 2011 from Keller to Tyson Rhame and Sterling COO Frank Bell, stating that Keller wanted to keep his arrangement with Sterling private: "I want to make sure that our

AO 72A
(Rev.8/8
2)

arrangement is between us and no one else ... As no one else needs to know about our arrangement... Please confirm... Thanks for all you guys do....'' (<u>Id.</u> ¶ 55).

In addition to email correspondence, the affidavit described other contacts between Sterling and Keller and/or Keller's website, including that "Sterling COO Frank Bell routinely appears on weekly conference calls hosted by the GET Team." (May Baucom Aff. ¶ 57). The affidavit alleged that "[d]uring the conference calls, GET Team managers will pass along what investigators believe to be false information that they supposedly received from sources about the Iraqi dinar and other currencies ... that will supposedly be 'revalued.'" (<u>Id.</u>). The affidavit then stated, "For instance," and provided examples of certain GET Team conference calls during which allegedly false statements were made by GET Team representatives. (<u>Id.</u> ¶¶ 57-59).

The Sterling Defendants argue that by including the words "For instance," Agent Baucom falsely implied that Bell was on each of the calls identified in the affidavit for the entire duration of the calls and that Bell heard Keller make the allegedly false statements. The Sterling Defendants argue that Agent Baucom knew that Bell was not on one of the calls at all, and participated in two of the other conference calls described in the affidavit for only the first few minutes of the calls. (Doc. 84-1 at 47-50).

41

The Sterling Defendants do not dispute the truthfulness of the statement that Frank Bell routinely appeared on conference calls hosted by the GET Team, and they have failed to show that Agent Baucom's statement was false or made with reckless disregard for the truth. From the Court's reading of the paragraph, the words "For instance" applied to the subsequent listing of examples of false information (supposedly from high-level, but unnamed sources) that the investigators believed GET Team members were passing along on their calls. The last sentence of the paragraph makes that clear, by noting that similar "source" information was frequently also posted in the GET Team's online chatroom. (May Baucom Aff. ¶ 57). The next two paragraphs continue to describe how Keller and other GET Team representatives lied about having sources and describe investigators' efforts to verify whether Keller's claims were true or false. (Id. ¶¶ 58-59). There are no allegations in the May Baucom Affidavit that Bell remained on each conference call for the entire duration of the call. Omission of the fact that Bell was not on one of the calls described and may have left the other calls before Keller allegedly made false statements does not undermine the "fair probability" that evidence of fraud and/or money laundering would be found, as established by the other evidence in Agent Baucom's affidavit. Franks, 438 U.S. at 171-72.

42

The Sterling Defendants argue that Agent Baucom further misled the magistrate judge by failing to disclose that at least one of Keller's alleged false statements (about supposed high-level information from a secret source at the U.S. Treasury Department concerning currency revaluation) occurred in the middle of a Keller monologue of bad jokes and other off-color comments. (Doc. 84-1at 50). The Sterling Defendants have failed to show that this purported omission in the affidavit was material. See Kapordelis, 569 F.3d at 1309.

The Sterling Defendants next argue that in his May affidavit, Agent Baucom misled the magistrate judge by selectively quoting from emails and excluding exculpatory sections that negate probable cause. (Doc. 84-1 at 51). Under the heading, "Additional Evidence of Fraud," Agent Baucom states, "Investigators have reviewed several emails that further show that individuals associated with Sterling were knowingly engaged in a scheme to defraud Iraqi dinar investors." (May Baucom Aff. ¶ 60). Agent Baucom cites three emails that he claims demonstrate Sterling's criminal activity.[9]

---

[9] The Sterling Defendants state that these emails were discovered during the execution of the January 2015 search warrants. (Doc. 84-1 at 51 n.11).

43

The first email discussed in Paragraph 60 of the May Baucom Affidavit is dated November 3, 2010.[10]   In it, Defendant Shaw explained to Tyson Rhame that Shaw's wife, Laurette

> has lately been very nervous and was crying last night because she knows we are running an illegal operation.
>
> The point is that her and I have worked way too hard in life for us to risk everything based on your belief (even if I agree with you) that the Iraqi dinar will not RV and it is ok to make millions of dollars in false promises to our customers. Not only are we risking everything we own, we are risking serious jail time as promoters of a ponzi scheme.

(Id.).  The last sentence of Paragraph 60 indicated that a copy of the email was attached to the affidavit. (Id.).

The Sterling Defendants argue that Agent Baucom deliberately mischaracterized the email by leaving out the paragraph immediately following the quoted language which appears to be discussing whether Sterling's Iraqi dinar supplier had signed a hedging contract.[11]   The Sterling Defendants argue unpersuasively that the omitted

---

[10] The affidavit identifies that the email was sent from Sterling co-owner James Shaw's email address shawmarket@aol.com to Sterling co-owner Tyson Rhame's email address trhame@earthlink.net.  (May Baucom Aff. ¶ 60).

[11]  The omitted paragraph reads: "If it was no problem for Abul to sign, then we should have back.  It is ok to pay him to sign actual hedging contract."   (Doc. 84-3 at 73).

AO 72A
(Rev.8/8
2)

language demonstrates that Shaw's worry and concern were for a hedging contract and being sufficiently capitalized to be able to honor customer exchanges, and that Shaw used the term "ponzi scheme" to describe that concern (not to describe making millions of dollars by lying to customers and the possibility of going to jail for defrauding customers). (Doc. 84-1 at 52).

Even assuming that Agent Baucom knew about this hedging contract in May 2015 and had included the omitted paragraph in the quoted selection from the November 2010 email, the words in the email speak for themselves. There is no indication that Shaw's wife was crying about the lack of a hedging contract. In any event, a complete copy of the entire email was attached to the affidavit as one of four short attachments and was easily available for the magistrate judge to review and consider. The Sterling Defendants have failed to make a substantial showing that Agent Baucom's omission of the hedging contract language from the body of the affidavit (while attaching a complete copy of the email for the magistrate judge's review) constituted a material misstatement or omission, or negated probable cause.

Agent Baucom's affidavit next included as additional evidence of fraud a March 22, 2011 email from Tyson Rhame to Shaw's wife, Laurette, with a copy to James Shaw. The subject line of the email was, "Comments related to AMENDED

45

Operating Agreement," and the email stated, "This amendment is complete bullshit for the purpose of obtaining banking. Jim and Ty are operation [sic] under the original partnership agreement. We are 50% partners and his ass will go to prison if mine does." (May Baucom Aff. ¶ 61). The email attached a document entitled, "Sterling Currency Amended Operating Agreement signed March 21, 2011" which contained Rhame's signature and indicated that Sterling was owned solely by Tyson Rhame, and that James Shaw was not an owner or partner, but merely entitled to 50% of the profits generated and/or losses incurred. (Id.).

The Sterling Defendants argue that this email is irrelevant to probable cause and does not in any way relate to a scheme to defraud Iraqi dinar investors. (Doc. 84-1 at 53). However, lying to a bank in order to open accounts to handle wire transfers could arguably be part of a wire fraud and money laundering scheme. The Sterling Defendants have failed to make a substantial showing that Agent Baucom's description of the March 22, 2011 email in Paragraph 61 of his affidavit was false and was made either intentionally or with reckless disregard for the truth, or that Paragraph 61 of the affidavit constituted a material misstatement or omission, or negated probable cause.

The Sterling Defendants next argue that Agent Baucom falsely claimed that an August 6, 2012 email from James Shaw to Frank Bell containing a link to a Forbes

46

magazine article, with a subject line, "not great article," also showed that individuals associated with Sterling were knowingly engaged in a scheme to defraud Iraqi dinar investors. (May Baucom Aff. ¶¶ 60, 62). According to the May Baucom Affidavit, the title of the article was "You Can't Fix Stupid: The Iraqi Dinar Scam Lives," and the article described how the sale of Iraqi dinar was a scam and provided thoughts on why the dinar would never revalue. (Id.). The Sterling Defendants disagree with Agent Baucom's interpretation of what the email evidence demonstrated, but have not made a substantial showing that Baucom's interpretation of the article and the email allegation was false and was made either intentionally or with reckless disregard for the truth, or that Baucom's description of the article and the email constituted a material misstatement or omission, or negated probable cause.

Finally, the Sterling Defendants argue that in Paragraph 56 of the May Baucom Affidavit, Agent Baucom included a discussion of several emails between Keller and either Rhame or Bell to suggest that Keller was pushing or promoting Sterling in order to pump Sterling's sales over other dinar sellers. (Doc. 84-1 at 54-55). One of the emails from Keller to Rhame, dated April 25, 2012, stated, "FYI Dinar Trade wanted back on my site yesterday to put his banner up...I turned him down I want you to know that I am a DINAR BANKER SUPPORTER and I only have Dinar Inc. on because they

47

make you guys look like GODS!!!!!  Your Friend TK."  (May Baucom Aff. ¶ 56).

Another email, dated July 22, 2013, from Keller to Bell stated, "Frank, please find

attached the banner invoice for the month of August 2013.  I trust things are going well,

as we keep promoting the heck out of Sterling.  If there is anything you need let me

know."  (Id.).

The Sterling Defendants argue that despite what Keller said in his 2012 and 2013

emails, on some of the GET Team conference calls identified in the affidavit, Keller

made no references to Sterling, or if he did, he said nothing improper to promote

Sterling. (Doc. 84-1 at 55).  The Sterling Defendants have not shown that any of Agent

Baucom's statements about the emails were false or constitute material

misrepresentations or omissions.  In fact, in their brief, the Sterling Defendants

acknowledge that Keller encouraged people to buy dinar from Sterling and "give those

guys a call."  (Doc. 84-1 at 55).   The Sterling Defendants have failed to show that

Paragraph 56 of Agent Baucom's affidavit was misleading in any way, or that it

negated probable cause.

The Sterling Defendants next argue that the May Baucom Affidavit failed to

show a "fair probability" that evidence of a crime would be found at the Sterling

48

Defendants' personal residences, and it failed to tie the Sterling Defendants' personal addresses to the illegal activity alleged in the indictment.  (Doc. 84-1 at 56).

"Where a warrant to search a residence is sought, the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that [the defendant] might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'" Kapordelis, 569 F.3d at 1310 (citing United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir.1999)). With regard to a suspect's home:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

Id. (citing United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B Jan.1981)). There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home, but "the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id. (citing United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002); United States v. Anton, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence of possession of contraband of type normally expected to be hidden in

49

residence will support search); <u>United States v. Jenkins</u>, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (nexus between items to be seized and defendant's home can be established circumstantially where contraband is capable of being hidden in residence)).

In this case, contrary to the Sterling Defendants' argument, the May Baucom Affidavit describes in great detail the various relationships between Rhame, Shaw, Bell, Shaw's wife (Carole Laurette Shaw), and the various Sterling entities and holding companies through which the Sterling entities and the Sterling Defendants engaged in the sale of Iraqi dinar and other currencies. (May Baucom Aff. ¶¶ 64-74). The affidavit documents the Sterling Defendants' ownership interests in the various Sterling entities, trusts, and related holding companies, and it describes in detail how the relevant entities are connected to the Sterling Defendants' home addresses, bank and trading account applications, and accounts through which Sterling and its related entities conducted business. (<u>Id.</u> ¶¶ 82-104). The affidavit also describes the financial records, company records, computers, electronic storage, emails, forensic evidence, and other evidence that was likely to be found at the subject premises. (<u>Id.</u> ¶¶ 105-111). Agent Baucom supplied the authorizing magistrate judge with a reasonable basis for concluding that the Sterling Defendants might keep evidence of their alleged criminal activity in their homes. <u>See</u> <u>Kapordelis</u>, 569 F.3d at 1310. The Sterling Defendants

50

AO 72A
(Rev.8/8
2)

do not allege any misrepresentation or omission material to the issue of whether contraband and other evidence would be found at the target residences. For the reasons stated, the Sterling Defendants are not entitled to a <u>Franks</u> hearing, and I recommend that the Sterling Defendants' Joint Motion to suppress the May 29, 2015 search warrants be denied.

**3.   Agent Baucom's August 13, 2015 Affidavit and Search Warrants**

On August 13, 2015, Agent Baucom submitted to Judge Baverman an affidavit in support of eight search warrants for information associated with 53 email addresses. The Sterling Defendants move this Court to suppress evidence obtained through the August 13, 2015 warrants authorizing the search of Rhame's, Shaw's, and Bell's emails from the date of the first search warrant (January 22, 2015) through August 13, 2015. (Doc. 84-1 at 58). With regard to the August 13, 2015 warrants and the supporting affidavit of the same date (the "August Baucom Affidavit," Doc. 112-49), the Sterling Defendants again adopt and reassert their arguments set forth earlier, and restrict their current arguments to the following additional statements added by Agent Baucom to the information contained in the first two affidavits discussed above: (1) a statement by Bell to federal investigators that Bell did not believe a revaluation would ever occur; (2) a statement by Bell to federal investigators that Sterling kept a "firewall" between

itself and other dinar promoters, including Keller and the GET Team; and (3) Rhame's statement to a customer that Sterling would be able to exchange customers' dinars at airport kiosks following a revaluation.  (Id. at 58-59).

As noted by the Government, by the time Agent Baucom's August 13, 2015 affidavit was presented to Judge Baverman, investigating agents had reviewed numerous emails, bank records, and business records, and they had interviewed various Sterling employees and other individuals associated with the promotion and sale of Iraqi dinars.  The August Baucom Affidavit indicated that the investigation had revealed that Sterling managers believed the revaluation would never occur and/or that Sterling was engaged in illegal activity.  (August Baucom Aff. ¶ 11).  The affidavit stated that Bell had told federal investigators that he "did not think the Iraqi dinar will undergo a revaluation as speculators commonly claim."  (Id. ¶ 10).  Other Sterling employees reported to investigators that they heard Bell make similar statements–i.e., that the revaluation would never occur.  (Id. ¶ 11).

The Sterling Defendants do not deny that Bell told investigators that he had no expectation that a revaluation would occur, but they argue instead that the August Baucom Affidavit mischaracterized Bell's statement to the FBI in May 2015 by omitting the following explanation:

52

I mean, I could see a modest climb in value if, if Iraq gets their security situation squared away, and finds a way to, you know, get a sectarian government in place that is going to work with all the factions that they've got pulling them apart right now, and the U.S. continues, you know, we continue our expansionary monetary policy, and if they ever decide to break from being a reserve currency, and they keep a sound monetary policy, I could see them doing what the Swiss did.

You know, the Swiss said we're not, they looked at Europe and they said, hey guys, you know, we're not going to print any more money.  This is not good.  And, you know, their exchange rate immediately shot up the second they made that announcement.... I could see something like that, but you're talking a 5-10% gain, not a 20,000% percent return that people speculate.

(Doc. 84-1 at 60; Sullivan Aff. ¶ 33).  It is clear from Bell's explanation that even under a best-case scenario, a modest increase in value was speculative at best, and he did not believe a revaluation–i.e., a sudden "dramatic[ ] gain in price compared to the U.S. dollar" that would "make even small investors massive profits" (August Baucom Aff. ¶ 10)–was imminent or even possible under current circumstances.  The Sterling Defendants have failed to show that Agent Baucom's statement was not a fair summary of what Bell told investigators or that inclusion of the omitted text would have negated the magistrate judge's probable cause determination.

The Sterling Defendants next argue that the August Baucom Affidavit misrepresented Keller's promotion of Sterling, but they do not articulate how any

statement by Agent Baucom was false or a material misrepresentation, or how he made any material omission. (Doc. 84-1 at 61). The affidavit quotes a May 12, 2012 email from Keller to Bell stating, "You should have gotten a lot of business on the reserves the past week, been pushing it hard on the site bro ... make sure TY is not selling dinar from the middle table that one is mine...." Bell responded, "TK, Will do, thanks for your support." (August Baucom Aff. ¶ 21). The affidavit further states that at least one victim told the FBI that Keller repeatedly told investors the revaluation was about to occur and directed people to buy from Sterling, and emails confirmed that Keller told Bell that he was promoting buying dinar from Sterling. (Id. ¶ 22). The Sterling Defendants' only offer of proof concerning this point confirms that Keller told listeners to his calls that if they wanted to buy more Iraqi dinar, they should give "those guys ... the first opportunity before you go out shopping around." (Sullivan Aff. ¶ 34). The Sterling Defendants have failed to show how any alleged misrepresentation negated the magistrate judge's probable cause determination.

Finally, the Sterling Defendants contend that the affidavit somehow mischaracterized Sterling's plans to exchange dinar at airport kiosks following a revaluation. Paragraph 22 of the August Baucom Affidavit states:

> Rhame told people that following a revaluation Sterling would be able to cash out customers at airport kiosks.

> Rhame and [a victim interviewed by the FBI] spoke on the phone at one point and Rhame stated that Sterling would have a kiosk at JFK International Airport following a revaluation.  However, officials from JFK International Airport have indicated that Sterling/Dinar Banker never made an application to open up an office or kiosk at that airport.

(August Baucom Aff. ¶ 22).

The Sterling Defendants argue that by August 2015, investigators had received and reviewed the GET Team conference calls.  The Sterling Defendants argue that on one of the calls in 2010, Rhame had stated that airport locations had simply been "scouted" and would be set up "when we have the demand."  (Doc. 84-1 at 63).  The Sterling Defendants imply that it should have been obvious to investigators that no formal applications to airports were required.  The Sterling Defendants characterize Rhame's later statement to a customer about kiosks at JFK as "an aberation" in light of other statements made on the GET Team calls by Bell and Rhame describing their plans to exchange customers' dinars following a revaluation.  The Sterling Defendants, however, have failed to show that Paragraph 22 of Baucom's affidavit was false, or contained a material misrepresentation, or a material omission.  Rather, the Sterling Defendants argue that on one conference call, Rhame described in more detail Sterling's plans to open offices at airport locations "if–or when–the  currency goes to

55

a particular value depending on the day of the week." (Doc. 84-1 at 63). In another call in August 2011, Bell reaffirmed to listeners that Sterling intended to open exchange offices at major hub airport locations, but clarified that opening multiple locations in the first 24 hours [presumably after a revaluation] was probably not feasible due to the lack of manpower. (Doc. 84-1 at 64). Including the language the Sterling Defendants contend was omitted from the affidavit would not negate probable cause or, as the Sterling Defendants claim, "prevent [ ] the magistrate judge from making a detached and neutral decision." (Doc. 84-1 at 65). The Sterling Defendants have failed to make a substantial preliminary showing that Agent Baucom intentionally or recklessly made false statements (or material misrepresentations or omissions) that were necessary to the magistrate judge's finding of probable cause. Franks, 438 U.S. at 171-72.

In sum, after setting aside the material that is the subject of the alleged falsity or reckless disregard, I find that "there remains sufficient content in the warrant affidavit[s] to support a finding of probable cause." Franks, 438 U.S. at 171-72. Accordingly, no Franks hearing is required.

### 4.   **United States v. Leon**

Finally, the Sterling Defendants' Joint Motion is also due to be denied based on the good faith exception under the Supreme Court's decision in United States v. Leon,

468 U.S. 897, 922, 104 S. Ct. 3405, 3422 (1984). <u>Leon</u> held that even if a search warrant is ultimately found to be unsupported by probable cause, the Fourth Amendment will not bar admission of evidence obtained by law enforcement officers if the officers were acting in reasonable reliance upon the search warrant. <u>United States v. Martin</u>, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing <u>Leon</u>, 468 U.S. at 922, 104 S. Ct. at 3422). The Eleventh Circuit interpreted <u>Leon</u> as follows:

> The <u>Leon</u> good faith exception applies in all but four limited sets of circumstances [citation omitted]. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 99 S. Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

<u>Id.</u> (internal citations omitted).

The Sterling Defendants have argued, but have not shown, that the magistrate judges that issued the warrants at issue in this case were intentionally misled by

information in Agent Coffin's and/or Agent Baucom's affidavits that the affiant knew was false or would have known was false except for his reckless disregard of the truth. See United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing Leon, 468 U.S. at 922, 104 S. Ct. at 3422).  The Sterling Defendants have not set forth any other applicable exception to the Leon rule.  Accordingly, the Leon good faith exception to the exclusionary rule applies, and there is no basis for suppression.

## II.   KELLER'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS FOR KELLER'S EMAIL ACCOUNTS (DOCS. 77, 93)

Keller has also filed a motion to suppress (and perfected motion to suppress) evidence seized pursuant to search warrants for his email accounts in which he echoes many of the arguments asserted in the Sterling Defendants' Joint Motion.  (Docs. 77, 93).  Like the Sterling Defendants, Keller also asks this Court to hold a hearing under Franks v. Delaware to determine whether the affidavits supporting the search warrants issued to search his email accounts contained material omissions and misrepresentations that require suppression of the evidence found.  There are two sets of warrants that Keller challenges regarding the searches of his email accounts–(1) warrants issued on February 13, 2015 signed by Judge Brill (Docs. 112-7, 112-8), and (2) warrants issued on August 13, 2015 signed by Judge Baverman

58

(Docs. 112-50, 112-52).  The February 13, 2015 warrants were supported by an affidavit of Agent Baucom of that same date (the "February Baucom Affidavit," Doc. 77-1 at 13-38), which incorporates most of the January Coffin Affidavit discussed above.  The August 13, 2015 warrants for additional emails are supported by the August Baucom Affidavit discussed above.  (Doc. 77-4 at 22-70).  To the extent that Keller adopts the arguments raised in the Sterling Defendants' Joint Motion regarding the Coffin Affidavit dated January 22, 2015, those arguments are without merit for the same or similar reasons discussed above.

### A.    The February 13, 2015 warrants for Keller's email accounts

In addition to Keller's incorporation of the arguments contained in the Sterling Defendants' Joint Motion, Keller raises two arguments specific to his email accounts in support of his position that the February 13, 2015 warrants signed by Judge Brill lack probable cause.  First, Keller contends that the February Baucom Affidavit fails to connect his email accounts to any unlawful activity.  (Doc. 93 at 8-10).  Second, he argues that the February 13, 2015 warrants are overly broad and violate the particularity requirements of the Fourth Amendment.  These arguments are addressed in the order presented.

59

In Agent Baucom's February Affidavit, Agent Baucom adopted Agent Coffin's January affidavit and added nine paragraphs relating to Keller and his alleged ties to Sterling, for purposes of demonstrating probable cause for the search of Keller's two email addresses.  (Feb. Baucom Aff. ¶¶ 36-44).  In those additional paragraphs pertaining to Keller, Agent Baucom avers that Sterling was paying substantial sums of money to the GET Team blog, which allegedly made the same types of misleading claims about the dinar that were the subject of various regulatory warnings (id. ¶¶ 38-39); that Keller was making posts promising an imminent revaluation and claiming to have inside knowledge that the dinar would skyrocket in value on a particular date (id. ¶ 38); and that Keller used the email accounts listed in the affidavit to establish a relationship with Sterling, coordinate weekly conference calls with listeners, and order dinar from Sterling (id. ¶¶ 40-44).  These facts, along with the information about Sterling contained in the incorporated January Coffin Affidavit, provided an ample basis for Judge Brill's conclusion that there was probable cause that evidence of wire fraud and money laundering would be found in Keller's email accounts.

Keller next argues that the February 13, 2015 warrants do not meet Constitutional muster because they are not sufficiently particular.  The Fourth Amendment requires that a warrant particularly describe both the place to be searched

AO 72A
(Rev.8/8
2)

and the persons or things to be seized. U.S. CONST. amend. IV;  United States v. Bemka Corp., 368 F. App'x 941, 943 (11th Cir. 2010) (per curiam).  Keller contends that the February 13, 2015 warrants are overly broad because they authorize the seizure of all email content and information, without any date restriction.  Keller argues that it is improper for the Government to seize emails dating back to a time where there is no evidence of even a business interaction between Keller and Sterling.  (Doc. 93 at 12).

"It is universally recognized that the particularity requirement [of the Fourth Amendment] must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982).  The search warrants at issue in Keller's case set out a two-step process for searching and seizing evidence. First, the warrants required the service provider to disclose, among other things, the contents of all emails stored in the accounts.  The Government, however, was authorized to seize only a subset of the information disclosed, specifically information "that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1343 and 1956 and conspiracy to commit these offenses...." (Doc. 77-1 at 40-41).

AO 72A
(Rev.8/8
2)

Keller contends that the limitation in the warrants to the "fruits" or "instrumentalities" of wire fraud and money laundering is "anemic" and essentially meaningless. (Doc. 93 at 13). I disagree. To the contrary, the description of the items to be seized is sufficiently detailed and particular. By explicitly limiting the scope of what may be searched and seized to evidence of the crimes under investigation, the warrant was sufficiently particular to enable the searcher to reasonably ascertain and identify the property authorized to be seized. See United States v. Lee, No. 1:14-cr-227-TCB-2, 2015 WL 5667102, at *3 (N.D. Ga. Sept. 25, 2015) ("a warrant that requires disclosure of the entire contents of an email account and then describes a subset of that information that will be subject to seizure is reasonable"); United States v. Harvey, No. 1:15-cr-53-TWT-RGV, 2015 WL 9685908, at *13 (N.D. Ga. Nov. 30, 2015), adopted by 2016 WL 109984, at *1 (N.D. Ga. Jan. 8, 2016) (concluding that a search warrant for a cell phone was sufficiently particularized where the property to be seized was limited to evidence of the crimes being investigated); United States v. Archie, No. 1:15-cr-338-MHC-CMS, Docket No. 96, adopted by 2016 WL 3086410, at *1 (N.D. Ga. May 31, 2016) (concluding that there was no improper "general exploratory seizure" of the information contained in the defendant's email accounts where the warrant limited the seizure to evidence of illegal activities in violation of

62

specified state laws).  The universe of property that could be seized pursuant to the February 13 warrants was limited to evidence of the crimes being investigated–i.e., illegal wire fraud, money laundering, and conspiracy.  For the reasons stated, I conclude that the warrants were sufficiently particular and not in violation of the Fourth Amendment.  See Lee, 2015 WL 5667102, at *10 ("Indeed, the two-step procedure employed by the government to review the email accounts in this case—first obtaining the disclosure from Google and subsequently reviewing the disclosure for the items specified in the warrants—is explicitly authorized by Rule 41 of the Federal Rules of Criminal Procedure, and federal courts around the country have consistently upheld similar email search warrants utilizing this same procedure as constitutional under the Fourth Amendment.").

For all the reasons stated, Keller is not entitled to a Franks hearing as to the February 13 search warrants or the February Baucom Affidavit.

**B.     The August 13, 2015 warrants for recent emails**

In addition to the arguments Keller adopts from the Sterling Defendants' Joint Motion, Keller claims that the August Baucom Affidavit contains a material misstatement and a material omission relevant to the probable cause determination regarding his email addresses.

63

Keller first complains that Agent Baucom incorrectly summarized a statement that Keller gave to the FBI. (Doc. 93 at 16-17). In his August affidavit, Agent Baucom described various "sources" of information about the Iraqi dinar that Keller, during conference calls, claimed to have, including an unnamed source at Wells Fargo (who had supposedly told Keller that a revaluation "was supposed to happen but that the time keeps changing") and someone from the United States Treasury Department (who allegedly told Keller that "the rate was good and that everything would be released that week"). (August Baucom Aff. ¶ 18). In Paragraph 19 of the affidavit, Agent Baucom explained, "Investigators believe that Keller is lying about having these sources. For one, in a June 3, 2015 interview with federal agents, Keller stated that he did not actually have any sources." (Id. ¶ 19). Keller argues that the statement in Paragraph 19 is a mischaracterization of the FBI's own interview memorandum.

According to Keller, the FBI's 302 report reflects that Keller told the FBI that he did, in fact, have some sources. Keller argues that he told the FBI that he relied on some unspecified Department of Treasury publications (i.e., *written* sources) and that he had spoken with third-party sources who claimed to have information from the Treasury Department that later turned out to be untrue. (Doc. 93 at 16-17). Keller argues that he also told the FBI that one of his sources was "a person at Wells Fargo,

where he had his personal account." (Id. at 17).  Keller argues that because he told the FBI about these sources, Baucom's statement in his affidavit that "Keller stated that he did not actually have any sources" is false, and the related implication that Keller made everything up is misleading.  (Id.) (emphasis added).

From the Court's review of the materials on file, there is no indication that Keller identified any specific Treasury Department written publication or Treasury Department official who said that a revaluation was imminent or that "the rate was good and that everything would be released that week."  (August Baucom Aff. ¶ 18). With respect to Wells Fargo, Keller's purported statement to the FBI regarding "a person at Wells Fargo, where he had his personal account" is vague, at best.  But even assuming that Keller's summary of the statements he made to the FBI is more accurate than Agent Baucom's, Keller has not shown that Agent Baucom's alleged mischaracterization is material, that it was made with an intention to mislead, or that inclusion of the statements Keller purportedly made to the FBI about sources would have altered Judge Baverman's probable cause determination.  See Madiwale, 117 F.3d at 1327.

Keller further complains that the August Baucom Affidavit omitted the facts that Keller had invested a "significant amount" of his own money in dinar and that he gave

dinar to family and friends as gifts.  (Doc. 93 at 17-18).  Keller argues that these facts reflect that Keller believed in the potential value of the dinar, and they cut against any implication that he was intentionally misleading investors.  (Id. at 18).  As noted earlier, however, the Government is generally not required to include in search warrant applications exculpatory information, such as facts about Keller's personal investments in dinar.  Nor has Keller shown that the omission of these facts negates probable cause.

In sum, Keller has failed to make a sufficiently strong preliminary showing that Agent Baucom made a material false statement or omission in his August affidavit, either deliberately or with reckless disregard for the truth, that would have negated the probable cause determination.  See Mays, 134 F.3d at 816.  Accordingly, and for all the reasons stated, Keller is not entitled to a Franks hearing as to the August 13, 2015 search warrants or Agent Baucom's August Affidavit.

## III.   KELLER'S MOTION TO SUPPRESS EVIDENCE REGARDING THE SEARCH OF HIS RESIDENCE (DOCS. 79, 100)

In Keller's second motion to suppress, he asks this Court to hold a hearing under Franks v. Delaware to determine whether the affidavit supporting the search warrants issued to search his home in Kentucky contained material omissions and misrepresentations that require suppression of the evidence found.

66

On June 2, 2015, United States Magistrate Judge Edward B. Atkins of the Eastern District of Kentucky authorized a search warrant for Keller's personal residence (the "Kentucky Warrant," Doc. 112-43) based upon an affidavit signed by FBI Special Agent Clay Hoover of that same date (the "Hoover Affidavit," Doc. 79-1, Doc. 112-42).  The Hoover Affidavit is substantially similar, if not identical, to the May Baucom Affidavit discussed above and contains many of the same averments as the January Coffin Affidavit.  In arguing that the Kentucky Warrant was not supported by probable cause, Keller adopts and reiterates portions of the Sterling Defendants' Joint Motion. For the same reasons that I recommend denial of the Sterling Defendants' Joint Motion, I find Keller's adopted arguments unavailing.  Keller also argues unpersuasively that there is insufficient information in the Hoover Affidavit to tie him to any scheme.

In addition to the incorporated facts discussed above from the Coffin Affidavit regarding the alleged Sterling scheme, the Hoover Affidavit contains information that affirmatively ties Keller to Sterling.  According to the Hoover Affidavit, investigators determined that Keller operated the GET Team website through his Kentucky corporation, TCB Group, Inc.  (Hoover Aff. ¶ 60).  The Hoover Affidavit describes how Sterling advertised with the GET Team, and the GET Team provided listeners with supposed inside information from high-level government and banking sources

67

regarding an imminent Iraqi dinar revaluation. (Id. ¶¶ 63-72). The affidavit states that Keller claimed, during conference calls, that a U.S. Treasury Department source and a Wells Fargo source had provided him information about a pending Iraqi dinar revaluation, but Keller's claims were not true. (Id. ¶ 69, 72).

The Hoover Affidavit also describes emails that link Keller to Sterling. In one email, Keller told Sterling executives that he (Keller) was pushing the sale of dinar reserves, trying to get sales moving, and actively promoting Sterling. (Hoover Aff. ¶ 67). In another email to Sterling's COO Frank Bell and Tyson Rhame, Keller admitted that he had an "arrangement" with Sterling and that he wanted to keep it secret, and he sought assurances from Rhame and Bell that their arrangement was only between them, stating "no one else needs to know about our arrangement." (Id. ¶ 66). I find this evidence sufficient to connect Keller to Sterling and the alleged scheme.

With respect to Keller's residence located at 504 Sherwood Drive ("the subject premises"), the Hoover Affidavit shows that that address was the address listed with the Kentucky Secretary of State as TCB Group, Inc.'s principal office, and there was evidence that it was also TCB Group, Inc.'s mailing address. (Hoover Aff. ¶¶ 76, 79). Financial records reviewed during the investigation revealed that monthly payments in the amount of $4,000 were made by Sterling to TCB Group, Inc. located at the subject

AO 72A
(Rev.8/8
2)

premises.  (Id. ¶ 77).  Various other financial records obtained during the course of the investigation also indicated that TCB Group, Inc. was located at the Sherwood Drive address.  (Id. ¶¶ 77-80).  Judge Atkins therefore reasonably determined that there was a sufficient nexus between the alleged criminal activity and 504 Sherwood Drive.  To the extent that Keller argues that the Kentucky Warrant was not supported by probable cause, those arguments are without merit.

In his final argument, Keller contends that to the extent the Government has searched any computers and/or data storage devices that were seized during the search of his house, such search was unconstitutional because the Kentucky Warrant authorized only the seizure of these devices–not the subsequent search of the content on the devices.  Keller points to the fact that the category of "computers or storage media" is listed in the warrant as an item to be seized, rather than a place to be searched.  (Doc. 79 at 24-33).

The Kentucky Warrant authorized agents to search "504 Sherwood Drive, Grayson, Kentucky 41143, as more particularly described in Attachment A," for the items listed in Attachment B. (Doc. 79-1 at 2).  Attachment A is a three-page document titled "PLACE TO BE SEARCHED."  Attachment A contains the street address, a description of the house, and several photographs of the house.  (Id. at 46-48).

69

Attachment B is a five-page document titled "LIST OF ITEMS TO BE SEIZED," including, among other things, "all paper and electronic files of Terrence Keller, TCB Group, Inc., and the GET Team, and any other businesses, nominees and associates that may contain evidence, instrumentalities, fruits, and contraband concerning violations of Title 18, United States Code, Sections 1343 and 1956...." (Id. at 49).  The list contains several subcategories of documents, including records related to finances, foreign currency trading, web development, and personal expenses.  (Id. at 49-50).

Attachment B to the Kentucky Warrant further provides that the terms "records" and "information" include "all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies)." (Id. at 53).  Attachment B also specifically authorizes agents to seize evidence that may be contained within those devices and references "any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant." (Id. at 51).

Keller's argument is that law enforcement exceeded the scope of the warrant when they searched the computers and that they should have obtained a second warrant

to search the content of the computers.  Keller argues that the Government was required by the Fourth Amendment to obtain a warrant specific to each such device before searching the content of the devices.  (Doc. 79 at 24-33).  These arguments are without merit.

In <u>United States v. Evers</u>, 669 F.3d 645 (6th Cir. 2012), the defendant similarly argued that although the search warrant for his home authorized the seizure of his computer, it did not authorize a search of the computer, and "the police therefore unlawfully exceeded the scope of the warrant when they searched the contents of the computer without obtaining a second warrant." <u>Id.</u> at 652.  The Sixth Circuit disagreed, reasoning as follows:

> The federal courts are in agreement that a warrant authorizing the seizure of a defendant's home computer equipment and digital media for a subsequent off-site electronic search is not unreasonable or overbroad, as long as the probable-cause showing in the warrant application and affidavit demonstrate a "sufficient chance of finding some needles in the computer haystack."...  Moreover, a second warrant to search a properly seized computer is not necessary "where the evidence obtained in the search did not exceed the probable cause articulated in the original warrant."...This is in keeping with the general principle that "even evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search warrant.

71

Id. (internal citations omitted).  Here, the search warrant for Keller's residence specified that officers were permitted to seize, among other things, "electronic files" that may contain evidence of crimes as well as "computers or storage media" either used as a means to commit the specified crimes or that may contain "records or information that is otherwise called for by this warrant."  (Doc. 79-1 at 49-51).  The affidavit in support of the warrant explained in detail the dinar scheme that law enforcement was investigating and Keller's alleged ties to that scheme.

In the case of mail and wire fraud, it is the contents of the computer—the files—that would comprise the evidence of a crime, not the computer itself.  See United States v. Tillotson, No. 2:08-CR-33, 2008 WL 5140773, at *4-5 (E.D. Tenn. Dec. 2, 2008) ("Rather obviously, it is the contents of a computer that is the evidence in crimes involving computers.").   Because a computer is a repository of information, it only makes sense that a search warrant authorizing the seizure of evidence necessarily also authorizes the search of the repositories that contain such evidence.

I note that the Kentucky Warrant specifically authorized the seizure of "electronic files" that may contain evidence of fraud as well as any "computers or storage media" used as a means to commit fraud.  Combined with the fact that the Kentucky Warrant was based on probable cause that evidence of a crime would be

72

located at Keller's residence, the Kentucky Warrant necessarily authorized law enforcement to search the computers and storage media for such evidence of fraud. See United States v. Rhoades, No. 1:08-cr-56-TWT, 2008 WL 3925168, at *8 (N.D. Ga. Aug. 26, 2008) (concluding that agents did not exceed the scope of a warrant by looking at the content of a DVD where the warrant authorized the seizure of certain images in any form wherever they may be stored); United States v. Hernandez, 2007 WL 2915856 at *17 (S.D. Fla. Oct. 4, 2007) (unpublished) (noting that the seizure of computers, and subsequent analysis away from the search premises, has uniformly been held to be proper when the executing agents were authorized to search for records likely to be stored on a computer).   Contrary to Keller's assertion, law enforcement was authorized to review the contents of the computers and other electronic media pursuant to the Kentucky Warrant in order to determine if they contained evidence of the type covered by the warrant.   See Rhoades, 2008 WL 3925168, at *8; United States v. Giberson, 527 F.3d 882, 886 (9th Cir. 2008); Tillotson, No. 2:08-CR-33, 2008 WL 5140773, at *4-5 (holding that agents did not exceed the scope of a warrant when they searched the computer for evidence of child pornography where the warrant authorized the seizure of a computer).   For these reasons, I recommend that Keller's motion to suppress–based on the argument that law enforcement exceeded the scope of its

73

authority by searching the computers–be denied.[12]

## IV.   BELL'S MOTION TO SUPPRESS (DOC. 85)

Defendant Bell filed a motion to suppress evidence from an April 27, 2015 warrant authorized by Judge Vineyard for the search of frankdinarbanker@gmail.com. (Doc. 85). In its response brief, the Government states that it will not seek to introduce evidence from that warrant for frankdinarbanker@gmail.com because the email account had been deleted by the time agents executed the warrant. The Government also states that the search of frankdinarbanker@gmail.com was not used to obtain any evidence in this investigation. Accordingly, I recommend that Bell's Motion to Suppress Evidence (Doc. 85) be denied as moot.

## V.   CONCLUSION

For the reasons stated, I **RECOMMEND** as follows:

- that the Sterling Defendants' Joint Motion to Suppress and for a

---

[12] In support of his argument that the search of his computers was unconstitutional, Keller relies on Riley v. California, 134 S. Ct. 2473 (2014), which held that the warrantless search of a cell phone seized from an arrestee is unconstitutional. Here, unlike Riley, Keller's computers were not seized during a search incident to arrest, but rather pursuant to a valid search warrant specifically permitting officers to seize computers and other electronic devices. Therefore, Keller's reliance on Riley is misplaced.

74

Franks hearing (Doc. 84) and accompanying request for oral
argument (Doc. 140) be **DENIED**;

- that Keller's original and perfected Motion to Suppress Evidence
  regarding the search of two email accounts (Docs. 77, 93) be
  **DENIED**;

- that Keller's original and perfected Motion to Suppress Evidence
  regarding the search of his residence (Docs. 79, 100) be **DENIED**;

- and that Bell's Motion to Suppress Evidence (Doc. 85) be
  **DENIED AS MOOT**.

**IT IS SO RECOMMENDED**, this 5th day of December, 2016.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

75