IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION |
| TYSON RHAME, JAMES SHAW, FRANK BELL, and TERRENCE KELLER | NO. 1:16-CR-67-SCJ-CMS |

## <u>REPORT AND RECOMMENDATION</u>

This case is before the Court on the Motion to Dismiss Indictment filed by three of the defendants in this case, Tyson Rhame, James Shaw, and Frank Bell (collectively "the Sterling Defendants"), and adopted by the fourth defendant, Terrence Keller.  (Docs. 81, 149, 150).  In the motion, Defendants argue that each of the counts of the indictment in which they are charged should be dismissed for failure to allege an offense.  There have been two rounds of briefing on the motion, and the parties presented oral argument on December 22, 2016.  (Docs. 108, 120, 132, 137, 143).  For the reasons discussed below, I recommend that the motion to dismiss be DENIED.

## I.    LEGAL STANDARD

Defendants bring this motion pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), which allows a defendant to move for dismissal for "failure

to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  In ruling on such a motion, "a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in the original) (reversing a trial court's dismissal of an indictment charging the defendants with mail fraud and conspiracy to launder proceeds of mail fraud).   The Court is not permitted to review the sufficiency of the evidence that will be offered in support of an indictment's allegations, for "[t]here is no summary judgment procedure in criminal cases."  United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992) (per curiam); United States v. Salman, 378 F.3d 1266, 1267-68 (11th Cir. 2004) (making clear that a district court may not dismiss an indictment prior to trial on the ground of insufficient evidence); Sharpe, 438 F.3d at 1263 (stating that courts may not dismiss an indictment based on facts that should have been developed at trial).  "The sufficiency of a criminal indictment is determined from its face." Critzer, 951 F.2d at 307 (reversing the dismissal of an indictment where the trial court looked beyond the face of the indictment and considered facts proffered by the Government).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.  The

Federal Rules of Criminal Procedure require that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  "For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet." Sharpe, 438 F.3d at 1263 (citations and quotations omitted). The Eleventh Circuit has held that an indictment is sufficient "if it charges in the language of the statute" and apprises the defendant with reasonable certainty of the charged offense. Sharpe, 438 F.3d at 1263; Critzer, 951 F.2d at 307

## II.    ALLEGATIONS IN THE INDICTMENT

On February 10, 2016, a federal grand jury returned a 24-count indictment against the four defendants in this case.  Count One charges all Defendants with a conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.  Paragraph 1 of the indictment alleges:

> Beginning in or about 2010, and continuing to on or about June 3, 2015 . . . , the defendants . . . did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with others . . . to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omissions of material facts, well knowing and having reason to know that said pretenses were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material and, in so doing, caused the

United States Postal Service and other interstate carriers to be used, and interstate wire communications to be made, in furtherance of the scheme and artifice to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

(Doc. 1, Indictment, ¶ 1).

The indictment provides as background information that the Sterling Defendants were each associated with a company known as the Sterling Currency Group, LLC ("Sterling"), which was in the business of selling and exchanging so-called "exotic currencies," including the Iraqi dinar. (Indictment ¶¶ 2, 3). Rhame and Shaw were co-owners of Sterling, and Bell was Sterling's Chief Operating Officer. (Id. ¶ 3). The indictment alleges that defendant Keller was the leader of a group of individuals known as "the GET Team," and that he ran a website, an internet chat forum, and weekly conference calls in which information was disseminated concerning the potential investment value of the Iraqi dinar. (Id. ¶ 5).

The indictment further avers that between 2010 and June 2015, Sterling's website described the potential for the Iraqi dinar to increase in value. (Indictment ¶ 6). Other publicly available information predicted a revaluation, or "RV," of the Iraqi dinar that could mean a sudden, exponential rise in the value of the dinar as compared to the U.S. dollar and could mean enormous gains for individuals who owned the dinar at the time of the revaluation. (Id.). According to the indictment, Defendant Keller, through the GET Team, was one of the leading internet-based

proponents of the RV theory, and Keller falsely claimed to have information regarding an "imminent" revaluation from, and verified by, among others, "high-level confidential sources" in the U.S. and Iraqi governments.  (Id. ¶ 7).   Keller allegedly induced his followers to believe his claims about the imminent revaluation by making material misrepresentations and by making omissions of material facts.  (Id. ¶ 9).

The indictment states that Sterling's business revenue was driven in part by the investment advice touted by Keller and others.  (Indictment ¶ 8).  According to the indictment, the Sterling Defendants, through Sterling, began advertising with the GET Team through a web banner placed on the GET Team's website.  (Id.).  A Sterling representative also participated in the GET Team's internet forum and on conference calls with followers.  (Id. ¶¶ 8, 12).  The Government alleges that the presence of Rhame, Bell, and other Sterling representatives on the GET Team's conference calls and internet forums provided validation to listeners and readers that Keller's claims about an imminent revaluation of the Iraqi dinar should be believed.  (Id. ¶ 13).

The indictment alleges further that Keller had "a secret arrangement" with the Sterling Defendants to "promote and pump" the Iraqi dinar in exchange for payments made by Sterling to benefit Keller.   (Indictment ¶ 10).  It is further

alleged that all Defendants "knew and believed that representations concerning an imminent 'RV' of the Iraqi dinar, particularly claims that the information came from one or more supposed high-level confidential sources, would boost sales for Sterling." (Id.).

The indictment recognizes that the Sterling Defendants made no direct representations about the likelihood of a revaluation and that the Sterling Defendants offered no investment advice:

> While making no direct representations about the likelihood of an "RV" themselves or offering investment advice to potential investors, RHAME, BELL, and other Sterling representatives assured listeners on The GET Team's conference calls that Sterling was prepared to handle the high volume of Iraqi dinar exchanges that many investors expected would occur immediately after the "RV."

(Indictment ¶ 13).   The indictment also recognizes that the Sterling Defendants "told their employees not to speculate or offer investment advice to customers." (Id. ¶ 15).   However, the indictment also alleges that:

> [the Sterling Defendants] knew and believed that many of Sterling's customers relied upon information from Terrence Keller and these other promoters when making investment decisions regarding the Iraqi dinar, and that much of the information being disseminated by Keller and the other promoters was materially false.   For one, [the Sterling Defendants] never believed that Keller or the other dinar promoters had the types of high-level sources they repeatedly claimed to have.  Furthermore, at the same time that [the Sterling Defendants] told their employees not to speculate or offer investment advice to customers, they knew that Keller and the other promoters would continue to spread false information about the dinar.

(Id.).   The indictment further alleges that the Sterling Defendants knew and believed that the pumping activities of Keller and the other dinar promoters were essential to Sterling's financial success.  (Id. ¶ 16).

In Counts Two through Seven, incorporating by reference the factual allegations in Count One, the indictment alleges that Defendants committed mail fraud on six separate occasions between April 29, 2011 and October 8, 2014. (Indictment ¶¶ 17-18).  In Counts Eight through Eleven, incorporating by reference the factual allegations in Count One, the indictment alleges that Defendants committed wire fraud on four separate occasions between July 11, 2011 and May 14, 2015.  (Id. ¶¶ 19-20).

In Count Twelve, incorporating by reference the factional allegations in Count One, Rhame and Shaw are charged with a conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), by conspiring "to knowingly

engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from" mail fraud and wire fraud. (Indictment ¶¶ 21-22).

In Counts Thirteen through Twenty-four, incorporating by reference the factual allegations in Count One, the indictment alleges that Rhame and Shaw, "aided and abetted by each other and others known and unknown to the Grand Jury," committed the offense of money laundering on twelve specified occasions between January 24, 2011 and January 26, 2015.  (Indictment ¶¶ 23-24).

## III.   DISCUSSION

At this stage in these proceedings, the Court's role is limited to determining whether the indictment is legally sufficient.  Defendants and the Government both cite to Eleventh Circuit case law holding that a legally sufficient indictment must do three things: (1) present the essential elements of the charged offense; (2) notify the accused of the charges against him; and (3) enable the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.  United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009).  "In determining whether an indictment is sufficient, we read it as

a whole and give it a common sense construction." Id. (citations and quotation marks omitted).

Defendants do not assert that the indictment lacks sufficient detail to apprise them of the charges or to defend against double jeopardy.  Moreover, although they contend that the indictment fails to state a claim against them, they do not contend that essential elements of the charged crimes are missing from the language of the indictment.

Rather, Defendants make various arguments about why the Government's case against them fails as a matter of substantive law.  Defendants argue that: (1) the indictment fails to allege a criminal conspiracy between the Sterling Defendants and Keller because there is no allegation that the Sterling Defendants made any false statements or that they paid or otherwise encouraged Keller to make a false statement; (2) the allegedly false statements described in the indictment are akin to opinions, and therefore are not material; (3) the indictment is fatally flawed because it does not identify intended victims of the alleged scheme; and (4) the indictment does not allege fraud because the alleged victims got exactly what they paid for, at the proper price.

As discussed below, these arguments may indeed carry the day at the close of the evidence either with a jury or with the Court in the context of a motion for a

judgment of acquittal.   These arguments, however, are not persuasive in the context of challenging the indictment.   The determination that I have been tasked with making is whether the indictment is legally sufficient "on its face."   <u>See Sharpe</u>, 438 F.3d at 1263.   The purpose of a motion to dismiss is to point out defects in the indictment—such as the failure to allege all the elements of a crime or the failure to include sufficient detail to allow the defendant to prepare a defense.   Defendants' arguments do not address such pleading deficiencies, but rather present various theories of defense.

### A. The Conspiracy Charge

Count One alleges a conspiracy to commit mail fraud and wire fraud in violation 18 U.S.C. § 1349.   "A 'conspiracy' is an agreement by two or more persons to commit an unlawful act."   <u>Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2016</u>, Offense Instruction 54 (Conspiracy to Commit [Mail] Fraud).   The crime of conspiracy has three elements: (1) an agreement between two or more persons to achieve an unlawful objective; (2) the knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement.   <u>United States v. Broughton</u>, 689 F.3d 1260, 1277 (11th Cir. 2012).   In this case, the Government alleges that the unlawful objective of the conspiracy was mail fraud and wire fraud.   For those crimes, the

Government must prove that the defendant: (1) voluntarily and intentionally devised a scheme to defraud or obtain money or property based on materially false representations or promises; (2) did so with the intent to defraud; and (3) used, or caused to be used, the U.S. Mail (for mail fraud) or an interstate wire communication (for wire fraud) in furtherance of, or in an attempt to carry out, some essential step in the scheme. 18 U.S.C. § 1341; 18 U.S.C. § 1343; see also Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2016, Offense Instructions 50.1 and 51 (Mail Fraud and Wire Fraud).

Paragraph 1 of the indictment alleges a conspiracy and tracks the statutory language of the mail fraud and wire fraud statutes.  (Indictment ¶1).  Where, as here, an indictment tracks the language of the criminal statute, the indictment must also include enough facts to inform the defendant of the specific offense that the Government is charging. United States v. Bobo, 344 F.3d 1076, 1083-84 (11th Cir. 2003) ("An indictment that requires speculation on a fundamental part of the charge is insufficient.").  It is not necessary, however, for an indictment to allege in detail the factual proof that the Government intends to rely upon to support the charges. United States v. Crippen, 579 F.2d 340, 342 (5th Cir. 1978).

Paragraphs 2 through 16 of the indictment provide the factual basis for the conspiracy charge.  The indictment describes the object of the scheme (to defraud

investors by touting the dinar as a potentially lucrative investment opportunity in order to boost Sterling's dinar sales).  (Id. ¶¶ 6-16).  It sets forth the manner of executing the scheme (by making false statements and omissions of material facts on the internet and during conference calls regarding whether a dinar revaluation was "imminent"). (Id. ¶¶ 7, 8, 12).  It alleges a series of acts to effect the object of the scheme (by making false claims about an "imminent" revaluation, by claiming to have high-level sources who said that a revaluation was "imminent," by concealing Keller's financial incentive, and by making assurances to listeners on the GET Team's conference calls that Sterling was prepared to handle the high volume of dinar exchanges that Sterling supposedly expected after the "imminent" revaluation). (Id. ¶¶ 6-16).  Finally, the indictment alleges the relation of the scheme to interstate commerce (alleging that the money orders and checks were handled by the Postal Service or other interstate carriers and that the wire communications were transmitted in interstate commerce).  (Id. ¶ 1).

It is evident from the face of the indictment that the indictment alleges a conspiracy and states all of the elements of the underlying fraud charges.  The indictment also provides enough facts and circumstances to inform Defendants of the specific conspiracy with which they are charged. Nevertheless, Defendants contend that the conspiracy count should be dismissed.

Defendants first argue that the indictment fails to state a federal conspiracy offense because the enumerated facts do not allege that the Sterling Defendants encouraged Keller to make any false statement or conditioned advertising money on Keller's false statements.   (Doc. 81 at 10-11) ("[T]here is no allegation that Sterling directed the Get Team on what to say.")  They claim that the Government is essentially proceeding on a theory of vicarious liability.  (Id. at 9-12).  This argument is without merit.  The Government has no obligation to demonstrate that each conspirator agreed personally to commit—or was even capable of committing—the crime that is the object of the conspiracy.  Rather, it is sufficient for the conspirators to agree that some member of the conspiracy would commit the offense.  Ocasio v. United States, 136 S. Ct. 1423, 1432 (2016).  Indeed, "[e]very member of the conspiracy becomes the agent or partner of every other member."  Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2016, Offense Instruction 54 (Conspiracy to Commit [Mail] Fraud).

Defendants next argue that the indictment alleges a mere advertising relationship between the parties.  They argue that there is nothing illegal about an arrangement by which one party pays another to "promote and pump" its products. (Doc. 81 at 16-18).  Defendants contend that notwithstanding the statements in Paragraph 1, the facts describing the conspiracy in later paragraphs allege a

legitimate advertising relationship and nothing more. According to Defendants, the absence of facts to show that the Sterling Defendants were paying Keller to lie (as opposed to paying Keller to "promote and pump") is fatal to the conspiracy count because there is no allegation that the Sterling Defendants knowingly engaged in a conspiratorial objective with Keller. (Id. at 14-15). This view of the indictment, however, asks the Court to ignore the allegations cited above in Paragraph 1—the precise statute-tracking allegations that the case law indicates is sufficient. See Sharpe, 438 F.3d at 1263. Contrary to Defendants' argument, the indictment alleges much more than a mere advertising relationship. It alleges that Defendants conspired to devise a fraudulent scheme to obtain money or property by false pretenses. (Id.). In addition, it provides the facts that the Government contends form the backdrop of the scheme. The Government need not allege all the facts it intends to prove at trial regarding the intricacies of the alleged scheme. Crippen, 579 F.2d at 342.

Finally, Defendants argue that mere knowledge that a crime is being committed does not make someone a conspirator. (Doc. 81 at 18-22). Defendants stress that there must be an intent to join and facilitate the conspiracy, not just awareness of the illegal activity, and that "anonymous transactions" do not create criminal liability. (Id. at 20-21). With respect to this argument, I agree with the

14

Government that Defendants are simply making their closing argument. Defendants are arguing what they expect the evidence to show, i.e., that there was no agreement to devise a fraudulent scheme. The indictment, however, specifically alleges such an agreement, which is all that the law requires.

The indictment sufficiently sets forth the essential elements of a conspiracy to commit mail fraud and wire fraud and provides sufficient factual detail to provide notice of the basis for the charge and to enable Defendants to protect against double jeopardy. Whether a conspiracy in fact existed is a question for the jury.

### B. Materiality

Defendants next argue that they cannot be guilty of fraud because Keller's alleged false statement—that he had high-level confidential sources who were saying that a revaluation of the dinar was imminent—is not material. They argue that citing to an unnamed confidential source is the equivalent of repeating a rumor or giving an opinion and that such a statement cannot amount to fraud as a matter of law. (Doc. 81 at 12-13). The Government responds that whether the alleged false statements are, in fact, material is a trial issue. (Doc. 137 at 11-13).

"In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to

which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999) (citations and quotations omitted).  When, as here, materiality is an element of a criminal fraud offense, the question of materiality is usually submitted to the jury.  United States v. Gaudin, 515 U.S. 506, 522 (1995); see also United States v. Ferro, 252 F.3d 964, 967 (8th Cir. 2001) (reversing the district court's dismissal of fraud charges on the issue of materiality and stating that the district court erred procedurally in taking up the question of materiality prior to trial).  Where the indictment contains a facially sufficient allegation of materiality, it is not proper to make a pre-trial determination of the sufficiency of the evidence.  See Critzer, 951 F.2d at 307-08.  While mere "puffing" or "sellers' talk" is not a crime under the federal fraud statutes, United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013),  the determination as to whether such statements fall into that category is one to be made at trial.  See United States v. Majors, 196 F.3d 1206, 1211 (11th Cir. 1999) (affirming a fraud conviction where the evidence at trial showed that the defendant surpassed "puffing or "sellers' talk" by, among other things, serving as an officer of fraudulent corporations, signing newsletters and corporate literature that contained false statements, attending meetings, and answering stockholder inquiries).  The indictment in this case alleges more than mere immaterial

"puffery" or "sellers' talk." It alleges a scheme to defraud, and the Government is entitled to try to prove the existence of that scheme.

At oral argument, the Government insisted that materiality is always a jury issue and would not concede that materiality could ever be the proper subject of a motion to dismiss. I disagree. It is possible, I believe, to conceive of an allegation of materiality that is so factually weak as to permit a pretrial determination that no reasonable jury could find it to be material. See Ferro, 252 F.3d at 968. The allegations of materiality in this case, however, do not fall into that category.

The alleged misrepresentations in this case are not so attenuated that no reasonable jury could find them material. On the contrary, the indictment alleges that Defendants engaged in a scheme to defraud investors by falsely claiming that high-level sources in the "the U.S. government, the Iraqi Government, international organizations, and major financial institutions" were indicating that a dinar revaluation was "imminent." A reasonable jury could conclude that the reference to these high-level sources could have a tendency to influence the decision-making process of the people who were listening to conference calls and reading the GET Team blogs. See Neder, 527 U.S. at 16. The allegations of materiality in this case are not so factually weak as to require dismissal. Because

17

the indictment contains a facially sufficient allegation of materiality, this issue must be left to the jury.  See Critzer, 951 F.2d at 307-08.

### C. Failure to Identify the Intended Victims

Defendants next argue that the Government has failed to allege that anyone listening to the conference calls was victimized by the alleged fraudulent conduct or that Defendants intended to victimize anyone.  (Doc. 81 at 16).  They make this argument despite the fact that in the substantive fraud counts, Counts 2-11, the indictment identifies (by their initials) the customers who allegedly were defrauded. (Indictment ¶¶ 18, 20).   In support of their argument, the Sterling Defendants cite to United States v. Novak, 443 F.3d 150 (2d Cir. 2006), United States v. Gabriel, 125 F.3d 89 (2d Cir. 1997), United States v. Rossomando, 144 F.3d 197 (2d Cir. 1998), and United States v. Litvak, 808 F.3d 160 (2d Cir. 2015). (Doc. 81 at 16-17).  These cases, however, do not stand for the proposition that the indictment must allege anything in particular with respect to the alleged victims of a fraudulent scheme.   Each of those cases addresses the evidence that the Government must prove at trial to support a conviction, not the pleading standards for a federal indictment.

At my request, Defendants provided the Court with authority addressing the pleading standards under Rule 12 of the Federal Rules of Criminal Procedure, but

again, the cases Defendants cite are not on point.  They do not hold that the indictment must allege anything in particular with respect to the alleged victims of a fraudulent scheme.  (Doc. 143 at 9-14).  This makes sense in light of the fact that to obtain a conviction for mail and wire fraud, the Government is not required to prove that any of the alleged victims view themselves as such or even that the scheme was successful.  United States v. Williams, 527 F.3d 1235, 1245 (11th Cir. 2008).

In presenting this argument about the alleged victims, Defendants are asking the Court to assume what they believe the Government's evidence will show, i.e., that the Government either does not have individuals who identify themselves as victims or that there is no evidence of intent to defraud anyone.  As noted above, such an argument has no place in the context of a motion to dismiss.  Defendants will have the opportunity at trial to elicit evidence that the GET Team followers who purchased dinar do not view themselves as victims and/or that Defendants did not intend to injure anyone.  The wording of the indictment, however, sufficiently alleges the Government's charges against Defendants, and the lack of certain factual allegations regarding victims and Defendants' intent does not provide a basis to dismiss the indictment at this stage of the proceedings.  See United States v. Xiong, No. 16-cr-167-SRN-HB, 2016 WL 7018525, at *2 (D. Minn. Nov. 30,

2016) (stating that if some of the defendant's alleged victims do not think that they have been victimized, it might make the Government's case more difficult to prove, but it is not a basis for dismissing the charges before trial).

### D. **Takhalov**

Finally, Defendants argue that even if the alleged victims in this case in fact relied on Keller's alleged misrepresentations in making their decision to purchase dinar, those misrepresentations are still not material because they amount to mere deceit, as opposed to fraud.  Defendants cite to the recent Eleventh Circuit case, United States v. Takhalov, 827 F.3d 1307 (11th Cir. 2016).  Defendants argue that mere incidental lies—lies that do not go to the nature or value of the bargain— cannot form the basis of a federal criminal fraud charge.  (Doc. 120 at 9-17).

In Takhalov, the Government accused several nightclub owners of wire fraud based on activities such as pouring vodka into their patrons' beer to get them more drunk, misrepresenting the price of drinks, and forging customers' signatures. 827 F.3d at 1310.  To entice men to come into the clubs, defendants hired Eastern European women—known as "B-girls"—to pose as tourists, locate visiting businessmen, and lure them into the defendants' nightclubs. Id. The defendants denied engaging in the fraudulent activities inside the clubs, but they did not dispute either that they used the B-girls to lure the men into the clubs or that the B-

20

girls concealed from the men their relationship with the clubs.  Id.   The defendants

essentially agreed that by using the B-girls, they had tricked the men into coming

into the clubs, but they maintained that it was a legitimate business practice.  Id.

At the conclusion of the trial, and fearing that the jury might convict them of wire

fraud based on the B-girls' actions alone, the defendants requested the following

jury instruction:

> Failure to disclose the financial arrangement between the B-girls and
> the Bar, in and of itself, is not sufficient to convict a defendant of any
> offense.

Id. at 1310, 1311.  The district court refused to give this instruction, stating that it

was not a correct statement of law.  Id. at 1311.  During closing arguments, the

Government argued that when the B-girls concealed their bar-affiliation from the

men, the B-girls were making material misrepresentations sufficient to constitute

fraud.  Id.  In other words, the Government argued that the jury could convict the

defendants of wire fraud based solely on the lies of the B-girls.

On appeal, the Eleventh Circuit approved of the defendants' proposed

instruction, concluding that it, indeed, was an accurate statement of the law,

stating:

> For § 1343 forbids only schemes to *defraud*, not schemes to do other
> wicked things, *e.g.*, schemes to lie, trick, or otherwise deceive. The
> difference, of course, is that deceiving does not always involve
> harming another person; defrauding does. That a defendant merely

> "induce[d] [the victim] to enter into [a] transaction" that he otherwise
> would have avoided is therefore "insufficient" to show wire fraud.

Takhalov, 827 F.3d 1310 (italics in the original) (citing United States v. Starr, 816

F.2d 94, 98 (2d Cir. 1987)).  The Court went on to discuss the difference between

deceiving and defrauding: "to *defraud*, one must intend to use deception to cause

some injury; but one can *deceive* without intending to harm at all."  Id. at 1312

(italics in the original) (citing dictionary definitions).  Ultimately, the Eleventh

Circuit remanded the case for re-trial due to the district court's failure to give the

defendants' requested instruction.  Id. at 1325.

Here, Defendants argue that the alleged victims in this case got exactly what

they paid for at the correct price.  They argue that just as the businessmen in

Takhalov got what they paid for (drinks with women), the purported victims in this

case got what they paid for (Iraqi dinar at the market price).  The problem with this

argument is that it does not address whether the indictment has sufficiently alleged

an offense.  While Defendants may expect to show at trial that the worst they did

was act in a deceitful way and that they did not intend to defraud or obtain money

or property from anyone, the allegations in the indictment certainly allow for the

Government's theory that Defendants did more than perpetrate an innocent "trick"

on investors. The indictment clearly alleges that Defendants knowingly and

willfully conspired to devise a fraudulent scheme to obtain money or property from the GET Team followers and Sterling's customers. (Indictment ¶¶ 1, 9, 15).

Moreover, I find unpersuasive Defendants' argument that the misrepresentations alleged in the indictment are, at worst, "incidental lies" that do not go to the nature or value of the bargain. It is for the jury to decide whether a lie goes to the nature or value of the bargain. See United States v. Chan, No. 1:14-cr-203-ODE-AJB, N.D. Ga. Doc. 100, (Oct. 27, 2016) (rejecting argument based on Takhalov that customers who bought dietary supplements received exactly what they paid for at the price they agreed to pay, and concluding that a reasonable jury could find that the customers bargained not only for a dietary supplement at a particular price, but also for a dietary supplement that was legal and safe). Here, a reasonable jury could find that the investors bargained not only for Iraqi dinar at the stated market price, but also for an investment that would exponentially increase in value in the immediate future.

## IV.   CONCLUSION

Taken as a whole and given a "common sense construction," the indictment in this case meets the basic pleading requirements as established by the Federal Rules of Criminal Procedure and Eleventh Circuit case law. See Jordan, 582 F.3d at 1245. The indictment tracks the language of the relevant statues, and it includes

sufficient detail to place Defendants on notice of the allegations against them and to defend against double jeopardy. This is all that the law requires.  Accordingly, I **RECOMMEND** that the Motion to Dismiss Indictment (Doc. 81) be **DENIED**.

In addition, it appears that there are no further outstanding pretrial or discovery matters for me to address.  Accordingly, this case is **CERTIFIED** as ready for trial.

IT IS SO ORDERED this 31st day of January, 2017.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE