# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TYSON RHAME, TERRENCE** | : | **CRIMINAL ACTION NO.** |
| **KELLER, JAMES SHAW, and** | : | **1:16-CR-67-SCJ-CMS** |
| **FRANK BELL,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

This matter appears before the Court for consideration of a January 31, 2017 Report and Recommendation ("R&R") (Doc. No. [167]) and a September 29, 2017 R&R (Doc. No. [245]), in which The Honorable Catherine M. Salinas, United States Magistrate Judge, recommended that Defendants' Motions to Dismiss the Indictment (Docs. No. [81], [150], [220], [221], [240]) be denied. Pursuant to 28 U.S.C. § 636(b)(l) and Federal Rule of Criminal Procedure 59(b)(2), Defendants timely filed their objections to the R&Rs (Docs. No. [176], [255], [256]), and this matter is now ripe for consideration. The Court will "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

# I.    BACKGROUND

On February 10, 2016, Defendants were indicted on 24 counts. Doc. No. [1]. They moved to dismiss the indictment (Docs. No. [80], [150]) and Judge Salinas issued an R&R recommending denying those motions (Doc. No. [167]). Defendants objected to the R&R (Doc. No. [176]), but just four days later a grand jury returned a superseding indictment (Doc. No. [178]). The following facts are drawn from the superseding indictment, but the Court also considers the arguments from the first round of motions to dismiss because they are fundamentally unchanged by the superseding indictment.

## A.    Defendants

The Sterling Currency Group, LLC ("Sterling") was a business that sold and exchanged so-called "exotic currencies." Doc. No. [178], p. 2, ¶3. Between 2010 and June 2015, Sterling was one of the largest sellers of the Iraqi dinar[1] in the United States. Id. p. 3, ¶6. Defendants Tyson Rhame and James Shaw were the owners of Sterling. Id. p. 2, ¶3. Defendant Frank Bell was its Chief Operating Officer. Id. Collectively, these Defendants are referred to as the

---

[1] The term "dinar" (or some derivation thereof) has been used to refer to various currencies since the Roman Republic and is currently the name of the legal tender in nine countries. For simplicity, both the Court and the parties occasionally refer to the Iraqi dinar as simply "the dinar."

"Sterling Defendants." Defendant Terrence Keller was the leader of a group known as "the GET Team" and ran a website, chat forum, and conference calls. Id. p. 3, ¶5.

**B.     The Alleged Conspiracy**

During the time period of the conspiracy, the Sterling Defendants and Keller had a secret arrangement to "pump" the Iraqi dinar through the GET team. Id. p. 5, ¶9. Certain "websites, blogs, chat rooms and conference calls," including Keller's, predicted that "a 'revaluation' [or 'RV'] of the Iraqi dinar would occur imminently." Id. p. 3, ¶¶5−6. Such a revaluation would have caused "a sudden, exponential rise in value of the Iraqi dinar as compared to . . . other relatively stable global currencies," which would have led to "potentially enormous gains" for individuals who owned Iraqi dinars. Id. ¶6. Keller falsely claimed to have information from, and verified by, high-level confidential sources in the United States government, the Iraqi government, international organizations, and major financial institutions, regarding an imminent revaluation. Id. p. 5, ¶9. Keller and the Sterling Defendants knew and believed that those representations would boost sales for Sterling. Id.

The Sterling Defendants publicly maintained that they merely had an advertising relationship with promoters like Keller. Id. p. 6, ¶11. Keller, in turn, claimed that any advertising money he received merely covered the cost of running the GET team. Id. In actuality, Sterling paid Keller more than $160,000, which was well in excess of the cost required to run and maintain the GET team, and nearly all of which Keller used for his own personal benefit. Id. p. 7, ¶12 The Sterling Defendants consistently downplayed the financial benefits to conceal the pumping relationship and make Keller's false claims seem more credible. Id.

The Sterling Defendants also had financial relationships with other promoters of the Iraqi dinar who spread the false notion of an imminent revaluation. Id. ¶13. These financial arrangements included commissions based on how much dinar the promoter sold and monthly payments based upon how much business the promoter directed to Sterling. Id. The Sterling Defendants knew and believed that these payments would causes Keller and other promoters to continue to spread false and misleading information and to direct business to Sterling. Id. ¶14.

Defendant Rhame himself also allegedly made misrepresentations to consumers to buttress the fraud. He told customers "Sterling would open secure Iraqi dinar exchanges at airports throughout the United States and Canada within a matter of hours or days of a revaluation," allowing investors to rapidly reap large profits. Id. p. 4, ¶7. In reality, Rhame knew "Sterling did not have the capacity to open these airport exchanges in the manner and timeframe" he represented. Id. ¶8. He made the representations to bolster the false rumors that a revaluation was imminent and to encourage customers to purchase dinars from Sterling "with the expectation that the company had the capacity to immediately open these airport exchanges." Id. ¶7.

C.   **The Charges**

The superseding indictment charges 36 counts. Doc. No. [178]. Count 1 charges a conspiracy to commit mail and wire fraud, as outlined above. Id. pp. 1—9, ¶¶1—16. Counts 2 through 6 incorporate the above allegations and charge Defendants with five specific instances of mail fraud. Id. pp. 9—11, ¶¶17—19. Counts 7 through 17 likewise incorporate the above allegations and charge 11 instances of wire fraud. Id. pp. 11—12, ¶¶20—22. Count 18 is for an alleged conspiracy to commit money laundering, and Counts 19 through 30

are substantive money laundering charges. <u>Id.</u> pp. 12—15, ¶¶23—26. The money laundering charges are predicated on Defendants' alleged commission of mail and wire fraud.

Finally, Counts 31 through 36 are for allegedly providing false statements to Federal Bureau of Investigation ("FBI") special agents during the investigation of this case, in violation of 18 U.S.C. § 1001. <u>Id.</u> pp. 16—20, ¶¶27—38. Counts 31 through 34 are for allegedly false statements made by Defendant Rhame. <u>Id.</u> pp. 16—18, ¶¶27—34. Counts 35 and 36 are for allegedly false statements made by Defendant Bell. <u>Id.</u> pp. 19—20, ¶¶35—38. Specifically, Count 35 alleges Bell "falsely stated that he and Sterling maintained a 'firewall' with Iraqi dinar promoters who were 'hyping' the dinar and that he affirmatively told the promoters 'not to drive business' to Sterling's website." <u>Id.</u> p. 19, ¶36. The Government asserts that this statement is false because Bell "knew that he had not in fact told [Keller] to stop driving business to the Sterling website even though [Keller] consistently updated [Bell] on his promotional efforts." <u>Id.</u> Count 36 accuses Bell of saying "that he had told [Defendant Keller], not to promote Sterling." <u>Id.</u> p. 20, ¶38. Again, this statement is allegedly false because Bell "knew that he had not in fact told

[Keller] to stop driving business to the Sterling website even though [Keller] consistently updated [Bell] on his promotional efforts." Id.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), a defendant may move to dismiss a count for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). The Court must then determine whether "the factual allegations in the indictment, when viewed in the light most favorable to the government, [are] sufficient to charge the offense[s] as a matter of law." United States v. deVegter, 198 F.3d 1324, 1327 (11th Cir. 1999). The focus is on the facts alleged in the indictment itself, not outside facts presented by Defendants or facts that need to be developed at trial. See United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006); United States v. Plummer, 221 F.3d 1298, 1302 n.3 (11th Cir. 2000).

An indictment "must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense." United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985). To clear this bar, the indictment need only include language "set[ting] forth the essential elements of the crime." Id. An

indictment is sufficient "if it charges in the language of the statute" and apprises the defendant with reasonable certainty of the charged offense. Sharpe, 438 F.3d at 1263; see also United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992) (*per curiam*).

## III.   ANALYSIS

All Defendants have moved to dismiss Counts 1 through 30. Docs. No. [220], [240]. Defendant Bell, individually, has filed a Motion to Dismiss Counts 35 and 36. Doc. No. [221].

### A.   Counts 1 through 30

Defendants first object to the denial of their Motions to Dismiss by arguing that Count 1 fails because there are insufficient allegations to demonstrate an illicit conspiracy between the Sterling Defendants and Keller. Doc. No. [176], pp. 7—12. They next argue that Counts 1 through 30 fail because they are predicated on a scheme to "defraud," and the indictment does not allege such a scheme. Id. pp. 12—20, 23.[2]  Finally, they contend that

---

[2] Defendants initially argued that Count 7 was subject to dismissal on the additional ground that it is barred by the statute of limitations. Doc. No. [220], pp. 23—24. Judge Salinas explained why this was not the case (Doc. No. [245], pp. 16—18), and Defendants raise no objections on this point. See Doc. No. [255]; see also Fed. R. Crim. P. 59(b)(2) (noting that a failure to object "waives a party's right to review").

any allegedly false statements made by Keller are not material "as to the Sterling Defendants." Id. pp. 20—23. The Court addresses each of these arguments in turn.

**1.** *The Conspiracy Charge*

Defendants' first objections to the R&R regard Count 1 of the indictment, which charges a conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349. Doc. No. [176], pp. 7—12. "There are three elements for proof of such a conspiracy: (1) agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." United States v. Broughton, 689 F.3d 1260, 1277 (11th Cir. 2012). Defendants do not dispute that there was an agreement, and that both the Sterling Defendants and Keller knowingly and voluntarily participated in that agreement through overt acts in furtherance thereof. Rather, their arguments are, essentially, that the agreement did not have "an unlawful objective." See Doc. No. [176], pp. 7—12.

They first aver that "a supplier of legal goods cannot be held criminally liable in a conspiracy based on a purchaser's putting those goods to an illegal

use." Doc. No. [176], pp. 7—8. But this argument is specious. The Government does not contend that Defendants are liable because their customers put the Iraqi dinars "to an illegal use." The Sterling Defendants' contention that they simply "paid to advertise with [Keller]" and made "no request for deceptive statements" comes closer to the mark. Id. p. 9. They are correct that a person does not "become a conspirator by knowing that another person may be committing a crime." Id. p. 10. But the indictment alleges more.

As alleged in the superseding indictment, the Sterling Defendants did not simply have an "advertizing relationship" with Keller, and they did not simply have a peripheral awareness that Keller may be committing a crime. The Sterling Defendants paid Keller more than $160,000, along with other financial benefits. Doc. No. [178], p. 7, ¶12. Such payments could certainly have been part of a legitimate advertizing relationship. But both sides willfully misled consumers by downplaying the financial benefits and insisting that the payments "merely covered the cost of running the GET team." Id. pp. 6—7, ¶¶11—12. Even this might not have been a criminal conspiracy. But the efforts to conceal the financial ties were allegedly made to bolster a larger fraudulent scheme.

Keller was not simply paid to put advertising banners on his website. The Sterling Defendants "knew and believed that these payments would cause [Keller] . . . to continue to spread false and misleading information about the dinar and to direct business to Sterling." Id. p. 7, ¶14. Keller, in turn, falsely claimed to have information from, and verified by, high-level confidential sources in the United States government, the Iraqi government, international organizations, and major financial institutions, regarding an imminent revaluation. Id. p. 5, ¶9. Defendants Rhame, Bell, and other Sterling representatives were aware of these misrepresentations. Id. p. 8, ¶15. Indeed, the superseding indictment contains allegations that Defendant Rhame himself made misrepresentations to consumers to in furtherance of the conspiracy. Id. p. 4, ¶¶7−8. Defendants contend that his representation "was not material" and "did not affect the value of the dinar that was being sold," but do not dispute that the indictment alleges Defendant Rhame took actions "to bolster false representations . . . that a dinar revaluation was in fact imminent." See Doc. No. [255], p. 4; Doc. No. [178], p. 4, ¶7.

Thus, this case is distinguishable from Defendants' hypothetical. See Doc. No. [176], pp. 11−12. The Sterling Defendants did not simply put an

advertizing banner on the website of a person they knew to be lying. They actively concealed their payments from consumers and "knew and believed that these payments would *cause* [Keller] . . . to spread false and misleading information about the dinar and to direct business to Sterling." Doc. No. [178], p. 7, ¶14 (emphasis added). Rhame made his own series of misrepresentations to support the misrepresentations they paid Keller to make. Id. p. 4, ¶¶7−8. These actions move this case out of the realm of simply knowing about someone else lying and into the realm of a conspiracy to defraud consumers with those lies.

The foregoing facts are "sufficiently specific to inform the defendant[s] of the charge against [them] and to enable [them] to plead double jeopardy in any future prosecution for the same offense." Cole, 755 F.2d at 759. The facts allege knowing and voluntary participating in an agreement between the Sterling Defendants and Keller, lasting from 2010 to June 2015, to provide false information to customers regarding the likelihood of an imminent revaluation of the Iraqi dinar in the hope of inducing those customers to purchase dinar from Sterling. See Broughton, 689 F.3d at 1277. Indeed, the Sterling Defendants essentially admit that the indictment contains these

allegations in their own objections to the R&R. <u>See</u> Doc. No. [176], pp. 13—14.

Defendants do not argue that they are unaware of what allegedly illegal

agreement they are accused of participating in. Rather, their arguments are

that the conduct at the core of the agreement was not illegal. The Court turns

to these arguments now.

**2.**     *Intent to Defraud*

The elements of mail and wire fraud are: (1) the defendant

intentionally participated in a scheme to obtain money based on materially

false representations or promises; (2) did so with the intent to defraud; and

(3) used, or caused to be used, the United States mails (for mail fraud) or

an interstate wire communication (for wire fraud) in furtherance of, or in

an attempt to carry out, some essential step of the scheme. <u>See Sharpe</u>, 438

F.3d at 1263; <u>see also</u> 18 U.S.C. § 1341; 18 U.S.C. § 1343. Defendants' second

series of objections to the R&R regard the second argument, whether they had

an "intent to defraud." Doc. No. [176], pp. 12—20.

The Eleventh Circuit recently elucidated the meaning of the term

"defraud." <u>United States v. Takhalov</u>, 827 F.3d 1307, 1312 (11th Cir.), *opinion*

*modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). An intent to defraud

means an intent to deprive someone of something of value by trick, deceit, chicane, or overreaching. Id. at 1312−13. If the deceit does not deprive a person of something of value, then the person perpetrating the deceit does not have a scheme to defraud, "even if the transaction would not have occurred but for the trick." Id. at 1313. The Eleventh Circuit provides a helpful illustration:

> Consider the following two scenarios. In the first, a man wants to exchange a dollar into four quarters without going to the bank. He calls his neighbor on his cell phone and says that his child is very ill. His neighbor runs over, and when she arrives he asks her to make change for him. She agrees; the quarters pass to the man; the dollar passes to the woman; and they part ways. She later learns that the child was just fine all along. The second scenario is identical to the first, except that instead of giving the woman a true dollar, he gives her a counterfeit one. The first scenario is not wire fraud; the second one is.

Id.

Defendants argue that the charges in this case are like the fist scenario. Even if the customers were tricked into purchasing the dinars, "they still received the dinars that they were promised at the price that they agreed to pay." Doc. No. [176], p. 16. Defendants did not give the customers counterfeit dinars and the indictment does not specifically allege "that the price

14

[customers] paid was unfair or inflated." Id. Although superficially appealing, the case at bar is distinguishable in one essential respect.

A dollar is always worth four quarters; four quarters are always worth a dollar. Thus, in the first example provided in Takhalov, the woman is deprived of nothing of value. See 827 F.3d at 1313. Here, Defendants' assertion that customers buying Iraqi dinars paid "the market rate" belies an important point. See Doc. No. [176], p. 19; Doc. No. [255], p. 12. The "market rate" for currency exchanges changes, sometimes quite dramatically. Indeed, as alleged in the indictment, the entire reason Sterling's customers were buying the dinars was because they were deceived into believing that the exchange rate would change markedly to their advantage. This was an essential element of their bargain.

Consider a different hypothetical. A share of Acme, Inc. is valued at $100 when news breaks that, in a week, there is a 50% chance a share will be worth $150 and a 50% chance the value will stay the same. Based on this news, the expected value of a share is $125. People would happily buy shares at the current price—$100 a share—driving up the "market rate" for a share. But what if the news is a lie? Investors who believe the lie will buy a share at,

for example, $115 because it is less than the (false) expected value of $125. People who are in on the ruse will sell at $115, making a profit of $15 a share over the actual value of the stock. This is a classic "pump and dump" scheme.

The misrepresentations about the future value of the dinars are what distinguish this case from <u>Takhalov</u>. In <u>Takhalov</u>, the defendants "were tricking the victims into coming into [a] bar" by having "B-girls" pose as tourists. 827 F.3d at 1316. But once in the bar, defendants "gave the victims exactly what they ordered—*i.e.*, absurdly expensive drinks." <u>Id.</u> The trick did not "go[ ] to the value of the bargain," *i.e.*, the price of the drink. <u>Id.</u> 1313. Defendants are correct that the Government must allege a deception as to "the *current* value of the product." Doc. No. [255], p. 13 (emphasis in original). But they are wrong to suggest misrepresentations about the future value of a product cannot have an effect on the current value, especially where the product is an investment. <u>See</u> Doc. No. [176], p. 19. Drinks are bought to be drunk. The Iraqi dinars were, as alleged in the indictment, being bought because the customers believed they could later be resold at a better rate.

As in the stock example, lies about the future value of the dinars drives up their price in the present, benefiting people selling the currency—like

Sterling. The law in this Circuit is clear that deceptions as to the future value of a product can be sufficient to support a conviction for mail or wire fraud. See United States v. Svete, 556 F.3d 1157, 1160 (11th Cir. 2009) (holding that defendants could be convicted of mail fraud where they convinced investors to buy financial products based on lies about when the underlying insurance policies would pay off); see also United States v. Fullwood, 2016 WL 5106940, at *7 (M.D. Fla. Sept. 20, 2016) (denying a motion to dismiss wire fraud charges because lies about the future uses of donations did not just "induce the target into the transaction" but went "to the essence of the bargain itself"). Thus, the indictment sufficiently alleges an "intent to defraud."

### 3.   *Materiality*

The Sterling Defendants' final objection regarding the fraud counts is that Keller's misrepresentations are not material "because the[y] are not tied to Sterling." Doc. No. [176], p. 20. That is, other "gurus" promoted the Iraqi dinar and the indictment does not allege "Keller pushed his members to purchase" Iraqi dinar from Sterling specifically. Id. pp. 20–21. Boiled down, the argument is that because other people also fraudulently "pumped" the dinar and because other currency sellers might have benefited from Keller's

alleged misrepresentations, the Sterling Defendants cannot be guilty of fraud. The Court knows of no authority supporting such a proposition, and Defendants cite none. See id. Mail and wire fraud charges only require that the "scheme to obtain money [be] based on materially false representations." See Sharpe, 438 F.3d at 1263. There is no requirement that the defendant be the only person making materially false representations or the only person who might benefit from them.

Materiality means a misrepresentation has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Neder, 197 F.3d 1122, 1128 (11th Cir. 1999) (alteration in original). As discussed above, Keller's misrepresentations about the future value of the Iraqi dinar could have "a natural tendency to influence" a person's decision whether to buy dinar. Moreover, those misrepresentations were "calculated to deceive" the customers out of their U.S. dollars by fraudulently inducing them to buy dinar. See United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013).

Defendants' brief assertion that the misrepresentations made by Defendant Rhame cannot be material also fails. See Doc. No. [255], p. 4. His

alleged representations to customers that "Sterling would open secure Iraqi dinar exchanges at airports throughout the United States and Canada within a matter of hours or days of a revaluation" could have a natural tendency to influence the customers' decision whether to buy dinar for at least two reasons. See Doc. No. [178], p. 4, ¶7. First, it assured customers that, if they bought dinar, they could easily exchange the dinar when the price went up. Second, it insinuated that Sterling was investing substantial money to build the capacity to immediately open these airport exchanges, bolstering the misrepresentation that the dinar would imminently and precipitously rise in value.

Given the above, the indictment sufficiently alleges that the Sterling Defendants' "scheme to obtain money" was "based on materially false representations," and thus the fraud counts should not be dismissed because the statements were "immaterial." See Sharpe, 438 F.3d at 1263; see also Cole, 755 F.2d at 759. If Defendants wish to argue the statements would not have induced consumers to buy Iraqi dinar, they may do so to a jury. See United States v. Gaudin, 515 U.S. 506, 512, 115 S. Ct. 2310, 2314, 132 L. Ed. 2d 444

(1995) (holding that a jury must determine whether an allegedly false statement is "material").

## B. Counts 35 and 36

In Defendant Bell's objections to the R&R with respect to his Motion to Dismiss Counts 35 and 36, he first argues that Count 35 fails to allege a crime because "he told the literal truth." Doc. No. [256], pp. 1—2. He then argues that Count 35 is defective "pursuant to the 'stark contrast' rule." Id. pp. 6—8. As to Count 36, he alleges that it is "multiplicitous" because it accuses him of "making the same allegedly false statement" alleged in Count 35. Id. pp. 9—10. Finally, he argues that the allegedly false statement in Count 36 is immaterial as a matter of law. Id. pp. 10—11. The Court addresses each argument in turn.

### 1. *Count 35*

Count 35 alleges that Bell "stated that he and Sterling maintained a 'firewall' with Iraqi dinar promoters who were 'hyping' the dinar and that he affirmatively told the promoters 'not to drive business' to Sterling's website," when in fact he "knew that he had not in fact told [Keller] to stop driving business to the Sterling website even though [Keller] consistently updated

[Bell] on his promotional efforts." Id. p. 19, ¶36. Defendant Bell contends this count fails because his statement was "literally true," avering that he "did tell some promoters to stop driving business to the Sterling website." Doc. No. [256], p. 6. Notably, this assertion is found nowhere in the indictment. See Doc. No. [178]. A motion to dismiss is decided based on the facts alleged in the indictment itself, not outside facts Defendant Bell intends to present at trial. See Sharpe, 438 F.3d at 1263.

Defendant Bell next argues that Count 35 is defective "pursuant to the 'stark contrast' rule." Doc. No. [256], pp. 6−8. Simply put, the Eleventh Circuit has never adopted a so-called "stark contrast rule." United States v. Hassoun, 477 F. Supp. 2d 1210, 1216 n.4 (S.D. Fla. 2007). Under Eleventh Circuit precedent, an indictment need only "be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense." Cole, 755 F.2d at 759.

Here, the indictment alleges that Bell said "he affirmatively told the promoters 'not to drive business' to Sterling's website." Doc. No. [178], p. 19, ¶36. This statement is allegedly false because he did not tell Keller "to stop

driving business to the Sterling website." Id. Defendant Bell knows what law he is accused of violating and what false statement he allegedly made. He is prepared to defend against the charge by arguing his statement was literally true, and is prepared to plead double jeopardy in a prosecution for the same offense, as his arguments with regard to Count 36 demonstrate. The allegations in the indictment are sufficient, and the issue of whether Bell's statement was false is for a jury to decide.

### 2.    *Count 36*

Count 36 accuses Bell of saying "that he had told [Defendant Keller], not to promote Sterling," when he knew that he had not. Doc. No. [178], p. 20, ¶38. Defendant Bell first asserts "Count 36 is multiplicitous of Count 35 in that it charges Mr. Bell with making an identical statement to the same federal agents less than a week apart from one another." Doc. No. [256], p. 9. In the Eleventh Circuit, courts look to whether "each count requires an element of proof that the other counts do not require" to decide if the counts are multiplicitous. United States v. Jones, 601 F.3d 1247, 1258 (11th Cir. 2010). Defendant Bell's own argument makes clear that Counts 35 and 36 require "an element of proof that the other" does not. Namely, Count 35 concerns a

statement allegedly made on May 28, 2015 and Count 36 concerns a statement allegedly made on June 3, 2015. Doc. No. [178], pp. 19—20, ¶¶36, 38. They are separate statements, made on different days, and the Government must prove that each was made by Defendant Bell.

Not only were the statements made on different days, but they are also not, as Defendant Bell contends, "one in the same." See Doc. No. [256], pp. 9—10. On May 28, 2015, Defendant Bell is accused of saying "that he and Sterling maintained a 'firewall' with Iraqi dinar promoters who were 'hyping' the dinar and that he affirmatively told the promoters 'not to drive business' to Sterling's website." Doc. No. [178], p. 19, ¶36. On June 3, 2015, he is accused of saying "that he had told the [Defendant Keller], not to promote Sterling." Id. p. 20, ¶38. As Defendant Bell of all people should recognize, these statements are not "literally" the same. It is possible that, as Defendant Bell argues, his May 28 statement is "literally true"—because he told some promoters not to drive business to Sterling's website. But this does not negate the possibility that his statement on June 3 was false—because he did not tell Keller specifically not to promote Sterling. Accordingly, the counts are not

multiplicitous because they each require "an element of proof" that the other does not. See Jones, 601 F.3d at 1258.

Defendant Bell also contends that Judge Salinas erred in concluding that the allegedly false June 3 statement could be material. Doc. No. [256], pp. 10—11. He asserts that "telling the same alleged lie to the same FBI agents only six days after speaking with them initially *cannot* independently impair the FBI's investigatory function." Id. p. 10. Setting aside the fact that the statements were not "the same alleged lie," there is no binding authority in support of this argument. While Defendant Bell cites to Ninth Circuit precedent, the Court knows of no binding authority holding that similar false statements made on different occasions cannot both be material.

As mentioned above, materiality means that a statement "has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" United States v. Clay, 832 F.3d 1259, 1309 (11th Cir. 2016), *cert. denied sub nom.* Farha v. United States, 137 S. Ct. 1814, 197 L. Ed. 2d 758 (2017) (alteration in original). The allegation as to the June 3 statement is sufficient because a jury could conclude that it was material, even in light of the May 28 statement. The fact that an

individual repeats his denial of wrongdoing in a separate conversation would have "a natural tendency to influence" an investigator because it would tend to lend credence to the denial. There is no requirement that the investigator believe the lie or "actually rely on [it]." Id.

Defendant Bell also argues that the allegedly false statement that forms the basis of Count 36 cannot be material because it was "made on the final day of the conspiracy," and thus "could not have been *capable* of affecting or influencing" the investigators. Doc. No. [256], p. 11. There is simply no authority supporting such a proposition. If the FBI special agents had believed Defendant Bell's alleged deception, he may not have been arrested in connection with the alleged conspiracy. The fact that he made his allegedly false statement shortly before he was arrested does not mean the statement was immaterial as a matter of law. In addition to being an incorrect statement of the law, Defendant Bell's interpretation of "materiality" would be a slippery-slope. Could a statement made two days before an arrest be material? What about three days before, or four? The Eleventh Circuit requires only that the lie was capable of influencing the FBI special agents, not proof that it actually did. Clay, 832 F.3d at 1309. The fact that Defendant Bell's

alleged deception failed does not mean that the alleged lie was incapable of influencing the investigators.

## IV.     CONCLUSION

Accordingly, the R&Rs (Docs. No. [167], [245]) are **ADOPTED** as the order of the Court, and Defendants' objections (Docs. No. [176], [255], [256]) are **OVERRULED**. Defendants' Motions to Dismiss the Indictment (Docs. No. [81], [150], [220], [221], [240]) are **DENIED**. Their related Motions to Adopt each other's objections (Docs. No. [177], [257]) are **GRANTED**.

**IT IS SO ORDERED,** this 20th day of November, 2017.

s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE