**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**     :
                                  :
    **v.**     :
                                  :
**TYSON RHAME, TERRENCE**         :     **CRIMINAL ACTION NO.**
**KELLER, JAMES SHAW, and**       :     **1:16-CR-67-SCJ-CMS**
**FRANK BELL,**                   :
                                  :
    **Defendants.**     :

## <u>ORDER</u>

This matter appears before the Court for consideration of the December 6, 2016 Report and Recommendation ("R&R") (Doc. No. [146]), in which The Honorable Catherine M. Salinas, United States Magistrate Judge, recommended that Defendants' Motions to Suppress (Docs. No. [77], [79], [84], [85], [93], [100]) be denied. Pursuant to 28 U.S.C. § 636(b)(l) and Federal Rule of Criminal Procedure 59(b)(2), Defendants timely filed objections to the R&Rs (Docs. No. [164], [165]), and this matter is now ripe for consideration. The Court will "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

# I.    BACKGROUND[1]

Around 2004, Defendants Tyson Rhame and James Shaw formed the Sterling Currency Group, LLC ("Sterling")—a business that sold and exchanged so-called "exotic currencies." Doc. No. [178], p. 2, ¶3. Defendant Frank Bell was the Chief Operating Officer ("COO") for Sterling. Id. Collectively, these Defendants are referred to as the "Sterling Defendants." Other Sterling employees relevant to the present motions included Rhett Rhame (Tyson Rhame's brother) and Tony Pleasant,[2] who was the Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") officer for Sterling. Doc. No. [112-2], p. 7 ¶¶20−21.

Between 2010 and June 2015, Sterling was one of the largest sellers of the Iraqi dinar[3] in the United States, raking in hundreds of millions of dollars. Doc. No. [178], p. 3, ¶6. In 2012, for example, Sterling indicated that it

---

[1] The factual background is drawn from the allegations in the indictments, the assertions in various affidavits, and the evidence attached to the affidavits. The Court recognizes that Defendants dispute many, if not all, of these facts. To the extent that the factual disputes are relevant to the present motions, they are discussed below in the analysis section.

[2] Mr. Pleasant is occasionally referred to in various affidavits as "CW1" or "Cooperating Witness 1." See, e.g, Doc. No. [84-1], p. 2; Doc. No. [112-34] p. 5, ¶ 14.

[3] As in a prior order, the Court acknowledges that the term "dinar" can refer to a variety of currencies. Doc No. [264], p. 2 n.1. For simplicity, both the Court and the parties occasionally refer to the Iraqi dinar as simply "the dinar."

received $127,955,445 from customers, while in 2013 it received $107,934,961. Doc. No. [112-2], p. 9, ¶28. Sterling made this money by charging a fee for dinar purchases, and offering a "layaway" program whereby customers would send "a down payment for the option to purchase dinars in the future at a set rate." Id. pp. 9—10. In spite of its lucrative business, Sterling had bank accounts at several large financial institutions closed, and paid Pleasant a $10,000 dollar bonus to find a bank that would do business with them. Id. pp. 10—11, ¶30.

## A.    The January 22 Affidavit and Warrants

The first affidavit in connection with this case was signed by Federal Bureau of Investigation ("FBI") Special Agent ("SA") Roderick F. Coffin on January 22, 2015. Doc. No. [112-2]. Coffin investigated Sterling "for its suspected involvement in making false statements about the Iraqi dinar in order to increase sales." Id. p. 3, ¶5. As Coffin explained, there was "a relatively large market for Iraqi dinars in the United States," which largely consisted of "currency speculators." Id. p. 5, ¶12. These speculators believed that the Iraqi dinar would undergo a "revaluation"—or "RV"—thereby "generating enormous profits for those individuals who possess Iraqi dinars."

Id. pp. 5−6, ¶¶12−13. But "several state governments and a consumer protection group" warned against investing in the Iraqi dinar. Id. p. 6, ¶14

Specifically, the Utah Department of Commerce "listed the Iraqi dinar as a top ten scam for 2011." Id. ¶15. It warned that "the rapid appreciation of any currency's value is extremely rare (the opposite is much more likely), meaning investors should consider this a long-term gamble not a short-term guarantee." Id. A March 2014 Wells Fargo International Strategy Report "strongly advise[d] investors against buying Iraqi dinar as an investment" because "a revalued Iraqi dinar seem[ed] remote into the foreseeable future." Id. pp. 5−6, ¶¶11, 15. The Alabama Securities Commission warned that "investing in foreign currencies can be extremely risky and generally unsuitable for all but the most seasoned investors who can afford the high risk." Id. p. 6, ¶16. Finally, the Better Business Bureau "listed foreign currency scams—to include Iraqi dinars—as a top scam." Id. p. 7, ¶18. It warned, Iraqi dinars "will be very difficult to sell, and it's extremely unlikely they will ever significantly increase in value." Id. In spite of these warnings, many individuals purchased Iraqi dinar hoping that a revaluation would occur. See id. p. 11, ¶31.

As of January 2015, Sterling's website took care to state that it did not offer investment advice, and to include a disclaimer stating that customers agreed they had "researched the currency and underst[ood] the risks involved in investing in foreign currency." Id. p. 9, ¶27. Customers further agreed that they understood "that the value of a currency may go down or up depending on circumstances beyond [Sterling's] control." Id. However, Sterling had "previously promoted the dinar as a good investment on its website and through anonymous blogs." Id. p. 11, ¶32.

In a 2009 article[4] on its website, Sterling stated that there "seems to be minimal risk that the Iraqi Dinar will decrease in value," which when compared to the "tremendous potential upside return . . . seem[ed] to make the Iraqi Dinar a compelling investment opportunity." Id. pp. 12−13, ¶¶35, 37. The article stated that, with respect to an increase in value, "all indicators point toward something happening in the near future (next 12 months) if not the very near future (next 3 months)." Id. p. 13, ¶38 (emphasis omitted). The

---

[4] Although the affidavit suggests the article was posted on "December 22, 2010," Bell's attorney suggests that it was in fact posted on December 22, 2009. Compare Doc. No. [112-2], p. 12, ¶35, with Doc. No. [84-3], p. 12, ¶17. The timing of the article will be discussed below.

article then "speculat[ed]" that "an initial[,] sudden[,] significantly (overnight/over weekend) high revaluation seems very possible." <u>Id.</u>

Mercantile Bank, a bank with which Sterling did business, "expressed a concern about Sterling's promotion of the dinar on its website." <u>Id.</u> p. 22, ¶69. However, when Mercantile Bank permitted Sterling to maintain an account in 2011, it noted "that Sterling did not promote the dinar on its corporate website." <u>Id.</u> pp. 22—23, ¶69. Nevertheless, Pleasant told investigators that, as of 2012, "Sterling employees were actively using anonymous blogs to promote the dinar as a good investment." <u>Id.</u> p. 15, ¶44. Pleasant "told several employees at Sterling," including Defendants Rhame, Shaw, and Bell, as well as Bell's nephew, Sterling IT contractor Youssef Hodaigui, and Defendant Rhame's brother, that it was illegal for Sterling to provide investment advice on the blogs as it did not have the proper license. <u>Id.</u> pp. 15—16, ¶¶45, 47. Bell told Pleasant to either "go with it or be let go." <u>Id.</u> p. 15, ¶46.

When Pleasant "confronted Hodaigui about the illegality of providing investment advice in [*sic*] such blog sites, Hodaigui responded that the blog sites were anonymous." <u>Id.</u> p. 16, ¶47. Pleasant was aware of six such blogs, which he forwarded to investigators. <u>Id.</u> ¶48. The blogs were, indeed,

anonymously registered, but upon further investigation the subscriber was revealed to be Defendant Bell. <u>Id.</u> ¶49. The Internet registrar also revealed that Bell was the subscriber associated with another 13 blogs with "iraqidinar" in the domain name. <u>Id.</u> p. 17, ¶50. In response to a subpoena, the Internet registrar for the blogs identified seven payments by Bell and Hodaigui for the "iraqidinar" blogs. <u>Id.</u> pp. 17—20, ¶¶52—60.

SA Coffin "attempted to access each of the Iraqi dinar blogs," but found most were "no longer active and those that [were] active appear[ed] to likely be operated by different individuals." <u>Id.</u> p. 20, ¶61. However, during the 2012 timeframe discussed by Pleasant, the "blogs appear to have . . . been used to make false representations about the potential value of the dinar." <u>Id.</u> pp. 20—21, ¶61. The administrator of "iraqidinarinfo.com" posted, "[W]hen it is the Iraqi Dinar that we talk about there are no losses at all. The reason is that the Iraqi Dinar is instantly rising and not falling back. . . ." <u>Id.</u> p. 21, ¶62 (emphasis omitted). The post also stated, "The Iraqi currency will never get low . . . . [I]f you need the invested amount back you can easily exchange it with [*sic*] the same rate that you bought it." <u>See id.</u> ¶64.

A contributor on "iraqidinarscam.com" posted that the Iraqi dinar "is secure and has no losses whatsoever for you or any other investor." Id. ¶63. The contributor went on to state that "there are no threats of getting the currency back again to the bad values[;] if it is 1100 now then it will either stay there or will move ahead." Id. Likewise, a contributor on "iraqidinar-investment.com" posted, "[T]he Iraqi dinar will be soon [*sic*] giving away tons of dollars and large sums of returns for the people who have invested in it." Id. ¶65. Several of these blogs contained links to Sterling's website, although none stated that Sterling was associated with the blogs. Id. p. 22, ¶66.

Sterling's website itself also contained an article, published on October 21, 2010, stating that it would have "secure remote satellite offices set up at numerous airport locations nationwide as soon as possible in the event of a revaluation." Id. p. 14, ¶42. The article further provided a list of 22 major U.S. airports, including the Cincinnati/Northern Kentucky International Airport (the "Cincinnati Airport") and the John F. Kennedy International Airport ("JFK"). Id. Pleasant confirmed that he overheard Rhett Rhame tell a

customer in 2012 that "when the RV happened, Sterling would set up kiosks at all major airports." Id.

However, Pleasant stated that "Sterling had never approached airports about setting up currency exchange kiosks." Id. p. 15, ¶43. Officials at the Cincinnati Airport "confirmed to investigators that Sterling had never submitted an application to set up 'secure remote satellite' offices for customers to exchange foreign currency." Id. In fact, Pleasant "told Rhett Rhame that Sterling did not have enough money to pay out all of its customers if and when the RV actually happened." Id. SA Coffin believed the "fact that Sterling did not have large cash reserves [was] significant because it demonstrate[d] that its executives fully understood a large revaluation would not occur yet actively promoted this notion." Id. pp. 13—14, ¶40. After all of this, Pleasant was fired, ostensibly because "he was taking too long to obtain an anti-money laundering certification." Id. p. 16, ¶47.

Based on SA Coffin's affidavit detailing the above facts, United States Magistrate Judge Russell G. Vineyard authorized three search warrants for a total of eight email addresses (collectively "the January 22 Warrants"). See Docs. No. [112-2], [112-3], [112-4], [112-5].

**B.** **The February 13 Affidavit and Warrants**

On February 13, 2015, FBI SA W. Scott Baucom signed an affidavit in support of applications for search warrants for information associated with a variety of email addresses. Doc. No. [112-6]. Baucom's affidavit attached and incorporated SA Coffin's January 22 affidavit described above. Id. p. 4, ¶5; see also id. pp. 34—71. The February 13 affidavit also contained the following additional facts.

A preliminary review of emails searched pursuant to the January 22 Warrants led SA Baucom to believe "that several Sterling employees were knowingly involved in a scheme to defraud Iraqi dinar purchasers." Id. p. 5, ¶9. One email from Defendant Shaw to Defendant Rhame stated that Defendant Shaw's wife "has lately been very nervous and was crying last night because she knows we are running an illegal operation." Id. pp. 5—6; ¶10. Shaw further stated that he and his wife had "worked way too hard in life for [them] to risk everything based on [Defendant Rhame's] belief (even if [Defendant Shaw agreed]) that the Iraqi dinar will not RV and it is ok to make millions of dollars in false promises to our customers." Id. p. 6. The email noted that they were "risking serious jail time as promoters of a ponzi [*sic*]

scheme." Id. A full copy of the email was attached to the affidavit for the Magistrate Judge's review. Id. p. 72.

Another email from Defendant Bell stated that Pleasant "unilaterally had Roberta[5] pull down 3" anonymous Iraqi dinar blogs, "telling her she could go to jail if she did not." Id. p. 6, ¶11. A third email sent between the Sterling Defendants linked "a Forbes article that went into great detail describing how the sale of Iraqi Dinar is a scam and providing thoughts on why the dinar will never revalue." Id. p. 7, ¶12. The subject line of the email was "not great article." Id.

Among the additional email addresses to be searched were three emails associated with the "TCB Group/The Get Team." See id. pp. 14−19. SA Baucom explained that "thegetteam.com" advertized itself as "the largest Dinar Website," with news, updates, and conference calls on the Iraqi dinar. Id. p. 15, ¶38. The website also explained that it offered a free chat to answer questions, and that "[l]aw enforcement ha[d] not yet accessed the chat room of this particular website." Id. The website's "About Us" section stated "On

---

[5] The identity of "Roberta" is never explained.

behalf of TerryK, . . . welcome all of you—old and new—to your new home!"
Id.

Review of Kentucky Secretary of State records revealed that Defendant Terrence Keller was listed as a representative of "TCB Group, Inc." Id. p. 17, ¶39. An email from "tcbgroupinc@aol.com" to Defendant Rhame stated that "TerryK" owned "the worlds [*sic*] largest Dinar website." Id. ¶40. Financial records revealed "what appear to be $4,000 monthly payments from Sterling" to the TCB Group, Inc. Id. ¶39.

An internet search by SA Baucom discovered a January 3, 2013 post by "TerryK" on the website "dinarrecaps.com" titled "Terryk And Get Members Chat Thursday Afternoon." Id. p. 15, ¶38. In the post, "TerryK" discussed an "ECONOMIC RESET THATS [*sic*] ABOUT TO TAKE PLACE." Id. p. 16. He said that the "RUMOR" was that there was a "VERY STRONG" possibility that the reset would take place at "4PM EST" on the day of the post. See id. Later, "TerryK" stated "TONIGHT IS RED HOT. RED HOT. ANOTHER CALL COMING IN SOON TO GIVE ME MORE DETAILS. PP ARE OUT BEING DELIVERED. HAVE 3 COFIRMS ON THAT. WE ARE IN THE MONEY PEEPS. WHOO HOO. TREAT AS RUMOR OF COURSE." Id.

pp. 16—17. A revaluation of the Iraqi dinar did not occur on January 3, 2013. Indeed, there has been no such revaluation to date.

Based the information in the February 13 affidavit, United States Magistrate Judge Gerrilyn G. Brill authorized five search warrants (collectively "the February 13 Warrants"). <u>See</u> Docs. No. [112-6], [112-7], [112-8], [112-9], [112-10], [112-11].

C.   **The May 29 Affidavit and Warrants**

Upon further investigation, the FBI sought warrants to search physical addresses in the Atlanta area where Sterling was based, leading to another affidavit from SA Baucom. <u>See</u> Doc. No. [112-34]. This affidavit was based primarily on the facts set forth in the prior affidavits detailed above. <u>See</u> Doc. No. [112-34]; <u>see also</u> Doc. No. [146], pp. 36—37; Doc. No. [165], p. 14. However, certain additional facts were contained in Baucom's May 2015 affidavit.

In support of his contention that the anonymous blogs encouraged "viewers to purchase currency from Sterling," Baucom cited to an April 20, 2012, post on iraqidinarscam.com. Doc. No. [112-34], p. 16—17, ¶49. The post lauded Sterling as having a "great reputation" and being "trustworthy." <u>Id.</u> It

further stated that, while some companies "make promises they can't keep," the people at Sterling "back up everything they promise with actions to match." Id. Finally, the post averred that Sterling had "all the necessary licenses" and "long-established banking connections." Id.

The affidavit went on to discuss various communications between Defendant Keller and the Sterling Defendants. On November 7, 2011, Keller emailed Defendants Rhame and Bell, stating that he "want[ed] to make sure that [their] arrangement [was] between [them] and no one else" and that "no one else needs to know about [their] arrangement." Id. pp. 18−19, ¶55. Keller later emailed Rhame to state that, when a competitor sought to pay for an advertising banner on Keller's website, Keller "turned him down" because he supported Sterling. Id. p. 18, ¶56. Keller said that he only allowed an advertizing banner by another Sterling competitor "because they make you guys look like GODS!!!!!" Id. In reference to dinar reserves, Keller told Bell that he "should have gotten a lot of business" because Keller was "pushing it hard on the site bro." Id. Bell responded to thank Keller, and several other emails demonstrated that Keller took efforts to "promot[e] the heck out of Sterling." See id.

14

SA Baucom also stated that "Bell routinely appear[ed] on weekly conference calls hosted by the GET Team," and that during such calls the GET Team "pass[ed] along what investigators believe[d] to be false information that they supposedly received from sources about the Iraqi dinar." Id. p. 19, ¶57. Baucom pointed to three conference calls in particular. On January 8, 2014, "TerryK" allegedly "stated that a source at Wells Fargo had told him that it would take at most 10 to 15 minutes to process the exchange of Iraqi dinar." Id. pp. 19—20. In another call on March 12, 2014, he said "a source at Wells Fargo had told him 'it' was supposed to happen but that the time ke[pt] changing." Id. p. 20. Finally, on April 16, 2014, he "said he had heard from the 'UST' (which investigators believe[d] to mean the U.S. Treasury Department) that the rate was good and that everything would be released that week." Id.

Baucom believed Keller to be lying about having these sources, and noted that he and "other GET Team administrators ha[d] received emails from individuals accusing [Keller] of running a scam." Id. ¶58. Investigators spoke with "officials with the U.S. Department of Treasury and the banking and finance community, [including] the Wells Fargo Executive Vice President in charge of Wells Fargo's Foreign Exchange Services." Id. ¶59. The Treasury

officials stated that the U.S. government was "not preparing for an Iraqi dinar revaluation" and that any information to the contrary was false. Id. Likewise, the Wells Fargo executive confirmed that the company was "not preparing for an Iraqi dinar revaluation and ha[d] no plans whatsoever to exchange the Iraqi dinar." Id.

Finally, Baucom's May 29, 2015 affidavit discussed an email sent from Defendant Rhame to Defendant Shaw and his wife with the subject, "Comments related to AMENDED Operating Agreement." Id. pp. 21–22, ¶61. The document attached to the email stated that Defendant Rhame was to be the sole owner of Sterling, and that while Defendant Shaw was not an owner or partner he was entitled to 50% of the profits and losses of Sterling. Id. p. 22. Defendant Rhame described the amendment as "complete bullshit for the purpose of obtaining banking." Id. p. 21. He stated that he and Defendant Shaw were "50% partners and [Defendant Shaw's] ass will go to prison if mine does." Id.

Based on Baucom's May 29, 2015 affidavit, Judge Brill authorized four search warrants: three for the Sterling Defendants' physical residences in the Atlanta area and one for the physical address believed to be used by Sterling

(collectively "the May 29 Warrants"). Docs. No. [112-34], [112-35], [112-36], [112-37], [112-38].

**D.    The June 2 Affidavit and Warrant**

On June 2, 2015, FBI special agent Clay Hoover filed an affidavit that is, for the purposes of the present motions, "substantially similar, if not identical" to the May 29 affidavit and relies heavily on the January 22 affidavit. See Doc. No. [112-42]; see also Doc. No. [146], p. 67. Based on the June 2 affidavit, United States Magistrate Judge Edward B. Atkins of the Eastern District of Kentucky authorized a search warrant for Keller's personal residence ("the June 2 Warrant"). See Doc. No. [146], p. 67.

**E.    The August 13 Affidavit and Warrants**

Another affidavit, signed by Agent Baucom on August 13, 2015 contained the following additional assertions. See Doc. No. [112-49]. Baucom said that during an interview with federal investigators, "Bell stated that he did not think the Iraqi dinar will undergo a revaluation as speculators commonly claim." Id. p. 8, ¶10. "Bell himself informed federal investigators in late May 2015 and in early June 2015 that he did not think the revaluation would ever occur." Id. p. 9, ¶11.

Nevertheless, Sterling paid over $150,000 to Keller and his team, who spread "false information suggesting that the revaluation has occurred or will occur." Id. p. 11, ¶¶16−17. As examples of "false information about the Iraqi dinar" propagated by Keller, Baucom pointed to the GET Team conference calls described in the May 29 affidavit. Id. ¶18. One victim interviewed by the FBI indicated that "Keller constantly told people that his 'sources' told him that the RV was about to occur and directed people to buy from Sterling." Id. p. 13, ¶22. Defendant Rhame appeared with Keller on conference calls, and purportedly said "following a revaluation Sterling would be able to cash out customers at airport kiosks," specifically saying "Sterling would have a kiosk at JFK International Airport." Id. In fact, officials with JFK stated that Sterling "never made an application to open up an office or kiosk at that airport." Id. Based on the foregoing, United States Magistrate Judge Alan J. Baverman authorized eight search warrants for a total of 53 email addresses. Docs. No. [112-50], [112-51], [112-52], [112-53], [112-54], [112-55], [112-56], [112-57]. (collectively "the August 13 Warrants").

## II.     LEGAL STANDARD

In order to be valid, a search warrant must be supported by probable cause, which exists "when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). An affidavit in support of a search warrant must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). This requires "a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id.

But in reviewing a search warrant, courts do not "conduct a de novo determination of probable cause." Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085, 80 L. Ed. 2d 721 (1984). The reviewing court's role is "only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Id. This is "a practical, commonsense decision," and courts are not to "interpret supporting affidavits in a hypertechnical manner." United States v. Miller, 24 F.3d 1357, 1361 (11th

Cir. 1994). Courts want "to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id.; see also United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewing court to afford "great deference" to a judicial determination of probable cause).

Affidavits supporting search warrants are presumptively valid. Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978). In order to be entitled to an evidentiary hearing on the veracity of an affidavit, a defendant must demonstrate that the affidavit contains "deliberate falsehood[s]" or was made with "reckless disregard for the truth," and must accompany those allegations with "an offer of proof." Id. "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." Id.

In addition to affirmative misstatements of fact, material omissions from a supporting affidavit may also entitle a defendant to a hearing. United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009). If a defendant cannot show by direct evidence that an omission was made intentionally, it is

possible for him to show the omission was reckless "when the facts omitted from the affidavit are clearly critical to a finding of probable cause." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997). "Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant." Id. (citation omitted).

Even if an affidavit in support of a warrant contains deliberate falsehoods or false statements made with reckless disregard for the truth, the warrant will still be valid if the statements were not necessary to the finding of probable cause. See Franks, 438 U.S. at 155—56. The same is true of "intentional or reckless omissions." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir.1997). In such situations, no hearing is required. See Franks, 438 U.S. at 171—72.

Even when false statements or material omissions invalidate a search warrant, the defendant is not necessarily entitled to exclusion of the evidence obtained pursuant to that search warrant. Herring v. United States, 555 U.S. 135, 140, 129 S. Ct. 695, 700, 172 L. Ed. 2d 496 (2009). The exclusionary rule "is not an individual right." Id. at 141. It is a "last resort" whose "sole purpose" is "to deter future Fourth Amendment violations." United States v. Smith, 741

F.3d 1211, 1219 (11th Cir. 2013). "In addition, the benefits of deterrence must outweigh the costs." <u>Herring</u>, 555 U.S. at 141.

These principles derive from <u>United States v. Leon</u>, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), where the Supreme Court held that the exclusionary rule does not apply if the police acted "in objectively reasonable reliance" on a search warrant that is later held invalid for lack of probable cause. 468 U.S. at 922. This inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." <u>Id.</u> at 922 n.23. The Supreme Court has extended this exception to "searches conducted in objectively reasonable reliance on binding appellate precedent." <u>Davis v. United States</u>, 564 U.S. 229, 232, 131 S. Ct. 2419, 2423–24, 180 L. Ed. 2d 285 (2011).

## III. ANALYSIS

Defendants have filed two sets of objections—one by the Sterling Defendants and one by Defendant Keller. Docs. No. [164], [165]. The Court addresses these objections in turn.

## A. The Sterling Defendants' Objections

The Sterling Defendants challenge the affidavits supporting the January 22 Warrants, the May 29 Warrants, and the August 13 Warrants. The Court addresses each in turn.

### 1. *The January 22 Warrants*

The Sterling Defendants raise four objections to Judge Salinas' recommendation regarding the January 22 Warrants. First, they argue that Plesant did not tell "Sterling Executives" that a revaluation would not occur. Doc. No. [165], pp. 4—6. Second, they contend that the Utah Department of Commerce statement could not have influenced the 2009 article because the article was written first, and Coffin failed to mention that the article was taken down in 2010. Id. pp. 6—8. Third, they aver that the article about airport exchanges was removed "sometime between October 2010 and April 2011," and that Coffin should have explained that Sterling's plan "ended" when article was removed. Id. pp. 9—11. Finally, they argue that they took down the anonymous blogs after Plesant told them to do so. Id. pp. 11—13.

### i.  **Argument one**

The Sterling Defendants first argue that SA Coffin "falsified [Pleasant's] statements." Doc. No. [165], p. 4. Their contention that Coffin "manufactured evidence" is based on the fact that the January 22 affidavit states that Pleasant "informed Sterling executives [that] Sterling would not have the financial resources to 'cash out' its customers if and when a revaluation occurred." Id.; Doc. No. [112-2], p. 13, ¶40. In fact, the statement was made "to an employee in the call center who was never an executive (Rhett Rhame, the younger brother of Tyson Rhame)." Doc. No. [84-3], pp. 11−12, ¶18. Setting aside whether Defendants have made a competent offer of proof,[6] the misstatement does not demonstrate that SA Coffin offered a "deliberate falsehood" or acted "with reckless disregard for the truth." Franks, 438 U.S. at 171.

First and foremost, in a later paragraph the affidavit correctly states that Pleasant "told Rhett Rhame that Sterling did not have enough money to pay

---

[6] In order to be entitled to an evidentiary hearing, Defendants must make "an offer of proof" that the affidavit contains deliberate falsehoods or reckless omissions of material facts. See Franks, 438 U.S. at 171. This requires the "sworn or otherwise reliable statements of **witnesses**" or a satisfactory explanation why such information cannot be provided. Id. (emphasis added). The only affidavit offered by Defendants is one from Defendant Bell's attorney, based on his "personal knowledge" and "information provided to [him] by counsel for Defendants Tyson Rhame and James Shaw." Doc. No. [84-3], p. 2, ¶1.

out all of its customer if and when the RV actually happened," explicitly referring to the paragraph challenged by the Sterling Defendants. Doc. No. [112-2], p. 15, ¶43. It is inconceivable that Coffin would deliberately "falsif[y]" Pleasant's statement to "manufacture[ ] evidence," only to then turn around and provide a perfectly accurate account of Pleasant's statement. The Sterling Defendants seem to argue that this later, completely-accurate account of Pleasant's statement "could not possibly rectify the previous misrepresentation" because Coffin did not explain "Rhett Rhame's role in the company or state[ ] that he was not a 'Sterling Executive.'" Doc. No. [165], p. 6. In fact, SA Coffin did explain that Rhett Rhame was "Tyson Rhame's brother and was at one point a Sterling manager." Doc. No. [112-2], p. 7, ¶20.

Thus, this entire objection hinges on the fact that SA Coffin called a former "Sterling manager" a "Sterling executive." Courts do not "interpret supporting affidavits in a hypertechnical manner," but rather use their commonsense. <u>Miller</u>, 24 F.3d at 1361. Whether Coffin called Rhett Rhame a former Sterling manager or a Sterling executive could not have had any effect on the Magistrate's probable cause determination, especially since Coffin explicitly clarified who Pleasant made the statement to. What's more, the

Sterling Defendants' objection does not challenge the substance of Pleasant's statement—namely, that the company did "not have the financial resources to 'cash out' its customers if and when a revaluation occurred." Doc. No. [112-2], p. 13, ¶40; see also Doc. No. [165], pp. 4—6.

Regardless of whether Pleasant directly informed them of it or not, Coffin reasonably inferred that Sterling "executives fully understood a large revaluation would not occur[,] yet actively promoted this notion on [their] website," based on the "fact that Sterling did not have large cash reserves." Doc. No. [112-2], pp. 13—14, ¶40. The Sterling Defendants did not need Pleasant to inform them of the financial straits the company was in.

### ii.   **Argument two**

The Sterling Defendants next argue that Coffin omitted an essential fact about the December 2009 article that stated "all indicators point toward [an increase in the value of the dinar] in the near future (next 12 months) if not the very near future (next 3 months)." Doc. No. [165], pp. 6—8; see also Doc. No. [112-2], p. 13, ¶38 (emphasis omitted). Specifically, the Sterling Defendants note that the article was removed on December 27, 2010, a little over one year after it was posted. Doc. No. [165], p. 7. They contend that

disclosure of this fact would have shown that they merely "published [their] opinion and, when that opinion failed to materialize, Sterling stopped issuing that opinion." <u>Id.</u> This, they contend, would have defeated any inference "that Sterling was trying to deceive investors." <u>Id.</u>

But another, equally-plausible interpretation of the decision to take down the article is that Sterling intended to cover-up its demonstrably false prediction and perpetuate its alleged fraud. It would certainly have harmed Sterling's business if investors, who continued to believe that a revaluation was imminent, saw that such "predictions" did not come true. Yet another possible explanation is that the Sterling Defendants took down the article because Mercantile Bank, "expressed a concern about Sterling's promotion of the dinar on its website." Doc. No. [112-2], p. 22, ¶69.

While Sterling did hundreds of millions of dollars in business, it "had to locate banks that [would] permit the company to open and maintain accounts." <u>Id.</u> pp. 9−10, ¶¶28, 30. Indeed, the Sterling Defendants were apparently so desperate that they paid Pleasant "a $10,000 bonus after he helped Sterling create an account with Mercantile Bank." <u>Id.</u> p. 10, ¶30. Rather than taking down the article simply because their "opinion failed to

materialize," they may well have done so to protect their account at Mercantile Bank. Indeed, in 2011 when Mercantile Bank decided to permit Sterling to maintain an account, it noted "that Sterling did not promote the dinar on its corporate website." Id. pp. 22—23, ¶69.

Moreover, the arguments about Coffin's "omission" regarding the 2009 article are refuted by the fact that the affidavit did indicate the article was taken down. As just noted, the affidavit stated that "Sterling did not promote the dinar on its corporate website" as of 2011. Id. Additionally, Coffin specifically stated that Sterling "**previously** made claims about the potential for the dinar to increase in value," but that it "**currently** proclaims it does not offer investment advice." Doc. No. [112-2], p. 14, ¶41 (emphasis added). Thus, the affidavit clearly indicates that the 2009 article was taken down by 2011. See Miller, 24 F.3d at 1361.

There is no evidence that Coffin's failure to state the exact day the article was taken down was an "intentional or reckless omission[ ]." See Madiwale, 117 F.3d at 1327. Even if it were, it would not invalidate the search warrant because the "omission" would not have prevented a finding of probable cause. The fact that the article was taken down was at least as likely

to support a finding of probable cause, and the affidavit clearly expressed that the article was taken down by 2011.

Moreover, the fact that the article was not reposted after being taken down does not defeat probable cause. The fact remains that the Sterling Defendants posted an article apparently attempting to mislead investors in 2009. The Magistrate Judge could have reasonably believed they continued try to mislead investors, albeit through other means. Notably, the Sterling Defendants never deny that they ran anonymous blogs saying substantially the same allegedly false things contained in the 2009 article. The fact that their actions became more sophisticated and did not involve simply reposting the same article does not defeat the Magistrate Judge's finding of probable cause.

### iii.    <u>Argument three</u>

The Sterling Defendants also argue that Coffin "misrepresented the facts surrounding Sterling's plan to open airport exchange locations." Doc. No. [165], pp. 8–11. Specifically, Coffin did not inform the Magistrate that the article on Sterling's website discussing opening airport exchanges was removed from the site "by April 2011." Doc. No. [84-3], p. 13, ¶21. The Sterling Defendants baldly contend that "SA Coffin must have known this,"

because **if** he used the internet archive to view the webpage in question at some later date, he would have seen the article was no longer there. Doc. No. [165], p. 9. They provide no direct offer of proof that Coffin was aware the article was taken down. Nevertheless, they may still show recklessness if the fact omitted was "clearly critical to a finding of probable cause." <u>Madiwale</u>, 117 F.3d at 1327.

The Sterling Defendants contend that the fact that they took the article down "clearly indicates that Sterling abandoned this plan to open airport locations sometime before April 2011." Doc. No. [165], p. 9. This "was crucial" because it supposedly explains why "Pleasant did not know about airport exchange plans—because Sterling was no longer telling customers of this plan by the time of Pleasant's employment," which began in June 2011. <u>Id.</u> pp. 9—10. This conveniently ignores the fact that Pleasant told investigators that he heard Rhett Rhame tell "a customer in 2012 that when the RV happened, Sterling would set up kiosks at all major airports." Doc. No. [112-2], p. 14, ¶42.Thus, even if the article about airport exchanges was removed by April, this does not show Sterling "abandon[ed]" the plan. In 2012, it was still telling customers it would open airport exchanges.

The Sterling Defendants also assert that Coffin "manufactured probable cause out of whole cloth" because he did not tell the Magistrate that he called the Cincinnati Airport in sometime 2015. Doc. No. [165], pp. 10−11. Setting aside the fact that Defendants have presented no evidence when Coffin called, this "omission" is completely immaterial. The airport officials said "Sterling had **never** submitted an application to set up 'secure remote satellite' offices." Doc. No. [112-2], p. 15, ¶43 (emphasis added). Regardless of when Coffin called the airport officials, the implication is the same. In 2010, when Sterling claimed it would have "secure remote satellite offices set up at [the Cincinnati Airport] as soon as possible in the event of a revaluation," it had not applied to set up such a location and it did not do so at any time thereafter. See id. p. 14, ¶42.

### iv. **Argument four**

Finally, the Sterling Defendants argue the January 22 affidavit is invalid because Coffin failed to inform the Magistrate Judge that the 19 anonymous blogs mentioned in the affidavit "were removed sometime before May 26, 2012." Doc. No. [165], p. 12. Thus, they argue, the Court should "strike any suggestion that Sterling fired Pleasant for raising an issue about the blogs"

because Sterling "took them down" when "Pleasant raised [the] issue." Id. pp. 12—13. The problem is that their assertion that the "blogs were removed" is unequivocally false.[7] The affidavit cited by the Sterling Defendants states that **one article on one blog** was removed "sometime before May 26, 2012." Doc. No. [84-3], p. 14, ¶23; see also Doc. No. [165], p. 12. It is true that three anonymous blogs were taken down by **Pleasant**, but the Sterling Defendants have pointed to no evidence that **they** took down any of the anonymous blogs. See Doc. No. [112-6], p. 6, ¶11.

Given an honest assessment of the facts, Coffin failed to state that "Sterling took [one article on one blog] down"—the article discussed in paragraphs 62 and 64 of the affidavit. See Doc. No. [84-3], p. 14, ¶23. This "omission" would not have affected the probable cause analysis. There is, for example, no evidence the Sterling Defendants took down the post that claimed the Iraqi dinar "is secure and has no losses whatsoever for you or any other investor," and "there are no threats of getting the currency back again to the bad values[;] if it is 1100 now then it will either stay there or will move

---

[7] The Court notes that the Georgia Rules of Professional Conduct state, "A lawyer shall not knowingly make a false statement of material fact or law to a tribunal." Ga. R. Prof'l Conduct 3.3(a)(1). "The maximum penalty for a violation of this Rule is disbarment." Id. 3.3.

ahead." Doc. No. [112-2], p. 21, ¶63. Or the post stating, "[T]he Iraqi dinar will be soon [*sic*] giving away tons of dollars and large sums of returns for the people who have invested in it." Id. ¶65. Moreover, the specific posts pointed to by Coffin were merely **examples** of false statements on the 19 anonymous blogs operated by Sterling. As Coffin explained, the affidavit does not contain "every detail of every aspect of the investigation." Id. p. 3, ¶4.

Crucially, the Sterling Defendants do not deny that, after Pleasant told employees that Sterling did not have the proper license to offer investment advice on the anonymous blogs, Bell threatened to fire him if he did not "go with it." Id. p. 15, ¶¶45—46. Regardless of whether they removed one article, the Sterling Defendants thereafter fired Pleasant. Id. p. 16, ¶47. Coffin honestly informed the Magistrate Judge that the purported reason Pleasant "was fired was because he was taking too long to obtain an anti-money laundering certification." Id. But the Magistrate Judge was free to decide to believe or disbelieve the Sterling Defendants' proffered reason, and could reasonably have believed the reason for the firing was because Pleasant told employees what they were doing was illegal.

### v.     <u>The "totality of the circumstances"</u>

With essentially all of their arguments, the Sterling Defendants contend that Coffin should have included facts that are largely extraneous. But even if each fact had been included, they would not have defeated probable cause. The Sterling Defendant's interpretations of the facts are tenuous at best, and the facts were at least as likely to support a finding of probable cause, as discussed above. Having reviewed the entirety of the affidavit, it is clear that "substantial evidence" supported "the magistrate's decision to issue the warrant." <u>See Upton</u>, 466 U.S. at 728. The Sterling Defendants have cited to no omitted fact that was "clearly critical to a finding of probable cause." <u>See Madiwale</u>, 117 F.3d at 1327.

The Sterling Defendants did not, for example, ever post any articles renouncing their revaluation prediction or airport exchange plans. Such facts would have warranted inclusion. But the mere fact Sterling removed the articles containing false representations, for unexplained reasons, would not have defeated probable cause. When considering "the totality of the circumstances," the January 22 affidavit allowed "a conclusion that there [was] a fair probability of finding contraband or evidence" at the locations to

be searched pursuant to the January 22 Warrants. <u>See Brundidge</u>, 170 F.3d at 1352.

### 2.   *The May 29 Warrants*

The Sterling Defendants next challenge the warrants obtained based on Baucom's May 29 affidavit. Because the affidavit reincorporated many of the allegations from Coffin's January 22 affidavit, the Sterling Defendant's contend that the May 29 affidavit fails based on their arguments set forth above. Doc. No. [165], p. 14. For the reasons given above, the allegations of the January 22 affidavit were sufficient to establish probable cause. The Sterling Defendants raise two sets of objections specific to the May 29 affidavit. First, they argue that Baucom "misrepresented" that Bell was on the GET Team conference calls when Keller made false representations. Doc. No. [165], pp. 15−18. Second, they contend "Baucom omitted crucial language from Sterling Defendants' emails." <u>Id.</u> pp. 18−21. The Court addresses these arguments in turn.[8]

---

[8] The R&R addressed the issue of whether the information in the affidavits established "a 'fair probability' that evidence of a crime would be found at the Sterling Defendants' personal residences." Doc. No. [146], pp. 48−51. The Sterling Defendants do not object to Judge Salinas' ruling in this regard.

First, the Sterling Defendants argue that the statement "Bell routinely appear[ed] on weekly conference calls hosted by the GET Team" was misleading because it implied Bell heard the false statements by Keller in the three specific calls discussed by SA Baucom. Id. 16—17; see also Doc. No. [112-34], p. 19, ¶57. In fact, while Bell was on two of the three calls, the Sterling Defendants assert there is "no evidence" he heard Keller's allegedly false statements. Doc. No. [165], pp. 16—17. In this regard, the Sterling Defendants misunderstand their burden. They cannot simply claim there is "no evidence" Bell was on the April 16, 2014 call when Keller made his allegedly false statements. See id. They must provide an affirmative "offer of proof" that Bell was not on the call. Franks, 438 U.S. at 171. More importantly, this entire line of argument is a red herring.

The May 29 Baucom affidavit never states that Bell was on any of the three specific calls discussed or that Bell heard the false statements made during those calls. See Doc. No. [112-34], pp. 19—21, ¶¶57—60. Instead, the affidavit states Bell "routinely" appeared on the conference calls and that GET Team managers made what investigators believed to be false statements during conference calls. Id. p. 19, ¶57. The Sterling Defendants do not argue

that either of these statements is untrue. See Doc. No. [165], pp. 16—17. Nor is there any argument that the three specific conference calls described by Baucom differed in any meaningful way from the other conference calls Bell "routinely" appeared on. See id.

The Sterling Defendants next argue that Baucom "omitted crucial language" from certain emails. Doc. No. [165], pp. 18—21. The first email is the one discussed in paragraph 60 of the affidavit. Baucom directly quoted a portion of the email where Defendant Shaw wrote:

> [Shaw's wife] has lately been very nervous and was crying last night because she knows we are running an illegal operation. The point is that her and I have worked way too hard in life for us to risk everything based on [Defendant Rhame's] belief (even if I agree with you) that the Iraqi dinar will not RV and it is ok to make millions of dollars in false promises to our customers. Not only are we risking everything we own, we are risking serious jail time as promoters of a ponzi [*sic*] scheme.

Doc. No. [112-34], p. 21, ¶60. The Sterling Defendants contend Baucom made "lies and misrepresentations about the email" because he did not include the next two sentences of the email, which read, "If it was no problem for Abul to sign, then we should have back. It is ok to pay him to sign actual hedging contract." See Doc. No. [165], pp. 18—20.

These sentences, they argue, "show[ ] that Sterling was concerned that—at that time—it could not purchase sufficient Iraqi dinar to fulfill lay-away orders that it had received from customers." Id. p. 19. This interpretation is not at all clear from the email, even when read in its entirety. See Doc. No. [112-34], p. 51. True, the third paragraph discusses "Abul" and "hedging contract[s]." But the email discusses numerous problems with and aspects of the business. It is entirely unclear whether the third paragraph has any relation to the first two. See Doc. No. [112-34], p. 21, ¶60; id. p. 51. As Judge Salinas noted, "There is no indication that Shaw's wife was crying about the lack of a hedging contract." Doc. No. [146], p. 45. Why would she describe the lack of a hedging contract as "an illegal operation"? Doc. No. [112-34], p. 51. Why would Defendant Shaw describe a lack of a hedging contract as "a ponzi [sic] scheme?" Id. Defendants offer no persuasive explanation on these points. See Doc. No. [165], pp. 18−20.

Even assuming that these statements dealt with the lack of a hedging contract, one sentence quoted by Baucom stands alone. Defendant Shaw explicitly stated that he and Defendant Rhame believed "that the Iraqi dinar will not RV," which was contrary to representations Sterling made to

customers, as discussed above. Doc. No. [112-34], p. 51. In the exact same sentence, Shaw went on to acknowledge that Sterling was making "millions of dollars in false promises to [its] customers." Id. Whether it was making those millions through a lay-away program or otherwise, Judge Brill could have reasonably concluded that the "illegal" aspect of Sterling's "ponzi [*sic*] scheme" was not the lack of a hedging contract. It was the "false promises to [its] customers" regarding whether "the Iraqi dinar will . . . RV."

What's more, the entire email was attached to the affidavit so that Judge Brill could draw his own conclusions about its meaning. See Doc. No. [112-34], p. 21, ¶60; id. p. 51. The Sterling Defendants argue that this "cannot remedy lies and misrepresentations about [the] email" in the affidavit. Doc. No. [165], p. 20. The Court agrees, but there were no lies or misrepresentations about the email in the affidavit. Baucom simply quoted, in a completely accurate manner, the part he believed to be most relevant. Doc. No. [112-34], p. 21, ¶60. Quoting the entire email would not have affected the probable cause analysis because Judge Brill already had the entire email. Id. p. 51.

The next email the Sterling Defendants claim is "irrelevant to probable cause" is the email in which Defendant Rhame suggested Defendant Shaw "will go to prison if [Defendant Rhame did]." Doc. No. [165], pp. 20−21; Doc. No. [112-34], pp. 21−22, ¶61. In this paragraph of the affidavit, there indisputably is no false statement and no omission. Instead, the Sterling Defendants appear to be asserting that **if** all of the other allegations discussed above are excluded, this email would not have done anything to support probable cause. See Doc. No. [165], pp. 20−21. In fact, the email does provide at least some support for a finding of probable cause.

While the email discusses "obtaining banking," as the Sterling Defendants note, the amendment to the operating agreement does not appear to be the reason Defendant Rhame said Defendant Shaw would "go to prison if [he did]." Doc. No. [112-34], pp. 21−22, ¶61. Judge Brill could reasonably have concluded that the reason Defendant Rhame brought up the possibility of "go[ing] to prison" was the fact that Sterling was a "ponzi [*sic*] scheme" and had nothing to do with the discussion of the amendment or obtaining banking. His probable cause determination is entitled to a "high level of deference." Miller, 24 F.3d at 1361.

The final email discussed by the Sterling Defendants is the one linking to a Forbes article. Doc. No. [165], p. 21. While the Court agrees that this email, standing alone, "cannot establish probable cause," that does not mean the email is irrelevant. See id. As discussed above, Sterling is alleged to have actively promoted the notion that the dinar would revalue to increase its sales of the dinar. The fact that the Sterling Defendants read "a Forbes article that went into great detail describing how the sale of Iraqi Dinar is a scam and providing thoughts on why the dinar will never revalue," and thought the article was "not great" is obviously relevant to their state of mind. Doc. No. [112-34], pp. 22−23, ¶62. Additionally, the fact that they concerned themselves at all with the article and worried it would be "not great" for their business tends to show that they understood their "sale of Iraqi Dinar [was part of] a scam" because "the dinar will never revalue." See id.

Baucom did not have to demonstrate that a single email, standing alone, was conclusive proof of fraud. Each of the emails provided some indication of fraud, and the probable cause determination was made in light of "the totality of the circumstances." See Brundidge, 170 F.3d at 1352. Given this framework, the facts supporting the May 29 affidavit were undoubtedly

sufficient. Even if Baucom had disclosed that Bell was not listening at the exact moment Keller made misrepresentations during two conference calls, this would not have defeated probable cause. Moreover, "substantial evidence" supported the inference that Sterling was involved with Keller's activities and, by extension, "the magistrate's decision to issue the warrant[s]." See Upton, 466 U.S. at 728. When considering "the totality of the circumstances," the May 29 affidavit allowed "a conclusion that there [was] a fair probability of finding contraband or evidence" at the locations to be searched pursuant to the May 29 Warrants. See Brundidge, 170 F.3d at 1352.

### 3.    *The August 13 Warrants*

The Sterling Defendants acknowledge that Baucom's August 13, 2015 affidavit "reasserted the same allegations from the January 22, 2015[,] and May 29, 2015[,]" affidavits. Doc. No. [165], p. 22; see also Doc. No. [112-49]. Because those affidavits were valid, the August 13 affidavit was valid as well. Nevertheless, the Court discusses the two specific objections regarding the August 13 affidavit raised by the Sterling Defendants. First, they assert that Baucom "mischaracterized" Bell's statement to federal investigators. Doc.

No. [165], pp. 22–23. Second, they argue that Baucom wrongly suggested "that Sterling never had plans to set up [airport] exchanges." Id. pp. 23–24.

The Sterling Defendants suggest that Baucom "misrepresented" Bell's statements to investigators because Bell "said a modest climb in value [of the dinar] was possible." Id. p. 22. The paragraph of the affidavit the Sterling Defendants are challenging to reads, "Bell himself informed federal investigators in late May 2015 and in early June 2015 that he did not think the revaluation would ever occur." Doc. No. [112-49], p. 9, ¶11; see also Doc. No. [165], pp. 22–23.[9] Bell did indeed state that the dinar could see "a **modest** climb in value was **possible if** Iraq put in place a sectarian government, the United States continued its expansionary monetary policy, **and** Iraq broke from a reserve currency." Doc. No. [165], p. 22 (emphasis added); see also Doc. No. [84-3], p. 19, ¶33.

But Bell went on to say he did not believe the dinar would see the "20,000% percent [*sic*] return that people speculate." Doc. No. [84-3], p. 19, ¶33. In other words, the very excerpt the Sterling Defendants chastise Baucom

---

[9] While the Sterling Defendants cite to paragraphs 11, 14, and 15 of the affidavit, paragraphs 14 and 15 have nothing to do with Baucom's "mischaracteriz[ation]"of Bell's statement. See Doc. No. [165], pp. 22–23; Doc. No. [112-49], pp. 10–11, ¶¶14–15.

for omitting confirmed Baucom's contention that "Bell stated that he did not think the Iraqi dinar will undergo a revaluation as speculators commonly claim." Doc. No. [112-49], p. 8, ¶10.

Baucom did not mischaracterize Bell's statement to investigators. Rather, he left out extraneous information that was irrelevant to the probable cause determination. The Sterling Defendants are not accused of committing fraud by suggesting that a "modest" increase in the value of the dinar "was possible if" a wide array of events occurred. Doc. No. [165], p. 22. The Sterling Defendants' statements that the supported probable cause were those like the one where they told investors that "all indicators" pointed toward a revaluation in the next 3 to 12 months, and that revaluation could be in the range of 1,000 to 14,900%, with "numerous significant incremental increases in valuation" thereafter. See Doc. No. [112-49], pp. 9—10, ¶13. Bell expressly contradicted "speculat[ion]" of such an astronomical return. Doc. No. [84-3], p. 19, ¶33.

The Sterling Defendants' second argument regarding the August 13 affidavit is that Baucom "omitted information" about the planned airport exchanges. Doc. No. [165], pp. 23—24. But the body of the Sterling Defendants

objection does not mention any information Baucom "omitted." Instead, they take issue with his completely accurate statements that (1) Defendant Rhame told a victim "Sterling would have a kiosk at JFK International Airport following a revaluation" and (2) "officials from JFK . . . indicated that [Sterling] never made an application to open up an office or kiosk." Doc. No. [112-49], p. 13, ¶22; see also Doc. No. [165], p. 23.

Baucom did not, as the Sterling Defendants assert, tell the Magistrate Judge Sterling's "plan must be false." Compare Doc. No. [165], p. 23, with Doc. No. [112-49], p. 13, ¶22. The fact is Sterling did not submit an application to set up a kiosk and it advertized on Defendant Keller's conference calls where he "constantly told people that his 'sources' told him that the RV was about to occur." Doc. No. [112-49], p. 13, ¶22. If the Magistrate Judge made the reasonable inference the Sterling Defendants falsely claimed they planned to set up kiosks, he was entitled to do so. The Sterling Defendants' contention that he should have made a different inference is unavailing. See Robinson, 62 F.3d at 1331 (requiring "great deference" to a judicial determination of probable cause).

The Court notes that the Sterling Defendants attempt to bury a substantive argument in a footnote—a practice that is frowned upon. See, e.g., Bollea v. Clem, 937 F. Supp. 2d 1344, 1348 n.1 (M.D. Fla. 2013) (noting that putting substantive arguments in footnotes is "an apparent effort to circumvent the page limits" in violation of the Local Rules). In this footnote, the Sterling Defendants point to two conference calls not mentioned in Baucom's August 13 affidavit. Doc. No. [165], p. 24 n.5. While they baldly assert that "FBI agents had reviewed the GET Team conference calls," they offer no evidence that Baucom was aware of the statements in either call he "omitted." See id. Indeed, the affidavit itself suggests that the FBI's review of the information it had obtained was "not yet complete" at the time of the affidavit. Doc. No. [112-49], p. 7, ¶7.

Even making the assumption Baucom was aware of the conference calls, the statements made during them would not have affected the probable cause analysis. During one call, Rhame represented that all of the kiosk locations had been "scouted" and were "ready to be set up." Doc. No. [84-3], p. 19, ¶35 (emphasis omitted). If anything, this statement supports the inference that Sterling was lying to its customers because they claimed the

kiosks were "ready to be set up," when in fact Sterling had not so much as submitted an application to set up a kiosk. In the second call, Bell stated that Sterling did "not have the manpower" to "roll out 15—20 offices in the first 24 hours." Doc. No. [84-3], p. 20, ¶36. This statement would have added nothing to the probable cause analysis. Baucom did not suggest that Sterling told customer it would "roll out 15—20 offices in the first 24 hours."

The "totality of the circumstances" discussed in the August 13 affidavit undoubtedly supported "a fair probability" of finding evidence of a crime in the information to be searched. See Brundidge, 170 F.3d at 1352. In addition to the facts discussed above, Bell allegedly lied to FBI agents by claiming that Sterling had a "'firewall' between itself and Iraqi dinar promoters." Doc. No. [112-49], p. 10, ¶15. The Sterling Defendants say this fact "is irrelevant to probable cause." Doc. No. [165], p. 25. It is not. Sterling had quite a close relationship with Keller, who was "constantly [telling] people that his 'sources' told him that the RV was about to occur." Doc. No. [112-49], pp. 11—13, ¶¶16—22. But Bell himself acknowledged that he "did not think the Iraqi dinar [would] undergo a revaluation." Id. p. 8, ¶10. Bell's decision to allegedly lie to investigators about the relationship with Keller tends to show

he understood the illicit nature of the arrangement and did not believe it to be a simple, arms-length advertizing relationship.

### 4. _Leon_

The Sterling Defendants have not made a substantial showing that any of the above "misstatements" or "omissions" were necessary to a finding of probable cause that would warrant a <u>Franks</u> hearing. Nor do they address whether exclusion, which is a "last resort," would be appropriate even if the any of the warrants lacked probable cause. See <u>Smith</u>, 741 F.3d at 1219; <u>see also Herring</u>, 555 U.S. at 141. As Judge Salinas noted, "[t]he Sterling Defendants have argued, but not shown, that the magistrate judges that issued the warrants at issue in this case were intentionally misled." Doc. No. [146], pp. 57—58. Thus, the <u>Leon</u> good-faith exception would apply even if the warrants were unsupported by probable cause. <u>Id.</u>

## B. **Defendant Keller's Objections**

In his individual objections to the R&R Keller states that he "incorporates into [his] objections, by reference, his prior motions and submissions" and that he "objects to the Magistrate's legal conclusions and factual findings to the extent inconsistent with [Keller's] prior, extensive

submissions." Doc. No. [164], p. 4; id. n.4; see also id. p. 7 n.5 ("refer[ing] the Court" to arguments in a reply brief); id. p. 30 ("rel[ying] on the arguments" made in three different briefs); id. p. 36 ("incorporat[ing] by reference" ten pages from a preliminary motion and seven pages from a reply brief). Such "incorporation by reference" is completely inappropriate in objections to an R&R.

First, Keller's brief already exceeds the permitted length for objections to an R&R. The Court initially ruled that it would consider "only the first 25 pages of Defendant Keller's objections" due to this violation of the Local Rules. Doc. No. [263]. But Keller has since filed a Motion for Reconsideration, acknowledging that he "should have obtained permission from the Court to exceed the page limitation" and asking the Court to issue an order, *nunc pro tunc*, "allowing Mr. Keller to exceed the page limitation." Doc. No. [265], p. 5, ¶¶7−8. Because the interests of justice are best served by consideration of all 38 pages of Keller's objections to the R&R, his Motion for Reconsideration (Doc. No. [265]) is **GRANTED**. But the Court will not allow him to add what is by his own admission "more than [100] pages of briefing" to his objections

by "incorporation." <u>See</u> Doc. No. [164], p. 4 n.4; <u>see also</u> Docs. No. [77], [79], [93], [100], [125].

Second, "a party that wishes to preserve [an] objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with." <u>United States v. Schultz</u>, 565 F.3d 1353, 1360 (11th Cir. 2009). A "generalized re-assertion" of prior arguments will not suffice. <u>Id.</u> Accordingly, the Court will only consider the "specific objections" Keller raises in his objections. <u>See</u> Doc. No. [164], p. 4.

Keller challenges the warrants based on the February 13 Affidavit, the August 13 Affidavit, and the June 2 Affidavit. The Court addresses each affidavit in turn.

### 1. *February 13 Warrants*

With regard to the February 13 affidavit, Defendant Keller first argues that it fails because the January 22 affidavit is invalid. Doc. No. [164], pp. 5—12. He then argues that the February 13 affidavit itself cannot independently establish probable cause. <u>Id.</u> pp. 12—17. Keller next contends that the February 13 affidavit fails to establish a nexus between himself and the

alleged illegal activity. <u>Id.</u> pp. 17—18. Finally, he avers that the February 13 Warrant lacks particularity. <u>Id.</u> pp. 19—23.

### i. <u>Arguments regarding the January 22 affidavit</u>

Keller first contends that the "regulatory warnings and consumer advisories" mentioned in the January 22 affidavit "are irrelevant." <u>Id.</u> p. 7. Simply put, the regulatory warnings and consumer advisories are not irrelevant; they give specific reasons why "several state governments and a consumer protection group" have warned against investing in the Iraqi dinar. <u>See</u> Doc. No. [112-2], p. 6, ¶14. It does not matter if Defendants "were aware" of the warnings. <u>See</u> Doc. No. [165], p. 7. The warnings themselves provided important background information that aided the Magistrate Judge in making the probable cause determination.

For example, Defendant Keller argues that whether "Sterling had plans to set up kiosk[s]" in airports is irrelevant to a probable cause determination. Doc. No. [164], p. 9. But the advisory warning by the Better Business Bureau explains that Iraqi dinar are "very difficult to sell." Doc. No. [112-2], p. 7, ¶18. This context is crucial. It explains why a false promise to set up kiosks at 22 major airports around the country is an indication of fraud. <u>See id.</u> p. 14, ¶42.

Customers, even if they believed a RV would occur, might well have been hesitant to buy dinar because they are "very difficult to sell" and the price could drop before the customer was able to cash out. See id. p. 7, ¶18. Sterling allegedly tried to assuage these concerns by falsely promising its customers that they would have special access to exchanges to easily sell their dinar.

Keller also contends that the 2009 article predicting a revaluation in the range of 1,000 to 14,900%, with "numerous significant incremental increases in valuation" thereafter, was not fraudulent. See Doc. No. [112-49], pp. 9—10, ¶13. This argument is based on the fact that the article "never really makes a concrete prediction," and that the Sterling website contained "extensive disclaimers." Doc. No. [164], p. 7. The article speaks for itself. It says "the Iraqi Dinar [seems to be] a compelling investment opportunity" due to the "minimal risk that the Iraqi Dinar will decrease in value" and the "tremendous potential upside return." Doc. No. [112-2], pp. 12—13, ¶¶35, 37.

The supposedly irrelevant regulatory warnings and consumer advisories explain why "these types of claims are highly suspect." See id. p. 14, ¶41. The "disclaimers" Keller discusses were nowhere to be found on the webpage containing Sterling's dubious investment advice. See Doc.

No. [164], p. 7. Moreover, such "disclaimers" do not negate the fact that Sterling was allegedly providing knowingly false advice to customers.

Regarding the anonymous blogs, Keller avers they contained "prophecy, prediction, or opinion about future events," but that without a "factual statement that is verifiably refutable, there is no fraud." <u>Id.</u> p. 11. Of course, the blogs contained factual statements like the post claiming that "the Iraqi dinar [would] be soon [*sic*] giving away tons of dollars and large sums of returns for the people who have invested in it." Doc. No. [112-2], p. 21, ¶65. That statement is demonstrably false. So was another post asserting that the Iraqi dinar "[was] secure and ha[d] no losses whatsoever for you or any other investor." <u>Id.</u> ¶63. The value of the dinar fluctuated and could have plummeted at any time.

The Court has previously rejected the argument that these kinds of misrepresentations cannot be evidence of fraud because they do not "cut[ ] to the value of the investment." <u>See</u> Doc. No. [164], p. 11; Doc. No. [264], pp. 13—17. The fact that Sterling had "warnings on its website" does not insulate it from liability for allegedly fraudulent statements on its anonymous blogs. <u>See</u> Doc. No. [164], p. 10. For the reasons discussed above with regard

to the Sterling Defendants' objections to the R&R, the January 22 affidavit was valid and supported the finding of probable cause for the January 22 Warrants and, by extension, the February 13 Warrants.

### ii. Allegations in the February 13 affidavit

Keller also makes arguments regarding certain allegations made for the first time in the February 13 Affidavit itself. Doc. No. [164], pp. 12—17. First, he contends that the fact that Pleasant decided to take down some of the anonymous blogs "is not evidence of anything other than rank speculation." Doc. No. [164], p. 13. But Pleasant was the BSA/AML officer for Sterling, which meant he was charged with ensuring its compliance with federal laws. Doc. No. [112-2], pp. 7—8, ¶21. His belief that the blogs were illegal is more than "rank speculation." Keller also conveniently never discusses the fact that Bell threatened to fire Pleasant for telling employees that the content on the blogs was illegal. See id. p. 15, ¶46. Thus, not only was there evidence that the content of the blogs was illegal, but there was evidence that Bell knew this and tried to cover it up.

Like the Sterling Defendants, Keller contends that the Forbes article calling sale of the Iraqi dinar a scam was "inconsequential." Doc. No. [164],

p. 13. For the reasons discussed above, this argument fails. Keller also endorses the argument that Baucom "mischaracteriz[ed]" the Ponzi-scheme email. Id. pp. 13−15. As discussed above, the Court does not believe the email was about Defendant Shaw's wife "crying about the lack of a hedging contract." See Doc. No. [146], p. 45. In any event, the email was attached to the affidavit. Doc. No. [112-6], p. 72. Keller says this "does not address the probable cause problem" caused by Baucom quoting part of the email, but he provides no explanation for this bald assertion. See Doc. No. [164], p. 14 n.9.

Even assuming the email dealt with concerns about a hedging contract, Keller is wrong to argue it provides "absolutely no evidence that Sterling did anything wrong." See id. p. 15. The email calls Sterling "an illegal operation" and "a [P]onzi scheme." Doc. No. [112-6], p. 72. It notes that both Rhame and Shaw do not believe the Iraqi dinar will revalue and that they are making "millions of dollars in false promises to [their] customers." Id.

Finally, Keller argues that the January 3, 2013, post by TerryK was "inconsequential." Doc. No. [164], p. 15. His suggestion that the affidavit "does not say who" made the post is wildly misleading. Id. The post was titled "Terryk And Get Members Chat Thursday Afternoon." Doc. No. [112-

6], p. 15, ¶38. Defendant Terrence Keller was the head of the GET Team and its website welcomed readers "[o]n behalf of TerryK." Id. p. 15, ¶38. It was no stretch for Baucom to "attribute[e] [the] comments to Mr. Keller." See Doc. No. [164], p. 15. Nor is it "very unclear whether the discussion is geared toward the dinar or even the event that is being discussed." See id. The post was made to **dinarrecaps.com**. Doc. No. [164], pp. 15−16. It discussed an "ECONOMIC RESET THATS [*sic*] ABOUT TO TAKE PLACE." Doc. No. [112-6], p. 16, ¶38.

While "TerryK" says his statements are based on a "rumor" and never explicitly "urges anyone to invest in dinar," this does not defeat the inference that he knowingly made false statements to encourage investors to buy the dinar. See Doc. No. [164], p. 16. He not only told people an economic reset would occur, but said there was a "VERY STRONG" possibility it would happen the day of the post. Doc. No. [112-6], p. 16, ¶38. He went on to say, "HAVE 3 CONFIRMS ON THAT." Id. pp. 16−17. This was while he was being paid thousands of dollars per month to encourage investors to buy dinar from Sterling. Id. p. 17, ¶39. Thus, an investor believing the alleged lies of "Terryk And Get Members" may well have gone to their site, seen the

advertisements for Sterling, and bought dinar thinking that they too were "IN THE MONEY." See id. p. 15—17, ¶¶38—39.

### iii.    **The nexus between Keller and Sterling**

Based on his suggestion that he had nothing to do with the January 3 post and that the post was, in any event, not evidence of fraud, Keller asserts that it "does not create a link to Mr. Keller and unlawful conduct relating to Sterling." Doc. No. [164], pp. 17—18. For the reasons discussed above, that argument fails. Keller simply does not argue that anything about Baucom's description of the January 3 post was inaccurate. See id.

As Keller himself notes, Baucom informed the Magistrate Judge that the post did not come from the GET Team website. Id. p. 17; Doc. No. [112-6], p. 17, ¶38. The inference that Keller was personally responsible for misleading investors to get them to buy dinar from Sterling was made by the Magistrate Judge based on an accurate account of what Keller said and how much he was being paid. Keller's argument that the Magistrate Judge should not have found "a link between Mr. Keller and unlawful conduct relating to Sterling" runs up against the "high level of deference traditionally given to magistrates in their probable cause determinations." See Doc. No. [164], p. 18; Miller, 24

F.3d at 1361. Nothing in Keller's objections suggests that the Magistrate Judge erred in concluding that the emails of Keller and the GET Team had a "fair probability" of containing evidence of the alleged fraud at the heart of this case. See Brundidge, 170 F.3d at 1352.

### iv.    **Particularity**

Keller also raises an objection regarding the February 13 Warrants themselves. Doc. No. [164], pp. 19—23. He bases his argument on a 1990 decision by the D.C. Circuit, which held that references to "broad statutes realistically constitute no limitation at all on the scope" of a warrant. United States v. Maxwell, 920 F.2d 1028, 1033 (D.C. Cir. 1990). There is no Eleventh Circuit authority supporting such a proposition, and the R&R cites to numerous district court decisions from this Court that have held warrants to be sufficiently particularized where they "explicitly limit[ ] the scope of what may be searched and seized to evidence of the crimes under investigation." See Doc. No. [146], p. 62. Keller acknowledges this authority and concedes that the February 13 warrants were limited by reference to the crimes under investigation. See Doc. No. [164], pp. 21—23. But he asserts that the "federal

wire and mail fraud statutes" are too broad to meet the constitutional particularity requirements. Id.

But again, there is no Eleventh Circuit authority supporting such a proposition. In order to be "sufficiently particular" a warrant need only "enable[ ] the searcher reasonably to ascertain and identify the things to be seized." United States v. Santarelli, 778 F.2d 609, 614 (11th Cir.1985). Thus, even when a warrant authorizes the seizure of "all property" at a particular residence, the Eleventh Circuit has held the warrant is not overly broad if "it limited the seizure to items that constituted evidence of" the crime at issue. Id. at 615. Even if the Eleventh Circuit were to revise this precedent and hold that the federal mail fraud, wire fraud, and money laundering statutes are too "broad" to describe what evidence should be seized, Keller would still not be entitled to suppression of the evidence seized pursuant to the February 13 Warrants.

Nothing on the face of the warrants would have given the officers any indication that they were invalid. The good-faith exception to exclusionary rule applies to "searches conducted in objectively reasonable reliance on binding appellate precedent." Davis, 564 U.S. at 232. As discussed above, the

precedent of the Eleventh Circuit is that a warrant is sufficiently particular if "it limited the seizure to items that constituted evidence of" the particular crimes at issue. Santarelli, 778 F.2d at 615; see also Signature Pharmacy, Inc. v. Wright, 438 F. App'x 741, 745–46 (11th Cir. 2011)(unpublished)(warrants were sufficiently particular because they "refer[red] to items that are evidence of a violation of certain statutes"). Indeed, the February 13 Warrants were more particular than the warrants in either Santarelli or Wright because the warrants in this case were limited to the seizure of emails. See Santarelli, 778 F.2d at 615 (authorizing the seizure of "all property" at an address); Wright, 438 F. App'x at 745 (authorizing "seizure of a number of items, such as documents, records, bills, logs, computer equipment, and so forth").

## 2. *August 13 Affidavit*

Defendant Keller next raises a variety of arguments that the August 13 affidavit lacks probable cause and contains material misstatements. Doc. No. [164], pp. 23–29. First, he contends that Bell's statements to federal investigators were "irrelevant to probable cause." Id. p. 24. This is not a challenge to the accuracy of Baucom's account of Bell's statements, but rather to U.S. Magistrate Judge Alan J. Baverman's interpretation of Bell's statements

as supporting probable cause. For the reasons discussed above, the Court agrees that Bell's alleged lies to investigators supported a finding of probable cause. In any event, Judge Baverman's probable cause determination is entitled to a "high level of deference." <u>Miller</u>, 24 F.3d at 1361. Keller's arguments do not defeat a finding of probable cause.

It was not just Defendant Bell who believed an RV would not occur. Defendants Rhame and Shaw apparently believed so as well. Doc. No. [112-6], p. 72. This indicates that the Sterling Defendants knew Keller was spreading "false information suggesting that the revaluation has occurred or will occur." <u>See</u> Doc. No. [112-49], p. 11, ¶17. Nevertheless, they paid him more than $150,000. <u>Id.</u> ¶16. Additionally, "Bell's opinion of whether a 'firewall' would be appropriate" is not "irrelevant" as Keller contends. <u>See</u> Doc. No. [164], p. 25. Bell's alleged lie on this point is strong evidence that Bell knew what Keller was doing was illegal and tried to distance Sterling from Keller.

Keller's primary objection regarding the August 13 affidavit is to the "misrepresentations" that led to the conclusion he made false statements to potential investors. <u>Id.</u> pp. 25 – 29. In this, Keller points to a statement in the affidavit that is actually incorrect. The affidavit says, "Keller stated that a

source at Wells Fargo had told him that it would take at most 10 to 15 minutes to process the exchange of Iraqi dinar." Doc. No. [112-49], p. 11, ¶18. In fact, when asked how long it would take to process dinar, the "Wells Fargo guy" allegedly said, "don't say dinar we don't work with dinar" and proceeded to tell Keller how long, in general, it would take to process any currency. Doc. No. [84-3], pp. 15—16, ¶26 (emphasis omitted). Thus, the Court will not consider any reference to Wells Fargo exchanging Iraqi dinar in determining if the August 13 affidavit supports a finding of probable cause. See Franks, 438 U.S. at 155—56.

But Keller's other arguments regarding Baucom's alleged "misrepresentations" are less availing. See Doc. No. [164], pp. 26—29. He argues that Baucom misled Judge Baverman by stating that Keller told investigators "he did not actually have any sources." See Doc. No. [112-49], p. 11, ¶19. In fact, Keller said he "had a contact with WELLS FARGO through his personal account there." Doc. No. [125-1], p. 4. But Keller did not know the name of this employee and went on to state that he "had no sources in the Treasury Department." Id. Based on the information known to him, Baucom did not misrepresent his position to Judge Baverman by saying he "believe[d]

that Keller [was] lying about having these sources." <u>See</u> Doc. No. [112-49], p. 11, ¶19.

Keller did not simply tell his listeners that he spoke with a lady at Wells Fargo who told him that the company did not exchange dinar. Doc. No. [125-1], pp. 4—5. Keller went much farther, telling his listeners that he "got a call from [his] Wells Fargo guy" who said "it [was] supposed to happen." Doc. No. [164], p. 28 (emphasis omitted). Indeed, Keller insinuated that he received several calls over a period of time from this "Wells Fargo guy" informing him that "it" was going to happen. <u>Id.</u> Baucom accurately recounted Keller's statement and said he "believe[d] that Keller was referring to a currency revaluation." <u>See</u> Doc. No. [112-49], p. 11, ¶18. Keller offers no proof that Baucom did not believe Keller was referring to a currency revaluation or any proof that Baucom could not have held this belief based on the full context of Keller's comments. <u>See</u> Doc. No. [164], pp. 27—28.

Keller's "contact" with Wells Fargo was apparently a low-level employee connected with Keller's personal account who told him that Wells Fargo would never exchange the dinar. <u>See</u> Doc. No. [125-1], pp. 4—5. The Wells Fargo Executive Vice President in charge of Foreign Exchange Services

confirmed that Wells Fargo was "not preparing for an Iraqi dinar revaluation." Doc. No. [112-49], p. 12, ¶19. These facts adequately support Baucom's belief that Keller was lying about getting "a call from [his] Wells Fargo guy" about revaluation of the dinar. See id. p. 11, ¶19. No one at Wells Fargo was preparing for such a revaluation and there was no reason to believe that Keller's only "contact" at Wells Fargo was a person who would have secret information about such a revaluation. Keller's dubious characterization of his statements as "casual, joking banter" does not defeat a finding of probable cause. See Doc. No. [164], p. 28.

Keller also challenges the statement that he told listeners "he had heard from the 'UST' (which investigators believe[d] to mean the U.S. Treasury Department) that the rate was good and everything would be released" the week of April 16, 2014. Doc. No. [112-49], p. 11, ¶18; see also Doc. No. [164], pp. 28—29. Baucom went on to explain that U.S. Treasury officials were in no way preparing for a dinar revaluation. Doc. No. [112-49], pp. 11—12, ¶19. Keller does not actually deny that he made the statement to his listeners. See Doc. No. [164], pp. 28—29. Rather, his principle argument is that Judge Baverman should not have believed the statement supported probable cause

because Keller did not specifically say the U.S. government was making preparations and did not make a specific prediction about the rate of exchange. Id. p. 29.

Of course, he did say he "heard from 'UST'" that "the rate was good and everything would be released" the week of April 16, 2014. Doc. No. [112-49], p. 11, ¶18. This is obviously a lie because, by Keller's own admission, he never "heard" anything "from 'UST.'" See Doc. No. [164], p. 29. Keller admitted to investigators that he "had no sources in the Treasury Department." Doc. No. [125-1], p. 5. Instead, he "read articles" and "had someone [falsely] telling him they had sources with the Treasury Department." Id. Keller is correct that he was "absolutely free to discuss what he heard **about** UST." Doc. No. [164], p. 29 (emphasis added). What he was not free to do was tell his listeners "he had heard **from the 'UST'** . . . that the rate was good and everything would be released." Doc. No. [112-49], p. 11, ¶18 (emphasis added). That was a lie.

Contrary to Keller's suggestion, it is **his** burden to make a competent "offer of proof" that Baucom's affidavit contains "deliberate falsehood[s]" or was made with "reckless disregard for the truth." See Doc. No. [164], p. 29;

Franks, 438 U.S. at 171. He does not do this with regard to the vast majority of his objections listed above. For example, he provides no citation to support his account of "the actual discussion" during the March 12, 2014 conference call. Doc. No. [164], p. 28. Thus, the Court has no way of knowing the full "context of [Keller's] statement" to decide whose interpretation is more accurate. See id. As discussed above, the only statement in the affidavit that appears to be false is the reference to Keller saying Wells Fargo would exchange Iraqi dinar. Excluding this statement, "the totality of the circumstances" in the August 13 affidavit still allowed "a conclusion that there [was] a fair probability of finding contraband or evidence," adequately supporting the search warrants. See Brundidge, 170 F.3d at 1352.

### 3. *June 2 Affidavit*

The June 2, 2015, affidavit by Hoover relies on the January 22 and May 29 affidavits. Doc. No. [164], p. 30; Doc. No. [146], p. 67; Doc. No. [112-42]. To the extent that Keller's arguments regarding the June 2 affidavit rely on his assertion that the January 22 affidavit lacked probable cause, his arguments are rejected for the reasons discussed above. See Doc. No. [164], p. 30. The rest of Keller's arguments are based on allegations from

the May 29 affidavit and are largely the same as those the Court addressed above. See id. pp. 30 – 35. To the extent that they are not otherwise discussed above, the Court addresses Keller's specific objections regarding the May 29 affidavit.

With regard to an April 20, 2012 blog post cited by Baucom, Keller asks, "What precisely were the hypothetical viewers mislead about that is relevant?" Doc. No. [164], p. 31. Where to begin? The April 20, 2012, post, written on iraqidinarscam.com, first claims that Sterling had a "great reputation" and was "trustworthy." Doc. No. [112-34], p. 16 – 17, ¶49. While dubious, this alone might be mere puffery. But the post goes on. It then claims that the people at Sterling "back up everything they promise with actions to match," they have "all the necessary licenses," and they have "long-established banking connections." Id.

Each of those statements were demonstrably false. Despite claiming they would have kiosks in 22 major U.S. airports, including the Cincinnati Airport and JFK, Sterling never took "actions to match" by applying to set up kiosks at these airports. See Doc. No. [112-2], p. 14, ¶42. The Sterling Defendants were informed by Pleasant that they were breaking the law by

"giving investment advice without a license" on the anonymous blogs. <u>See</u> Doc. No. [112-2], p. 16, ¶ 47. And in March 2011 Defendant Shaw readily admitted, "Banking [was] a big problem for [Sterling] even though [they were] willing to pay 40—50K per month in fees." Doc. No. [112-6], p. 13, ¶32. Far from having "long-established banking connections," Sterling was "running out of options for [its] dinar business." <u>Id.</u>

Keller argues that the other emails between him and Sterling representatives simply reflect "an arms-length business relationship." Doc. No. [164], pp. 33—34. In fact, they suggest his complicity in the alleged Ponzi scheme. <u>See</u> Doc. No. [146], pp. 47—48. For example, Keller emailed Defendants Rhame and Bell, stating that he "want[ed] to make sure that [their] arrangement [was] between [them] and no one else" and that "no one else needs to know about [their] arrangement." Doc. No. [112-34], pp. 18—19, ¶55. Keller also emailed Rhame to state he refused to allow one competitor to advertise on his site because he supported Sterling, and that he only allowed advertizing by another Sterling competitor "because they make you guys look like GODS!!!!!" <u>Id.</u> p. 18, ¶56. Such emails do not suggest an "arms-length business relationship."

Like the Sterling Defendants, Keller wants the Court to view every piece of evidence in isolation and to credit the most innocent explanation for the evidence. That is not how a probable cause analysis works. Even if a single email, when viewed in isolation, might seem innocuous, that does not mean the "email does nothing to further the probable cause analysis." See Doc. No. [164], p. 32. A single tree is not a forest; but many trees clumped together might be. The Court will not lose the forest for the trees. When considering "the totality of the circumstances," the June 2 affidavit allowed "a conclusion that there [was] a fair probability of finding contraband or evidence" at the locations to be searched pursuant to the June 2 Warrant. See Brundidge, 170 F.3d at 1352.

Keller also purports to object to Judge Salinas' conclusion that his home or his computers were connected in any way to any unlawful activity. See Doc. No. [164], pp. 35—36. However, here he simply "incorporates by reference" his prior arguments without raising any specific objections. Id. As the Court explained above, such "objections" are insufficient. See Schultz, 565 F.3d at 1360. Even if the Court were to entertain his "objection," the Court finds the reasoning of Judge Salinas in the R&R to be persuasive. See Doc.

No. [146], pp. 71—74. Contrary to Keller's suggestion, <u>Riley v. California</u>, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) deals with searches incident to arrest. Keller cites to no Eleventh Circuit authority in support of his reinterpretation of <u>Riley</u>. <u>See</u> Doc. No. [164], pp. 35—36.

**4.** *<u>Leon</u>*

Like the Sterling Defendants, Keller has not made a substantial showing that any of the above "misstatements" or "omissions" were necessary to a finding of probable cause that would warrant a <u>Franks</u> hearing. Nor does he address whether exclusion would be appropriate even if the any of the warrants lacked probable cause. <u>See Smith</u>, 741 F.3d at 1219; <u>see also Herring</u>, 555 U.S. at 141. Keller does at least address whether the <u>Leon</u> good-faith exception might apply, but his arguments are unpersuasive.

Even if any of the above statements in the affidavits were misstatements, there is simply no evidence that such misstatements were material or were made intentionally or with a reckless disregard for the truth. Keller's bald objection that "general warrant[s]" are not subject to the <u>Leon</u> good-faith exception also fails. <u>See</u> Doc. No. [164], p. 37. The only warrant that he characterizes as a "general warrant" in his objections are the February 13

Warrants. <u>See id.</u> pp. 22—23. As discussed above, those warrants adequately satisfy the Constitution's particularity requirements. Thus, the <u>Leon</u> good-faith exception would apply.

## IV.  CONCLUSION

Accordingly, the R&R (Doc. No. [146]) is **ADOPTED** as the order of the Court, and Defendants' objections (Docs. No. [164], [165]) are **OVERRULED**. Defendants' Motions to Suppress (Docs. No. [77], [79], [84], [85], [93], [100]) are **DENIED**. As an ancillary matter, Defendant Keller's Motion to Adopt (Doc. No. [258]) and his Motion for Reconsideration (Doc. No. [265]) are **GRANTED**.

**IT IS SO ORDERED,** this 28th day of February, 2018.

s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE